IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-CV-02278-LTB-KLM

TIMOTHY MASTERS,

      Plaintiff,

v.

TERENCE A. GILMORE, Former Deputy District Attorney of the Eighth Judicial District, in his
      individual capacity;
JOLENE C. BLAIR, Former Deputy District Attorney of the Eighth Judicial District, in her
      individual capacity;
JAMES BRODERICK, Lieutenant in the Fort Collins Police Department, in his individual and
      official capacities;
MARSHA REED, Former Detective in the Fort Collins Police Department, in her individual
      capacity;
DENNIS V. HARRISON, Chief of the Fort Collins Police Department, in his individual and
      official capacities;
CITY OF FORT COLLINS a municipality;
STUART VANMEVEREN, Former District Attorney of the Eighth Judicial District, in his
      individual capacity;
LARRY ABRAHAMSON, District Attorney of the Eighth Judicial District, in his official
      capacity;
EIGHTH JUDICIAL DISTRICT OF COLORADO, a political subdivision of the State of
      Colorado,
BOARD OF COUNTY COMMISSIONERS OF LARIMER COUNTY; a political subdivision
      of the State of Colorado
LARIMER COUNTY, a county,

      Defendants.

_____

**AMENDED COMPLAINT AND JURY DEMAND**

_____

      PLAINTIFF, Timothy Masters, by and through counsel David A. Lane, Sara J. Rich,

Althea S. Licht and Rebecca T. Wallace of KILLMER, LANE & NEWMAN, LLP, Maria Liu of

COLLINS, LIU & LYONS, LLP, and David Wymore, respectfully alleges for his Amended

Complaint and Jury Demand as follows:

## INTRODUCTION

On February 11, 1987, the sexually mutilated body of Peggy Hettrick was found in a field in Fort Collins, Colorado.  At the time, Tim Masters was a fifteen-year-old boy who lived in a trailer nearby.  During the days and months that followed, the Fort Collins Police Department (hereinafter "FCPD") had no suspect to charge with this heinous, violent, sexual crime that shocked and frightened the City of Fort Collins.  Intense community pressure existed to find the culprit.  Tim Masters became the focal point of the police investigation after he admitted that he had seen the body in the field on his way to school in the morning and had thought that it was a mannequin.

Ultimately, experts in sexual homicides concluded that the Hettrick murder was a calculated, organized, meticulous, genitalia-obsessed crime.  Peggy Hettrick's nipple had been excised, as had a portion of her vagina, with surgical precision.  It was difficult to understand how a fifteen year-old boy who had no criminal record, no sexual paraphilia, nor any worldly experience with women – could have cultivated and mastered the criminal talent and vision to commit the Hettrick homicide and ensure that *not one shred of physical evidence* for this bloody sexual murder connected him to the crime itself.  As a result, several FCPD personnel, including a lead investigator on the homicide, persistently expressed their disbelief that Tim could have possibly committed the crime and urged that the investigation expand its scope to other, more viable, suspects.  Irrespective of these urgings, the Defendants in this case refused to acknowledge the complete lack of physical evidence linking Mr. Masters to this sophisticated sexual homicide and became obsessed with securing his conviction at all costs and in spite of the great weight of evidence supporting his innocence.

Over the next ten years of "investigation" that followed, the Defendants systematically fabricated probable cause to arrest Mr. Masters for the murder of Peggy Hettrick. To do so, each Defendant, in various ways, had to conspire, encourage, allow, acquiesce in, supervise, and/or participate in one or more of the following: (1) the calculated suppression and destruction of massive amounts of clearly exculpatory evidence; (2) the manufacturing and orchestration of significant and obviously false inculpatory evidence; (3) the perpetual lying to and misleading of experts, judges, defense counsel, and Mr. Masters; and (4) a long-term and wide-reaching conspiracy to ensure that Tim Masters was arrested, tried, and convicted for the murder of Ms. Hettrick in spite of the great and obvious weight of evidence supporting his innocence.

As Mr. Masters and his post-conviction defense counsel began to uncover this conspiracy, the FCPD and the Eighth Judicial District took great pains to protect their reputations and one-sided investigation, even though such protection meant the continued jailing of an innocent man. Securing and preserving Tim Masters' wrongful conviction, while ignoring the mandates of justice, was the shared goal, plan and scheme of these Defendants, from the moment that the murder investigation began until just before Tim Masters was released from jail almost twenty years later. Due to the ongoing nature of Defendants' conspiracy to violate Tim Masters' constitutional rights well into 2007, as well as Defendants concerted acts to conceal the conspiracy, Mr. Masters did not and could not have, through the exercise of due diligence, discovered the basis for his constitutional claims against Defendants until recently.

## JURISDICTION AND VENUE.

1.          This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to

Title 28 U.S.C. § 1331.  Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

2.        Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events relevant to the claims contained herein occurred within the State of Colorado.

## PARTIES

3.        At all times pertinent hereto Plaintiff, Tim Masters, was a citizen of the United States of America and resident of the State of Colorado.  Mr. Masters presently maintains his residence in Colorado.

4.        Defendant Terence A. Gilmore is a citizen of the United States and a resident of the State of Colorado.  At all times relevant to the claims against him, Gilmore was acting under color of state law in his capacity as Deputy District Attorney ("DA") in the Eighth Judicial District of Colorado.  He was assigned to the Hettrick case by elected District Attorney Stuart VanMeveren and began investigating the murder on February 11, 1987, the day Ms. Hettrick's body was found.  Gilmore was responsible for the investigation, charging, and trial of Tim Masters.  He was at all times the lead prosecutor in the criminal case against Tim Masters and supervised DA Jolene C. Blair in her role as prosecutor in the case.  Gilmore was present at the scene of the discovery of the body and at the autopsy on February 11, 1987.  Gilmore was briefed on every aspect of the Hettrick and Masters investigations by Defendants Blair, FCPD Lieutenant James Broderick, and FCPD Detective Marsha Reed.  Gilmore, in his capacity as the DA assigned to the Hettrick case since its inception, advised Broderick, Reed, and the FCPD generally, with respect to the Hettrick and Masters investigations.  Along with Broderick, Reed and Blair, Gilmore was the driving force behind Mr. Masters' wrongful arrest and conviction.

Most of the acts by Gilmore complained of herein were undertaken in his investigative capacity. He is sued in his individual capacity.

5.     Defendant Jolene C. Blair is a citizen of the United States and a resident of the State of Colorado.  At all times relevant to the claims against her, Blair was acting under color of state law in her capacity as Deputy DA in the Eighth Judicial District.  She began working on the investigation and ultimate prosecution of Tim Masters in April 1998.  Blair was second chair in the prosecution of Tim Masters and was closely involved with virtually every aspect of his arrest and prosecution.  Blair, in her capacity as DA, advised Broderick and Reed, and the FCPD generally, with respect the Hettrick and Masters investigations.  Along with Broderick, Reed and Gilmore, Blair was the driving force behind Mr. Masters' wrongful arrest and conviction.  Many of the acts by Blair complained of herein were undertaken in her investigative capacity .  Blair is sued in her individual capacity.

6.     Defendant James Broderick is a citizen of the United States and a resident of the State of Colorado.  At all times relevant to the claims against him, Broderick was acting under color of state law in his capacity as a FCPD Lieutenant.  Broderick was closely involved in the investigation of the Hettrick case from the day her body was discovered until Tim Masters' conviction.  Broderick became lead investigator on the Hettrick case in 1995 and supervised Detective Marsha Reed's investigation of the Hettrick case.  As lead investigator, Broderick pursued Tim Masters' wrongful arrest and conviction virtually unchecked by the FCPD.  Broderick was the driving force, along with Reed, Gilmore, and Blair, behind Mr. Masters' wrongful arrest and conviction.  Broderick signed the affidavit supporting Mr. Masters' arrest warrant in 1998 and testified at the Mr. Masters' Proof Evident Presumption Great Hearing on September 16, 1998, that he had reviewed all police reports generated in the Hettrick case.

Broderick was a crucial prosecution trial witness and advised and conferred closely with Gilmore, Blair and Reed throughout the investigation and prosecution of Tim Masters. Broderick, as lead investigator at the time of Mr. Masters' arrest, was responsible for ensuring all documents relevant to his investigation, including evidence exculpatory of Mr. Masters, was shared with the District Attorney's Office of the Eighth Judicial District. Broderick is sued in his official and individual capacities.

7.      Defendant Marsha Reed is a citizen of the United States and a resident of the State of Colorado. At all times relevant to the claims against her, Reed was acting under color of state law in her capacity as a FCPD Detective. Reed was involved in the investigation of the Hettrick homicide from the day Ms. Hettrick's body was discovered, in February 1987, though Mr. Masters' arrest in August 1998. She closely assisted Broderick, Gilmore, and Blair in the investigation. Reed, along with Broderick, Gilmore, and Blair, was the driving force behind Mr. Masters' wrongful arrest and conviction. She was also part of the investigation into Dr. Richard Hammond, about whom information is detailed below. Reed is sued in her individual capacity.

8.      Defendant Dennis V. Harrison is a citizen of the United States and a resident of the State of Colorado and has acted under color of state law in his capacity as Chief of Police for the City of Fort Collins since 1997. As Chief, Harrison, is responsible for the training and supervision of FCPD personnel, provides overall management and accountability for the FCPD, and is the final policymaker for the FCPD and an agent of the City of Fort Collins. Harrison is sued in his official and individual capacities.

9.      Defendant City of Fort Collins is responsible for the supervision, training, official polices, customs, and actual practices of its agents, the FCPD and the Chief of Police of Fort Collins.

10.        Defendant Stuart VanMeveren is a citizen of the United States and a resident of the State of Colorado.  From 1972-2004, VanMeveren was acting under color of state law in his capacity as the DA for the Eighth Judicial District.  VanMeveren was responsible for the assignment of Gilmore and Blair to the Hettrick case and was their direct supervisor throughout the entire investigation and prosecution of Tim Masters.  As their direct supervisor, VanMeveren was regularly and thoroughly briefed on the investigation and prosecution of Tim Masters.  He also personally approved and/or personally participated in many of the unconstitutional acts undertaken by Defendants Gilmore and Blair, as alleged herein.  As DA, VanMeveren was responsible for the training and supervision of Eighth Judicial District personnel, provided overall management and accountability for the Eighth Judicial District, and was the final policymaker for the Eighth Judicial District.  Most of the acts by VanMeveren complained of herein were undertaken in his investigative capacity.  VanMeveren is sued in his individual capacity.

11.        Defendant Larry Abrahamson is a citizen of the United States and a resident of the State of Colorado.  At all times relevant to the claims against him, Abrahamson has acted under color of state law in his capacity as the elected DA for the Eighth Judicial District from January 2005 to the present.   Abrahamson assigned Eighth Judicial District DAs Cliff Riedel and Gregory Lammons to Mr. Masters' post-conviction case, which began in 2003.  Abrahamson was Riedel and Lammons' supervisor during their post-conviction investigation and continued prosecution of Tim Masters, until the Eighth Judicial District was disqualified from Tim Masters' case in 2007.  As DA, Abrahamson is responsible for the training and supervision of the Eighth Judicial District, provides overall management and accountability for the Eighth Judicial

District, and is the final policymaker for the Eighth Judicial District.  Abrahamson is sued in his official capacity.

12.       Defendant the Eighth Judicial District is a political subdivision of the State of Colorado and functions as the prosecutorial office headed by the elected district attorney who has a staff of deputy district attorneys.  The Eighth Judicial District worked hand in hand with the FCPD to investigate and prosecute Tim Masters.  The entity is responsible for the supervision, training, official polices, customs and practices of its agents, VanMeveren, Abrahamson, Gilmore and Blair.

13.       Defendant Board of County Commissioners of Larimer County ("the Board") is a political subdivision of the State of Colorado and has a mailing address of 200 W. Oak Street, Second Floor, PO Box 1190, Fort Collins, Colorado 80522-1190.  The Board funds and controls the budget of Defendant Eighth Judicial District, including attorneys fees and any judgment of liability imposed in this case.

14.       Defendant Larimer County is a political subdivision of the State of Colorado and encompasses the Board and the Eighth Judicial District.

15.       At all pertinent times mentioned herein, all of the Defendants sued in both their individual and official capacities were acting within the scope of their official duties and employment, under color of state law.

## FACTUAL BACKGROUND

**A.**  *Overview*

16.       On the morning of February 11, 1987, Peggy Hettrick's body was found lying in an open field in Fort Collins, Colorado, near the trailer in which 15-year old Tim Masters lived with his father.  She had been killed earlier that morning.

17.     Tim Masters was extensively interrogated for several days after the Hettrick murder, and his home and the area surrounding the scene where the body was found were extensively searched for evidence connecting Tim Masters to the homicide.  Mr. Masters told the police that he first saw Peggy Hettrick's body in the morning hours of February 11, 1987, when he was walking his typical route to school, which led him to pass through the open field where her body was lying.

18.     During subsequent FCPD interviews with Tim Masters, he consistently denied any wrongdoing and naively made efforts to assist the FCPD in solving the crime, such as suggesting different locations where they might look for evidence.  FCPD Detective Ray Martinez, who extensively interviewed Tim Masters, noted and shared with other FCPD Detectives that he found nothing in his interviews with Tim that was "indicative of deception."

19.     Almost immediately after Ms. Hettrick's death, Defendant Broderick made clear to many members of the FCPD that Tim Masters was the murderer.  For the next ten years, Broderick would devote much of his professional life to constructing a case to ensure the wrongful arrest and prosecution of Tim Masters, which required Broderick to lie under oath, make material misrepresentations to the Eighth Judicial District and experts hired by the State, withhold exculpatory evidence from the Eighth Judicial District and Tim Masters, destroy exculpatory evidence, manufacture inculpatory evidence, and utterly ignore the wealth of evidence and cacophony of law-enforcement voices declaring the innocence of Tim Masters.  In virtually all of these acts, Gilmore, Reed, and Blair would conspire with Broderick with the sole intent to arrest and convict Tim Masters at all costs and in spite of the great weight of evidence supporting his innocence.

20.     During the investigation of Tim Masters, both the FCPD and the Eighth Judicial District took the unprecedented step of establishing separate "war rooms" within their offices for the specific purpose of storing documents and evidence relating to the investigation, arrest, and prosecution of Tim Masters.  Both institutions had locks installed on the doors to these "war rooms" and allowed access to the rooms only by Gilmore, Blair, Reed, and Broderick.

21.     No suspect to the Hettrick murder but Tim Masters was seriously considered by the FCPD or the Eighth Judicial District after mid-1987.  To this date, no physical or scientific evidence connecting Tim Masters to the crime was ever discovered.

22.     Over ten years after the Hettrick murder, in 1998, Broderick and Reed consulted an ex-FBI criminal profiler, Roy Hazelwood, and a forensic psychologist, Dr. Reid Meloy, in an effort to develop some evidence against Tim Masters.  As a result of the opinions declared by Dr. Meloy, based on information supplied by Broderick and Reed, an arrest warrant was issued in August, 1998, and Tim Masters was arrested at his home in California.

23.     Tim Masters was subsequently charged by an information filed by the Eighth Judicial District Attorney with first degree murder.  After a trial on March 17-26, 1999, during which the State was represented by Gilmore and Blair, Tim Masters was convicted and sentenced to life in prison, based largely on the testimony of Dr. Meloy and Defendant Lieutenant Broderick.  The conviction was affirmed on appeal by the Colorado Court of Appeals in 2001 and the Colorado Supreme Court in 2002.  Throughout the entire process, Tim Masters maintained his innocence.

24.     In 2003, Tim Masters filed a *pro se* post-conviction motion under Colorado Rule of Criminal Procedure 35(c).  Attorneys Maria Liu and David Wymore were assigned by the State to represent him.

25.     Defendants intentionally maintained the secrecy of the gross misconduct in which they had engaged until Riedel and Lammons were forced by a court order to disclose significant exculpatory information to Mr. Masters beginning in November 2007.

26.     After considerable litigation regarding discovery matters and the disqualification of the local judges and prosecutors, counsel for Tim Masters filed a Partial Motion for Relief Pursuant to Rule 35(c) and a Supplemental Partial Motion for Relief in late November 2007.

27.     The prosecutors from the Seventeenth Judicial District, who had been assigned to prosecute Tim Masters after the Eighth Judicial District Attorney was disqualified from Mr. Masters' case, stipulated to many of the allegations in that motion and shortly thereafter confessed the motion.  The conviction was, thus, vacated and Tim Masters was released on January 22, 2008.  On the prosecutors' motion, the trial court dismissed the charge against Tim Masters on January 25, 2008.

**B.**     ***The Investigation***

28.     Dr. Patrick Allen, the coroner and forensic pathologist charged by Larimer County with determining the circumstances of Ms. Hettrick's death, determined after an autopsy on February 11, 1987, that Ms. Hettrick had been stabbed in the back once by a knife, leading to a loss of blood that resulted in her death within 5-30 minutes.

29.     When Ms. Hettrick's body was discovered, her tight jeans and panties were pulled down to just above her knees, and her blouse and bra were pulled up, exposing her breasts. According to Dr. Allen, Ms. Hettrick's left nipple and a portion of her external genitalia had been carefully excised *postmortem* with a very sharp instrument, most likely a scalpel.  There were no signs of sexual assault.

30.     At the autopsy, in the presence of Gilmore, Dr. Allen remarked on the "surgical," medical precision of the genital and breast excisions.

31.     After early 1987, despite the existence of numerous other potential suspects, the police and Gilmore targeted only one suspect, Plaintiff Tim Masters, who was a fifteen-year-old boy at the time of Ms. Hettrick's murder.

32.     Former FCPD Detective Jack Taylor was the lead detective in the Hettrick case from 1987-1988.  He stated in a March 11, 2008, interview with the Weld County District Attorney's Office: "I was worried that people were getting 'tunnel vision' about Tim Masters and I thought [the FCPD] had to look at other suspects.  I can't remember who cleared the boyfriend [Matt Zoellner, whose DNA was later found on the cuffs of Ms. Hettrick's shirt and her underwear], but we were told he was cleared."

33.     Former FCPD Detective Linda Wheeler-Holloway, who was lead detective on the Hettrick case from 1991-1993, stated in a March 11, 2008, interview with the Weld County District Attorney's Office that "[w]hen she was assigned to the case in 1991, [her] job was to put a case together on Tim Masters, not to reinvestigate or look for new suspects."

34.     In 1992, Wheeler-Holloway obtained an arrest warrant for Tim Masters, who was at that time serving in the U.S. Navy.  Despite having an arrest warrant, after extensive interrogations during which Tim Masters continued to adamantly deny any guilt, Wheeler-Holloway decided she did not have probable cause to arrest Mr. Masters.  Broderick urged Wheeler-Holloway to arrest Mr. Masters anyway and implied that they could compel Mr. Masters to confess once they had him in their custody on the way back to Colorado.  Wheeler-Holloway expressed her strong doubts regarding Mr. Masters' guilt to Broderick, Gilmore and VanMeveren, and ultimately refused to arrest Mr. Masters.

35.     Unsatisfied with Tim Masters as a suspect in the case, in 1992, Wheeler-Holloway contacted Roy Hazelwood of the FBI to profile the perpetrator in the Hettrick case from "square one." Hazelwood agreed to do the profile at no cost to the FCPD. When Wheeler-Holloway approached her supervisor at the FCPD – Donald Vagge – and explained that she planned to have the FBI do a free profile in the Hettrick case, Vagge responded, "No, you are not." The inference of the conversation was that the FCPD had their suspect – Tim Masters – and that there was, thus, no need for a profile. In 1993, because the FCPD was not interested in investigating any suspects other than Tim Masters for the Hettrick murder, and because Wheeler-Holloway had determined that Mr. Masters was likely innocent of the murder, she shut down the Hettrick investigation.

36.     Broderick spearheaded the re-opening of the Hettrick case in 1995 and was the lead investigator on the case through Mr. Masters' arrest in August 1998. Marsha Reed worked closely with Broderick as an investigator in the Hettrick case from 1995 though Mr. Masters' arrest.

37.     Upon the reopening of the case, many FCPD Detectives expressed their wonder at what new evidence may have prompted Broderick's decision. To the surprise of these detectives, there was *no new evidence*.

38.     Nonetheless, based on a number of blatant misrepresentations to the court, Broderick, with Gilmore, Blair and Reed's support, obtained a warrant to arrest Tim Masters for the Hettrick murder in 1998.

39.     Prior to executing the arrest warrant, Gilmore and Blair called Wheeler-Holloway to discuss the arrest warrant. At the meeting, Wheeler-Holloway again told both Gilmore and Blair that she had serious doubts about Mr. Masters being the culprit.

40.     Nonetheless, Mr. Masters was arrested on August 10, 1998, for the murder of Peggy Hettrick.  He was formally charged with first-degree murder on August 27, 2008.

41.     Throughout the entire investigative process, Defendant Gilmore worked closely with Defendants Broderick and Reed.  Defendant Gilmore was briefed on all aspects of the investigation and consistently provided legal advice to the police during pre-trial investigation of the facts by Defendants Broderick and Reed.  Once involved with the case, Defendant Blair played the same role as Defendant Gilmore in advising the FCPD.

**C.     *Trial***

42.     Mr. Masters was tried for first degree murder in March of 1999.

43.     The State's theory, as expressed by Broderick, Gilmore and Blair at trial, was that during the early morning hours of February 11, 1987, Tim Masters, acting alone, climbed out of his bedroom window, and stalked and stabbed Ms. Hettrick in the back while she was walking along the street which ran next to that field and Tim Masters' trailer home.  According to that theory, the 120 pound Tim Masters then picked Ms. Hettrick up under her arms and carried her, with her heels dragging on the ground, into the open field where her body was ultimately found.  There, the 15 year-old boy performed the precise and extremely difficult surgical excisions of her breast and genitalia, by himself in the middle of an overcast night in February.  Teenage Tim Masters was supposed to have performed this difficult surgery – a "partial vulvectomy" – despite never before having actually seen, much less surgically excised, the particular body part at issue.

44.     The State admitted at trial that its case against Tim Masters was entirely circumstantial and that it had no direct evidence that Tim Masters committed any act connecting him with the crime, nor any physical evidence that he was guilty.

45.     According to the State's theory as expressed in opening and closing statements by Gilmore and Blair, as well as Broderick's and Dr. Meloy's testimony, the central evidentiary link proving Tim Masters' guilt was the "fantasy motive" aspect of the sexual homicide of Peggy Hettrick, as played out largely in Mr. Masters' boyhood drawings.

46.     The State acknowledged that Dr. Meloy's opinions regarding Tim Masters' sexual fantasies supplied the critical element to the decision to formally charge and prosecute Mr. Masters.

47.     Also central to the State's theory was the purported *absence of any other person* who had such fantasies and an opportunity to commit the Hettrick homicide.  The State, through Blair, argued to the jury that "no one in the world could have committed this homicide, in this way, but Tim Masters," based on Broderick's testimony about the supposedly exhaustive investigation of every possible suspect, including all sex offenders in the Fort Collins area.

48.     A jury convicted Mr. Masters of first degree murder, which was affirmed by the Colorado Court of Appeals in 2001 and the Colorado Supreme Court in 2002.

**D.     *Post-Conviction***

49.     In 2003, Mr. Masters file a *pro se* Motion for Post-Conviction relief, after which David Wymore and Maria Liu were appointed counsel for Mr. Masters.

50.     Subsequent investigation by post-conviction defense counsel revealed, among other things, that members of the FCPD, including Broderick and Reed, as well as DAs Blair and Gilmore had colluded to destroy and withhold significant exculpatory evidence, manufacture inculpatory evidence, and make false statements to the public, the court, and the jury, in order to gain the unconstitutional arrest and conviction of Mr. Masters.

51.     Tim Masters obtained a court order on November 6, 2006, to test certain items of Ms. Hettrick's clothing in the court's possession for DNA.  Shortly thereafter, post-conviction DAs Riedel and Lammons attempted to destroy the potential evidentiary value of the items held by the court.

52.     In December 2006, Tim Masters moved to disqualify the Eighth Judicial District Attorney based on the illegal conduct of Riedel and Lammons, as well as a longstanding conflict of interest involving Gilmore's relationship with a viable alternate suspect in the Hettrick case. Defendant VanMeveren shortly thereafter disqualified the Eighth Judicial District without waiting for a court ruling on Tim Masters' motion, and a special prosecutor from the Seventeenth Judicial District was appointed.

53.     Due to Defendants' concerted acts to conceal their conspiracy to wrongfully arrest, prosecute, and convict Tim Masters for Peggy Hettrick's murder, Mr. Masters did not and could not have, through the exercise of due diligence, discovered the basis for his constitutional claims against Defendants until 2007, when post-conviction defense counsel finally was forced by the court to disclose significant portions of the exculpatory evidence that the FCPD and the Eighth Judicial District had long kept hidden from Mr. Masters.

54.     After extensive hearings in January 2008, the special prosecutor assigned to Mr. Masters' case agreed that critical exculpatory evidence was not turned over to the original defense team in violation of the Constitution of the United States.

55.     On January 15, 2008, Tim Masters' post-conviction defense counsel met with the special prosecutors to explain to the State what the DNA evidence – which the State had in its possession but had not bothered to evaluate – showed.  DNA testing of the clothing worn by Ms. Hettrick showed that Tim Masters' DNA was not present anywhere on the clothing, nor at

locations where it would be expected to have been deposited had he committed the offense. However, DNA matching the profile of Ms. Hettrick's boyfriend, Matt Zoellner, was found at those locations.

56.     After conducting its own testing of the evidence, on January 22, 2008, the Special Prosecutor filed a Motion to Vacate Judgment of Conviction and Sentence of Tim Masters, which was subsequently granted.  Shortly thereafter the charge against Tim Masters was dismissed.  After having spent <u>ten</u> years in jail for a crime that Broderick, Gilmore, Blair and Reed *knew* he did not commit, Tim Masters was finally released from State custody.

57.     In January 2008, the Colorado Supreme Court Office of Attorney Regulation undertook an investigation of Gilmore and Blair concerning, *inter alia*, potential significant conflicts of interest in their being associated with the case and their roles in withholding evidence from Mr. Masters before and during his trial.  On September 8, 2008, the Office of Attorney Regulation recommended public censure of Gilmore and Blair for their misconduct during the prosecution of Mr. Masters, particularly their failure to provide him before trial with highly exculpatory evidence that Gilmore and Blair knew or should have known to exist. Gilmore and Blair swore an affidavit acknowledging having committed this misconduct in the stipulated, negotiated settlement, which resulted in a recommendation of public censure.

**E.     *Unconstitutional and Conspiratorial Acts of Investigative and Prosecutorial Misconduct***

58.     Long before the decision was made to actually charge Mr. Masters with a crime, Broderick, Reed, Gilmore, and Blair in their roles as investigative officers, and in a single-minded effort to obtain an arrest and conviction no matter what the methods or evidence, conspired to manufacture probable cause that Tim Masters committed the Hettrick murder, inevitably resulting in his unconstitutional arrest and conviction.

59.     In their effort to wrongfully arrest, prosecute and convict Mr. Masters for the Hettrick murder, Broderick, Reed, Gilmore, and Blair worked closely together, sharing information and strategizing, as is evinced by hundreds of pages of reports, memos, and other documents. Broderick and Reed necessarily consulted closely with their supervisor, Defendant FCPD Chief Harrison, in the decision to wrongfully arrest Mr. Masters and their aggressive participation in his malicious prosecution.  Gilmore and Blair consulted closely with their supervisor, Defendant DA VanMeveren in their investigation of Mr. Masters, their advising of the FCPD regarding the investigation, their participation in the wrongful arrest of Mr. Masters, and their malicious prosecution of Mr. Masters that ultimately resulted in his unfair trial.  VanMeveren took a personal interest in Mr. Masters' successful prosecution, in spite of the great weight of evidence supporting Mr. Masters' innocence.

60.     Most of the acts by DAs Gilmore, Blair, and VanMeveren alleged herein were performed in an investigative capacity, not in their prosecutorial role as an advocate for the State. Those acts alleged herein that may have been undertaken in a prosecutorial capacity serve as evidence of Defendants' common motive, intent, scheme and plan throughout the relevant time period.

61.     Had Defendants not engaged in the following acts of unconstitutional investigative misconduct, Mr. Masters would never have been arrested, charged, tried, convicted, or incarcerated for the murder of Peggy Hettrick.

*i.*          ***Surgical Expert Dr. Chris Tsoi***

62.     In December of 1997, six months before Tim Masters' arrest, during a meeting with Broderick, Reed, and Gilmore, forensic psychologist Dr. Meloy recommended that the prosecution seek the expert opinion of a plastic surgeon regarding the surgical wounds on Peggy

Hettrick's body due to the precision and complexity of the surgery involved and doubts about the ability of an unsophisticated fifteen year-old to have undertaken and successfully completed such a difficult task.

63.    Immediately thereafter, Reed consulted with and interviewed Chris Tsoi, M.D., a plastic surgeon in Fort Collins, regarding Ms. Hettrick's wounds. The State retained Dr. Tsoi as a potential expert witness, sent him several photos, a report, and list of questions, and then interviewed him concerning his opinions.

64.    Dr. Tsoi responded with opinions to the effect that it was extremely unlikely, to the point of a realistic impossibility, that Mr. Masters could have committed the Hettrick murder.

65.    Dr. Tsoi described the vaginal excision as being a "hard cut" that was done in a "precise manner," and that would have been difficult for an experienced surgeon, like himself, to accomplish.  Dr. Tsoi expressed the opinion that it would have been "pretty darn hard" for a fifteen year old boy, such as Tim Masters to have performed the post-mortem excisions of Ms. Hettrick's body.  Young Tim Masters had absolutely no experience with anything remotely resembling the "surgical" excisions accomplished in the Hettrick murder.

66.    Dr. Tsoi indicated that the vaginal excision would have had to occur while Ms. Hettrick was in a "frog-leg" position, not with her tight jeans positioned as found, above her knees.  He based his theory on the sharp and precise lines of the cut as well as the practical impossibility of making the cut when her legs were closed.

67.    Dr. Tsoi also opined that two doctors would likely have been required to perform the "surgery," one to handle the very pliable skin and the other to perform the excision.  In light of this, and the fact that the crime occurred at night, Dr. Tsoi suggested that the excisions occurred somewhere other than the open field where Ms. Hettrick's body was discovered.

68.     Dr. Tsoi stated that the excision of the nipple was done by a person holding a scalpel in his or her right hand, based on the manner in which the cutting occurred.  The State's theory behind the arrest and prosecution of Mr. Masters relied heavily upon him being left-handed.

69.     Detective Reed wrote a report regarding Dr. Tsoi's consultation but, to this day, this report has never been produced by the State.

70.     Despite Dr. Tsoi's highly exculpatory expert opinion, Defendants Reed, Broderick, Gilmore, and Blair focused their investigation of the Hettrick murder exclusively on Tim Masters, persistently acting as if Dr. Tsoi's expert opinions had never been sought or uttered.  In arresting and prosecuting Tim Masters, these Defendants aggressively pushed their theory of the case, even thought it was directly refuted by Dr. Tsoi – namely, that Tim Masters: (1) had the skills to do the crime; (2) acted alone; (3) performed Hettrick's surgery in the field (because if the surgery had been performed in another location, Tim Masters could not have been the assailant); and (4) was left-handed, as the State falsely claimed the Hettrick killer to be.  In order to pursue and protect this theory, Defendants Broderick, Reed, Gilmore, and Blair willfully ignored, hid, and/or destroyed salient evidence in the form of Dr. Tsoi's opinions to the contrary.  In taking these actions, Defendants Broderick, Reed, Gilmore, and Blair single-mindedly sought to charge, prosecute and convict of Tim Masters of the Hettrick murder regardless of the great weight of evidence pointing to his innocence.

71.     As further evidence of Broderick, Gilmore Reed and Blair's intent to manufacture probable cause that Mr. Masters had committed the Hettrick murder, thereby ensuring his wrongful charging, prosecution, and conviction, these Defendants ultimately destroyed this evidence and intentionally withheld it from Dr. Meloy, Mr. Masters, and his defense counsel.

These Defendants knew of the patently exculpatory value of this evidence at the time that it was destroyed and/or hidden.

***ii.***      ***Knife Expert Herb Gardner***

72.     Immediately after the Hettrick investigation began, an FCPD officer solicited assistance from knife expert Herb Gardner regarding the murder.  Gardner was informed that the police suspected that a "saw back" knife was used to stab Hettrick, and he was provided with photographs of the wound and information from the autopsy concerning the wound.  Mr. Gardner responded with the following written opinions on February 19, 1987:

         a.   "It would seem to me that a saw tooth back would pull the threads at the top of the cut in the clothing;"

         b.   "A sharpened portion of the top & tip of the blade might produce the strange cut at the top of the would if the blade were yanked out at an angle;" and

         c.   "A saw tooth back must certainly have marked the upper rib."

73.     Central to Broderick, Reed, Gilmore, and Blair's theory throughout their investigation and prosecution of Tim Masters was that he used one of his "survival knives" with a prominent "saw back" to murder Ms. Hettrick.  Yet, the physical evidence showed that there was no pulling of threads at the top of the cut in the clothing, as Mr. Gardner would have expected to see had the survival knife have been the murder weapon.

74.     Mr. Masters' survival knives did not have a sharpened top that, according to Mr. Gardner, would have produced the cut at the top of the wound.

75.     The upper rib was not marked as a "saw backed" knife would have marked it. According to Knife Expert Gardner, this "must certainly" rule out Mr. Masters' survival knife as the murder weapon.

76.     In or around March 1996, more than two years prior to Tim Masters' arrest, Reed, while under Broderick's supervision, viewed Mr. Gardner's opinions.

77.     Defendants Broderick, Reed, Gilmore, and Blair willfully ignored and hid the obvious import of the expert opinion they sought from Mr. Gardner.  They blindly and aggressively continued to seek to charge, prosecute, and convict Mr. Masters for the Hettrick murder, in spite of of the great weight of evidence pointing to his innocence.

78.     As further evidence of Broderick, Reed, Gilmore, and Blair's intent to manufacture probable cause that Mr. Masters had committed the Hettrick murder, thereby ensuring his wrongful charging, prosecution, and conviction, they intentionally withheld knife expert Gardner's statements from Dr. Meloy, Mr. Masters, and his defense counsel.

### iii.     Alternative Suspects

79.     Defendants were so single-mindedly intent on Mr. Masters' arrest and conviction that they refused to investigate strikingly more likely suspects, even when other FCPD police and detectives called for such investigations.

80.     Had Defendants properly investigated more obviously viable suspects than Mr. Masters, in particular Dr. Richard Hammond, Mr. Masters would not have been wrongfully arrested, prosecuted, convicted, or incarcerated.

### 1.  Dr. Richard Hammond

81.     Dr. Richard Hammond, a well-respected, skilled, experienced eye surgeon, lived approximately 250 feet from the bloody curb which marked the beginning of the drag trail to Ms. Hettrick's body in the field.  From his upstairs window, the entire Hettrick crime scene could be viewed.

82.     In March of 1995, Dr. Hammond was arrested for videotaping the genitalia of females without their knowledge through video cameras hidden inside his home.  FCPD officers found a room adjacent to Mr. Hammond's guest bathroom equipped with two sophisticated video cameras and computer equipment.  One video camera pointed at the toilet seat from the air vent, another recorded the remaining area of the bathroom, and another hidden camera was located in the downstairs room used as a bedroom.

83.     The FCPD seized the video equipment and several hundred videotapes made by Hammond, many of which showed high resolution close-ups of vaginas of girls and women sitting on the toilet.  The tapes also showed close-ups of girls' and women's breasts as they showered or changed clothes.  Lists cataloging the hundreds of tapes, including the names and ages of the victims, the number of times each had been taped, and notes concerning the particular vaginal details observed, were also seized.

84.     Upon discovering the Hammond taping system, Broderick and Gilmore came to the Hammond crime scene.  According to several FCPD detectives who were also at the scene, Hammond was immediately discussed by those present as a possible suspect in the unsolved Hettrick murder.  Detectives were struck by the proximity of the house (250 feet) from the Hettrick crime scene, Dr. Hammond's apparent obsession with female genitalia, and his surgical abilities.  These discussions regarding the Hettrick case occurred in the presence of both Broderick and Gilmore.

85.     Gilmore and his wife were acquainted with Dr. Hammond through church and social activities.  Gilmore's wife, in fact, had spent time at Dr. Hammond's house and, inferentially, may have been the subject of some of Dr. Hammond's tapes.  Gilmore did not immediately reveal this obvious conflict.  Instead, he successfully interceded to gain Dr. Hammond's

immediate release from custody.  Gilmore and the Eighth Judicial District ultimately disqualified themselves from the Hammond case, but, nevertheless, soon after granted Becky Hammond, Dr. Hammond's wife, immunity from prosecution.

86.     Blair was a patient at Dr. Hammond's eye clinic, and she, too, did not immediately reveal her conflict.

87.     Despite Hammond being a viable suspect in the Hettrick case according to several knowledgeable FCPD detectives, neither Blair nor Gilmore ever disqualified themselves from the Hettrick case.

88.     Dr. Hammond was arrested after he returned home from a family vacation on March 20, 1995.  Instead of being subjected to the standard protocol for such an arrest, Dr. Hammond was transported immediately to a hospital and did not spend any time in jail.

89.     Dr. Hammond committed suicide nearly a week after his arrest.  Prior to his death, Hammond shaved his body, including his genitals, a practice which would have facilitated not leaving trace evidence behind.

90.     In February 1987, the Behavior Science Unit of the FBI told the FCPD that the culprit in the Hettrick murder was likely a "voyeur" who would likely commit another crime on the anniversary date of the homicide.  Dr. Meloy similarly informed Broderick, Gilmore and Blair that the likely culprit of the Hettrick murder was a voyeur.  His materials and underlying research were replete with references to voyeurism as a sexual paraphilia, the existence of which was a crucial part of the "fantasy" aspect of his sexual homicide theories.

91.     Broderick, based on his own research, background and training, noted in his reports as early as February 12-13, 1987, that the police should "look for voyeur" in the Hettrick case. As part of his investigation of the Hettrick case, Broderick read and made annotations in a book

related to sexual homicides that explained the close relation between voyeurs and sexual homicides.

92.     Mr. Masters was not a voyeur and has never been diagnosed as a voyeur.

93.     According to psychological records released to Gilmore in 1995, Dr. Hammond was an admitted and diagnosed sexual voyeur – a recognized sexual paraphilia – since he was a teenager.  In any case, it was obvious, based on Hammond's videotapes and related writings, that he was a sexual voyeur.

94.     An FCPD Detective who was reviewing some of Dr. Hammond's homemade pornography tapes with Gilmore, stated to Gilmore that, since Dr. Hammond was a voyeur and potential suspect in the Hettrick case, his videotapes may include a recording of Peggy Hettrick prior to, during, and/or after her murder.

95.     Searches of storage lockers which Dr. Hammond had rented revealed over $13,000 worth of pornographic materials, "sex aids" and other items, including hundreds of pornographic magazines, tapes, and implements, stored in plastic bags according to Dr. Hammond's own perverse cataloging system.  Items such as women's earrings and sex toys were found in the plastic baggies.

96.     Dr. Meloy theorized that Ms. Hettrick's murderer would be likely to keep "souvenirs" such as the nipple or clitoral hood which had been surgically excised from her body.  No such "souvenirs" were located among Mr. Masters' possessions.

97.     The investigation revealed that Dr. Hammond made phone calls at all hours of the night to countries such as the Netherlands, Indonesia and Hong Kong, well-known pornography producing countries.  Dr. Hammond had also taped himself having sex with women at a hotel in Denver.  He had also assumed an alter-ego "Richard Hamitton" to which shipments of surgical

equipment, such as plastic gloves and calipers, were sent.  Investigations of Mr. Masters, on the other hand, never revealed a pornographic obsession or his use of an alter-ego.

98.     Becky Hammond insisted that she never knew about her husband's voyeuristic, pornographic or extensive extramarital activities.  She described Dr. Hammond as a very "private" man with insomnia.  Dr. Meloy theorized that it was to be expected that a person having the kind of sexual fantasies that led to Ms. Hettrick's murder would be expected to keep them private.  Mr. Masters, on the other hand, had routinely shown to his friends his boyhood drawings that Dr. Meloy connected to the sexual fantasy purportedly leading to the Hettrick murder.

99.     According to a police report of an incident on February 24, 1987, shortly after the Hettrick murder, a man closely resembling Dr. Hammond made stabbing motions with an icicle at a female employee of the Prime Minister – the bar at which Ms. Hettrick was last seen.  The employee, like Ms. Hettrick, was red-haired.  The perpetrator closely resembled Dr. Hammond in physical build, stature, and age.

100.     According to a police report of an incident dated April 17, 1987, a man closely resembling Dr. Hammond exposed his genitals and had a partial erection while walking by the location of the Hettrick crime scene.  A female witness later told an FCPD investigator that a mugshot of Dr. Hammond looked "just like" the perpetrator.

101.     Dr. Hammond lived at 401 Skysail in Fort Collins, approximately 250 feet from the blood spatter thought to be the cite of Ms. Hettrick's stabbing.  His house appears in police pictures of the scene, and Ms. Hettrick's body could be seen from his house, but not from Mr. Masters' house.  Indeed, Dr. Hammond permitted the police to photograph the crime scene from

his bedroom window because of the exceptional view it afforded of the crime scene.  Posing the body is widely known as one of the hallmarks of a sexual murderer.

102.   Dr. Hammond took the day off of work on February 11, 1987, when Ms. Hettrick's body was visible from his upstairs window.  Tim Masters went to school that day as usual.

103.   Dr. Hammond had access to a car.  Tim Masters did not.

104.   As an eye surgeon, Dr. Hammond had extensive experience in performing difficult, precise surgical procedures, as well as anatomical knowledge.  As a fifteen-year-old boy, Tim Masters had no such knowledge or experience.

105.   Thus, Dr. Hammond was a surgeon with an extraordinarily intense pornographic obsession with vaginas and women's breasts, and the experience, ability and wherewithal to have taken Hettrick to another location, there performed the precise, difficult vaginal surgery involved, washed the body, and returned it to where it was found, in sight of his house.  Tim Masters, on the other hand, could not see the body from his house, did not display an obsession with female genitalia, lacked the experience and knowledge to perform the excisions, and could not have transported the body.

106.   According to Becky Hammond, on February 11, 1987, two uniformed police officers went to the upstairs room of her house from which Ms. Hettrick's body could be seen that very morning.  On February 11, 1988, the two officers returned in an effort to survey the site as part of an extensive psychological experiment regarding Mr. Masters.

107.   Dr. Hammond was and remains the only sex offender that resided in South Fort Collins, near where Peggy Hettrick's body was found.

108.   Due to the Dr. Hammond's sexual obsessions and activities, his medical knowledge and surgical ability, and a plethora of evidence about his personal predilections and psychology,

several FCPD detectives urged Broderick, Gilmore, and Reed that that Dr. Hammond, not Tim Masters, was likely the culprit in the Hettrick case.  Other detectives expressed that there was ample reason to at least doubt that Mr. Masters was the culprit and that additional investigation into Dr. Hammond as a suspect was needed.

109.    FCPD Detective Tony Sanchez, lead detective on the Hammond case, created a "to do" list for the case which included "Look into Hettrick" as one of the tasks.  It was the only un-checked item on that list.  Neither Mr. Masters, nor his attorneys, received this information until March 2007.

110.    A former FCPD Detective asked permission of Broderick to get a court-ordered search warrant of the Hammond house with respect to the Hettrick murder.  Broderick refused the request.

111.    Because sexual murderers are known to film their victims, at least two former FCPD Detectives requested of Broderick that officers be assigned to look through Hammond's tapes for evidence of the Hettrick murder.  Broderick refused their request and stated that any officer who wanted to view the tapes was a "pervert."

112.    During 2008 interviews the Weld County District Attorney's Office, Gilmore and Blair asserted that, in spite of in depth knowledge of Dr. Hammond's voyeuristic crimes and tendencies, his possession of surgical skills, and the location of his home less than 250 feet from the scene of the crime, they had no "inkling" that Hammond should have been a suspect in the Hettrick homicide and that *no one* ever indicated to them that Hammond should be a suspect. These statements are patently false.  They fly in the face of common sense and directly contradict the statements of several FCPD detectives.

113.     During the eleven years leading up to Tim Masters' arrest, Broderick, Gilmore, and Reed doggedly refused to consider Dr. Hammond as a suspect in the Hettrick case and kept a blindly determined focus on Tim Masters.

114.     Instead of investigating Hammond's role in the Hettrick murder, Gilmore, who admittedly had an obvious and significant conflict of interest due to his and his family's relationship with Dr. Hammond, authorized having the physical evidence in the Hammond case burned in a fifty-five gallon drum, only a few months after Hammond's death, purportedly because it no longer had any evidentiary value.  The FCPD had not yet had the opportunity to review of the vast majority of Dr. Hammond's home-videotapes or other physical evidence *vis a vis* the Hettrick case.  In particular, the FCPD was never able to learn whether or not Hammond, a voyeur, recorded the death or mutilation of Peggy Hettrick.

115.     Gilmore knew of the patently exculpatory value of this evidence at the time that he sought its destruction.

116.     Prior to the destruction of this evidence, a Former FCPD Detective attempted to stop its destruction, vehemently pointing out its obvious potential evidentiary value in the Hettrick case.  Several FCPD Detectives were "shocked" when they learned the Hammond evidence had been so quickly destroyed.

117.     The decision to rapidly burn the Hammond tapes represented an extreme deviation from FCPD custom, policy, and/or actual practice.  According to a former FCPD Detective, typically, the FCPD kept evidence in storage for several years and only when a storage crisis occurred was it destroyed.  When a storage crisis did occur, police and records keepers would scour through the evidence and determine which evidence no longer had any conceivable evidentiary value.  The DA and eventually the court would then need to approve the destruction.

At that point, a few FCPD personnel would be assigned to take a large load of evidence to a dumpsite and bury it.  Typically, for practical and efficiency purposes, the evidence in several cases would be destroyed at once, in order to free up more storage space.

118.    In contrast, Gilmore, with Broderick's support, sought the rapid destruction of the Hammond evidence within a matter of months after Hammond's death, even though several FCPD Detectives had openly expressed that Hammond should be a serious suspect in the Hettrick case, and under the extreme protest of at least one FCPD Detective.  In an unheard of move, Gillmore who had a conflict on the Hammond case, obtained the assistance of the Fort Collins *City* Attorney to obtain the court order necessary to destroy the evidence, after he had conflicted off the Hammond case.  Further, FCPD Detective Tony Sanchez was directed to personally remove the Hammond evidence, put it in a 55-gallon drum, and watch it burn.  Sanchez spent over six hours of his day doing just that.  The Hammond evidence was the only case ordered to be destroyed that day, an aberration in the usual protocol.  In thirty years, according to one Former FCPD Detective, he had *never* seen evidence burned.

119.    At Mr. Masters' trial, Broderick, Gilmore, and Blair all directly represented to the jury that the FCPD had thoroughly investigated every potential suspect in the Hettrick case and, in particular *all sexual assaults* in Fort Collins, and that *no one* had the sexual fantasy or surgical weapon capable of inflicting the kind of injury that occurred in the Hettrick murder except fifteen-year-old Tim Masters

120.    Gilmore, Blair, Broderick, and Reed never investigated Dr. Hammond as a suspect in the Hettrick case, never informed Dr. Meloy, Tim Masters, or defense counsel, about Hammond's crimes, and kept a single-minded focus on manufacturing probable cause to arrest

Tim Masters for the Hettrick murder, thereby ensuring his wrongful charging, prosecution and conviction, at all costs and regardless of the great weight of evidence pointing to his innocence.

121.    Defendant VanMeveren was informed of the conflict of interest regarding Defendants Gilmore and Blair and any investigation of Dr. Hammond.  Nonetheless, Defendant VanMeveren allowed Defendant Gilmore to initially participate in the Hammond investigation and to offer Becky Hammond immunity.  Upon information and belief, during his tenure as DA, Defendant VanMeveren agreed not to investigate Mr. Hammond as a suspect, allowed for the destruction of the evidence in the case and failed to recuse the Eighth Judicial District from the Hettrick case due in part to the conflict.

## 2.    Donald Long

122.    Within a nine-month period, Ms. Hettrick, Linda Holt, and Mona Hughes, all of whom were females in their thirties, were fatally stabbed in the back in the Fort Collins-Greeley area.  Each of these murders involved a sexual aspect to the killing.

123.    Donald Long admitted to killing Mses. Holt and Hughes.

124.    In 1987, FCPD Detective Taylor drafted a report containing information potentially linking Mr. Long to Ms. Hettrick's murder.

125.    The FCPD listed Donald Long as one of ninety-four potential suspects in the Hettrick case.

126.    Yet, no member of the Eighth Judicial District or the FCPD ever posed a *single question* to Donald Long regarding his possible involvement in the Hettrick murder.

127.    Detective Wheeler-Holloway, while acting as lead investigator on the Hettrick case, asked to investigate Donald Long with respect to the Hettrick murder.  She was told by her FCPD supervisor not to investigate and that Donald Long had been eliminated as a suspect.

128.   Gilmore, Blair, Broderick, and Reed did not investigate Donald Long in relation to the Hettrick murder.

129.   In 1993, Gilmore authorized the release and destruction of all evidence in the Donald Long case.

130.   Gilmore and Blair never informed Dr. Meloy, Tim Masters, or defense counsel, about Donald Long's crimes and kept a single-minded focus on manufacturing probable cause to arrest Tim Masters for the Hettrick murder, thereby ensuring his wrongful charging, prosecution and conviction, at all costs and regardless of the great weight of evidence pointing to his innocence.

### iv.   1988 Surveillance

131.   A theory pursued by Broderick, Gilmore, Blair, and Reed throughout the investigation and prosecution of Tim Masters, and that Gilmore and Blair later argued at Mr. Masters' trial, was that Mr. Masters was triggered to kill Peggy Hettrick as a result of unresolved feelings stemming from the death of his mother. Ms. Hettrick was murdered one day short of the fourth anniversary of Tim Masters' mother's death, theoretically suggesting an "anniversary reaction."

132.   Broderick was the FCPD's liaison to the FBI Behavioral Sciences Unit during, at least, 1987 and 1988. Shortly before the anniversary of the Hettrick murder, Broderick approached FCPD Lieutenant in Charge of Investigations, Deryle O'Dell, and informed him that the FBI believed it would be a good time to have a plan to try to get Mr. Masters to react. Deryle O'Dell put the idea in a memo, and the FCPD Police Chief Bruce Glasscock approved it.

133.   The 1988 Surveillance methods and plan was also reviewed and approved by the District Attorney's Office of the Eighth Judicial District, including by Gilmore.

134.    With FBI Behavior Science Unit support, advice and instruction, the FCPD conducted a "psychological experiment" on Tim Masters around the first anniversary of Peggy Hettrick's death.  As explained in police reports, this operation was designed to cause Tim Masters to become psychologically agitated and upset if he were indeed the Hettrick murderer, so that his behavior would demonstrate his guilty-appearing psychological state and would leave him susceptible to interrogation.  In particular, it was expected that Mr. Masters would visit the scene of the crime or Peggy Hettrick's grave.

135.    For six days, the FCPD closely and constantly surveiled Tim Masters' home and Peggy Hettrick's grave site.

136.    Included in the written materials concerning this operation is a police report indicating that the FBI would falsely deny involvement if the scheme were revealed because of the risk that the experiment might "backfire."  By "backfire" the FBI and FCPD meant that the activities of the FCPD to agitate and manipulate Tim Masters might result in him killing himself or committing other crimes which might injure others.

137.    As part of this experiment, FCPD investigators, including Defendant Reed, working along with the FBI, planted "bogus" articles in the local newspaper specifically designed to suggest that an arrest of a suspect with Tim Masters' characteristics was imminent.  The FCPD then planted the newspapers, as well as a copy of Tim Masters' mother's obituary, on Mr. Masters' doorstep and delivered them to Mr. Masters through his friends in order to witness whether Mr. Masters exhibited an "anniversary" reaction.

138.    Mr. Masters' possession of these newspapers – which were planted by the FCPD – was later used by the Gilmore and Blair as evidence that he was the culprit in the Hettrick case.

139.     The result of the operation was that Tim Masters did not exhibit *any* of the behavior expected by the FCPD and the FBI.  Mr. Masters' life continued according to his normal schedule and he did not exhibit increased stress.

140.     Gilmore, Blair, Reed, Broderick and VanMeveren were all fully briefed on the outcome of the 1988 Surveillance.

141.     Because the results of the 1988 Surveillance contradicted their "anniversary" theory, Broderick, Gilmore, Blair, and Reed withheld any evidence of the 1988 Surveillance and its results from Dr. Meloy, as well as from Mr. Masters and his defense counsel.

142.     Defendants Broderick, Gilmore, Reed, and Blair willfully ignored the obvious import of their failed psychological "experiment" by blindly and aggressively continuing to seek to charge, prosecute, and convict Mr. Masters for the Hettrick murder, at all costs, and in spite of the great weight of evidence supporting his innocence.

### *v.     Manufactured Evidence*

143.     In light of the absolute dearth of any physical evidence connecting Tim Masters to the murder of Peggy Hettrick, Defendants conspired to manufacture inculpatory evidence to link Mr. Masters to the crime, in order to ensure his arrest and conviction at all costs, and in spite of the great weight of evidence pointing to his innocence.

144.     Had Defendants not manufactured evidence intended to fabricate probable cause to arrest Mr. Masters, he would never have been arrested, prosecuted, convicted or incarcerated for the murder of Peggy Hettrick.

### a.          Blood Spatter

145.     During Dr. Allen's investigation into the circumstances of Ms. Hettrick's death, he repeatedly stated to numerous FCPD Detectives that he thought the blood spatter near the site

where Ms. Hettrick's body was found was likely a dump site for the body, rather than the location of Ms. Hettrick's stabbing.  He opined that her dead body may have been dropped off from a car at that site and then dragged to the center of the field where the body was ultimately found.

146.     Dr. Allen's theory of the crime was not ruled out by the FBI in its analysis of the blood spatter in 1987, leaving open the possibility that the crime occurred in a car.

147.     However, in December, 1996, Broderick and Reed consulted with Tom Bevel, a crime scene/blood spatter expert, who – based on the information provided by Broderick and Reed – opined that Ms. Hettrick had been attacked by the curb and then dragged into the field where her body was found.

148.     This conclusion was essential to the Broderick, Reed, Gilmore, and Blair's theory of how Mr. Masters could have murdered and mutilated Ms. Hettrick without the aid of another person, a vehicle, or a private location at which to perform the excisions and the washing of blood from her body.

149.     Mr. Bevel's conclusion, however, was *manufactured* by Gilmore, Broderick, and Reed, who intentionally gave Mr. Bevel only carefully selected pieces of crime scene evidence in order to manipulate Mr. Bevel's opinion to support their fabrication of probable cause that Tim Masters committed the Hettrick murder.  Broderick and Reed, nonetheless, informed Mr. Bevel that they had turned over to him *all* of the relevant, available information in the State's possession.

150.     In 2007, during Mr. Masters' post-conviction proceedings, Mr. Bevel was finally provided with complete information concerning the scene where Ms. Hettrick's body was found, all of which was in Broderick, Gilmore and Reed's possession in 1996, when they sent the

information to Bevel. Based on this "new" information, Mr. Bevel's April 2007 analysis reflects an entirely different opinion, namely that the "best explanation" to comport with the physical evidence, is that Ms. Hettrick was attacked in another location and then transported to the field where her body was found, ruling out Tim Masters as the culprit.

151.     Mr. Bevel further stated that he had "serious concerns and questions why much of this information (which was known by investigators during my first analysis) was not supplied to me for consideration in the 1998 analysis."

### a.     Shoe Print Evidence

152.     Broderick, Reed, Gilmore, and Blair hid evidence concerning and lied about the presence of several Thom McAn shoeprints at the Hettrick crime scene because such shoeprints did not belong to Tim Masters and, thus, impeded these Defendants' ability to construct probable cause to charge, arrest and convict Mr. Masters for the murder of Peggy Hettrick.

153.     At the location where Ms. Hettrick's body was found, Detective Sherry Wagner discovered twelve Thom McAn shoeprints, which appeared to go directly from the curb area to the location of the body. At least three other apparent Thom McAn shoeprint impressions were located by police, one near the blood pool by the curb astride the drag trail, one a short distance away along the curb, and one inside the field next to the drag trail, with apparent blood in the impression.

154.     Broderick reviewed Detective Wagner's report and noted his own observation of at least one Thom McAn shoeprint at the curb, next to the blood spatter. Broderick's notes also discuss his observation of the twelve Thom McAn prints identified by Wagner. As a result of these observations, as well as the proximity of the clearly defined Thom McAn shoeprint by the

blood spatter, FCPD Detective Francis Gonzales sought, found, and photographed a Thom McAn shoe that his investigation showed was similar to the prints found at the scene.

155.     Only one shoeprint crossing the drag trail coincided with Mr. Masters' shoe.  The Thom McAn shoeprints did not match any of Mr. Masters' shoe prints.

156.     In 1997, when Broderick and Reed sent the casts of the Hettrick crime scene shoeprints to the FBI for analysis, they chose only to send only Mr. Masters' shoe for comparison.  They excluded any evidence related to the Thom McAn prints, including crime scene observations that the prints appeared to be Thom McAns, and the photo of the Thom McAn shoe thought to match the prints.

157.     Broderick and Reed hid the presence of the Thom McAn prints in an effort to ensure that the FBI shoeprint analysis would support their efforts to fabricate probable cause that Tim Masters committed the Hettrick murder at all costs and regardless of the great weight of evidence supporting his innocence.

158.     Before trial, Gilmore, Blair and Broderick did not provide Tim Masters with the high grade photographs produced by the FBI as a result if its examination of the shoe impression evidence, or the observations and opinions of Broderick concerning the Thom McAn shoeprints going towards the body and their similarity to the obvious Thom McAn shoeprint found near the blood pool.

159.     Broderick lied at trial about the Thom McAn shoe impressions in order to hide their obvious significance.  He denied his own and the other police observations about the apparent Thom McAn shoeprints other than the one next to the blood trail at the curb, and instead stated that that there was a lone Thom McAn shoeprint located at the scene.

160.      Gilmore and Blair chose not to call Detective Wagner to the stand, in spite of her early role as lead detective on the Hettrick case.  Calling Detective Wagner to the stand would have inevitably led to revealing her crime scene notations regarding the Thom McAn prints, thereby impeaching Broderick.  The choice not to call Wagner was a choice to continue the deception of Tim Masters, his defense counsel, and the public, and that was at the root of Mr. Masters' wrongful arrest and conviction.

161.      On July 8, 2008, the Weld County District Attorney's Office released a report of its investigation into allegations that Broderick, *inter alia*, perjured himself at Mr. Masters' trial when he testified about the crime scene footprints.  Broderick testified that there was only one Thom McAn footprint along the curb where Ms. Hettrick was purported to have been stabbed.  Weld County District Attorney Ken Buck stated in his report: "In my opinion, Lt. Broderick should have known that his testimony was incomplete when he stated that the only identifiable Thom McAn shoe print was located along the curb line…."   Further, Mr. Buck opined that "[t]he jury would have had evidence to conclude that another individual wearing Thom McAn shoes – not Tim Masters – was in fact the perpetrator or an accomplice to the murder if Lt. Broderick had testified completely."

### b.      Dr. Meloy's Opinion

162.      Well before Tim Masters was charged, and during the investigation of Mr. Masters and prior to the existence of probable cause to arrest him, Broderick, Gilmore, Reed, and Blair carefully selected a discrete set of evidence to share with sexual homicide expert, Dr. Reid Meloy, in order to manipulate him into concluding that Mr. Masters was guilty of the Hettrick murder.

163.     Broderick, Gilmore, Blair, and Reed explicitly recognized the highly circumstantial nature of the case they were building against Tim Masters and understood that to establish probable cause and eventually convict Mr. Masters "hinged" upon having a sexual homicide expert, such as Dr. Meloy, explain to a judge and then a jury exactly how Mr. Masters could be convicted of homicide based almost solely upon one man's interpretation of his boyhood drawings.

164.     While repeatedly informing Dr. Meloy that he was being provided with all documents relevant to his analysis of Mr. Masters' guilt or innocence, Defendants Broderick, Gilmore, Reed, and Blair intentionally withheld the following highly exculpatory and relevant information from Dr. Meloy:

     a.  all evidence related to Dr. Hammond;

     b.  all evidence related to Donald Long;

     c.  Dr. Tsoi's analysis;

     d.  Dr. Gardner's analysis;

     e.  all evidence related to the FBI psychological profile and the 1988 surveillance;

     f.  an FBI Agent's assessment that the Hettrick perpetrator was a voyeur; and

     g.  a transcript of a conversation secretly taped between Tim Masters and his father in which Mr. Masters' repeatedly professed his innocence [Gilmore ordered this conversation be removed from the tape of Tim Masters' interviews sent to Dr. Meloy].

165.     Additionally, Broderick, Gilmore, Reed, and Blair provided Dr. Meloy with the planted obituary and 1988 bogus article as items possessed by Tim Masters, but they did not inform Dr. Meloy that the items had been planted by the FCPD.  Dr. Meloy then predictably used

Tim Masters' possession of the articles in arriving at his misguided opinions regarding Mr. Masters' involvement in the Hettrick murder.

166.    In 2008, Dr. Meloy was given an opportunity to review the plethora of highly exculpatory evidence withheld from him during the investigation and prosecution of Mr. Masters.  Based upon this review, Dr. Meloy concluded that, had he been provided this information, he would not have been able to support Gilmore, Broderick, Reed, and Blair's determined effort to charge forward in the charging, prosecution and conviction of Tim Masters. In fact, with this new evidence, Dr. Meloy concluded that the "probability" that Mr. Masters committed the Hettrick homicide was "incredibly small."   Dr. Meloy stated that, had the evidence related to Dr. Hammond been presented to him prior to trial, it would have "strongly overridden" any suspicion of Mr. Masters, and Dr. Hammond would have been "at the top of the list" of suspects in the Hettrick case.

167.    Dr. Meloy related that throughout his interactions with Broderick, Reed, Gilmore and Blair, they expressed their absolute assurance that Tim Masters was the culprit for the Hettrick homicide and that the physical evidence, such as the blood spatter and the shoeprints, all directly implicated Mr. Masters.

168.    It was based on these misrepresentations and material omissions that, on February 4, 1999, about one month before Tim Masters' trial, Dr. Meloy wrote a letter to Defendant VanMeveren, the DA of the Eighth Judicial District, in which he stated that he hoped his time and energy in the Masters case would "result in a successful prosecution."  Clearly, Defendant VanMeveren was intimately involved in the details of the "investigation" of Timothy Masters, and was actively engaged in securing his arrest and conviction.

169.     Given the entirety of the evidence recently presented to Dr. Meloy, he now believes that Gilmore, Blair, Broderick, and Reed intentionally manipulated his professional opinion by misrepresenting the physical evidence and providing him only a portion of the evidence necessary to make a judgment with respect to Mr. Masters' psychological state, and with the sole intent of fabricating probable cause to arrest and convict Mr. Masters for the Hettrick murder at all costs, and in spite of the great weight of evidence supporting his innocence.

170.     Defendants Broderick, Reed, Gilmore and Blair utilized Mr. Meloy's fabricated expert opinion as the centerpiece of the affidavit supporting the 1998 arrest warrant and the trial.

171.     Without Dr. Meloy's fabricated expert opinion, no court would have found probable cause to arrest Mr. Masters.

### vi.     *Destruction of Fingerprints and Hairs*

172.     The FCPD found fingerprints on the contents of Ms. Hettrick's purse and determined that they were not Mr. Masters' or Ms. Hettrick's.  The State also found hairs on Ms. Hettrick's clothing that it determined were not those of Mr. Masters.

173.     According to FBI reports, these hairs and fingerprints were shipped to the FCPD in 1987, after having been submitted to the FBI for analysis.

174.     The FCPD now asserts that it has "lost" these fingerprints and hairs, making it impossible to compare them to those of other suspects in the Hettrick murder or to obtain DNA from them.

175.     Given the concerted effort by Gilmore, Blair, Broderick, and Reed to fabricate probable cause to arrest Tim Masters for the Hettrick murder, regardless of all evidence supporting his innocence, it is a reasonable inference that one or all of these defendants intentionally destroyed this evidence.

176.     Further, these Defendants knew of the patently exculpatory value of this evidence at the time that it was destroyed.

>           vii.     *False Statements and Misrepresentations in The Affidavit*
>                    *Supporting The Warrant to Arrest Mr. Masters*

177.     On August 6, 1998, Broderick submitted to Larimer County Court an affidavit to supporting his request for a warrant to arrest Tim Masters for the Hettrick homicide.

178.     Broderick drafted this warrant with the input, advice and approval of Gilmore, Blair, and Reed.

179.     Specifically, Gilmore and Blair supervised and gave Broderick and Reed legal advice with respect to drafting the affidavit, understanding that in doing so they were assisting in fabricating probable cause to arrest Mr. Masters.

180.     Defendants Gilmore, Blair, Broderick, and Reed made the decision to have Broderick seek the arrest warrant knowing they lacked probable cause to arrest Tim Masters and knowing that the arrest warrant contained numerous false statements and material omissions intended to mislead the court into believing probable cause for Mr. Masters' arrest existed.

181.     Had Defendants not made false statement and misrepresentations in the affidavit, Mr. Masters would  not have been arrested, prosecuted, convicted or incarcerated for the murder of Peggy Hettrick.

182.     Meloy and Hazelwood also each reviewed the affidavit in full and gave their input to Broderick prior to its submission to the court.

183.     The affidavit is replete with material statements that Gilmore, Blair, Broderick, and Reed knew to be false.  The following are a sampling of these false statements.

184.     Broderick swore that Ms. Hettrick's knife wound showed that the assailant was <u>left-handed</u>, as Broderick understood Tim Masters to be.  Yet, as Broderick knew, less than a year

prior, Dr. Tsoi had given an expert opinion that the knife cut around the nipple showed the assailant to be right-handed.  Broderick made no mention of Dr. Tsoi's findings.

185.    Broderick swore that shoe "*prints*" matching those of Mr. Masters were found at the curb and in and "alongside the bloody drag trail."  This statement was patently false.  Only one shoe print was identified as having been made by Mr. Masters' shoe, and it was a print *crossing* the drag trail, after the drag trail was created, something which Mr. Masters never denied doing. The single print did not parallel the trail, as would be required to drag Ms. Hettrick's body. Instead, notes by Broderick and Wagner show that the shoe prints found most consistently throughout the crime scene and closest to Ms. Hettrick's body appeared to be Thom McAn shoes.  Broderick knew that the Thom McAn prints did not belong to Mr. Masters.  Broderick not only falsely stated that Mr. Masters' footprints were found at the curb where Ms. Hettrick was purported to have been stabbed and "alongside the bloody drag trail," he also omitted the material fact that he had identified a series of similar footprints throughout the crimes scene, including one set walking between the body and the bloody curb.

186.    Central to Broderick, Gilmore, Reed, and Blair's theory of the Hettrick case was that Mr. Masters performed the excisions of Ms. Hettrick in the field where her body was found in the middle of the night.  In support of this theory, Broderick swore that "the full moon lit night and/or the flashlight with a red lens…would provide the necessary light for Masters to accomplish the mutilation, without drawing attention from any vehicles that might drive by."  No expert provided this opinion to Broderick.  Broderick is a not a surgeon nor a surgical expert. Broderick had no basis in fact, besides his own unfounded conjecture, that the moon or a red lens would provide sufficient lighting to perform precise surgery in a dark field.

187.    Particularly in 1998, when Broderick submitted his affidavit to the court, the field of study of "sexual homicides" was nascent and highly controversial as a legitimate avenue to analyze criminal behavior.  Given that Broderick could not produce a single piece of direct evidence linking Mr. Masters to the crime, it was essential that his "sexual homicide" theory be palatable and persuasive to the court.  To shore up his affidavit, Broderick swore that he had consulted with Meloy and Hazelwood, experts in the field of "sexual homicide."  Broderick then proceeded to explain exactly how, under these experts' theories, Mr. Masters could be definitively linked to Ms. Hettrick's murder in spite of a complete dearth of direct evidence.

188.    Broderick, however, knew, through telephone and written communications, that Meloy and Hazelwood disagreed on several material statements in the affidavit.  Hazelwood's edits to Broderick's draft affidavit are, in fact, exculpatory of Mr. Masters.  Nonetheless, Broderick misrepresented that both experts agreed on their analysis of the Hettrick homicide and Tim Masters' potential involvement in that homicide.  Broderick consistently chose to cite solely the expert's opinion (Dr. Meloy) that was most likely to allow for prosecution.  Broderick intentionally and falsely stated to the court that the opinions he cited were undisputed between the experts.  By way of example, Defendant Broderick cites Dr. Meloy's opinion that the Hettrick homicide "was planned and rehearsed in the obsessive fantasies of Masters," supporting a case for First Degree Murder.  However, Hazelwood had opined that the murder was "impulsive" and involved a "lack of forethought."  Yet, Broderick's statements in the affidavit are manipulated in such as way as to present a unified psychoanalysis by the two experts.

189.    Broderick also misrepresented that the drawings found on a bridge one-hundred feet from the Hettrick crime scene were similar to Mr. Masters' drawings, even though Detective

Wheeler-Holloway, the only officer who had observed the drawings, had stated that the drawings did not match those of Mr. Masters and placed no significance on those drawings.

190.    Detective Wheeler-Holloway told Blair before and after the affidavit was submitted to the court that its statements regarding the drawings under the bridge were blatantly false, and that she did not want to be a part of any of the misrepresentations being made to the court.  Yet, Broderick, Gilmore, Blair, and Reed chose not to change the affidavit to reflect the truth. Wheeler-Holloway also told Blair that she had serious doubts regarding Tim Masters' guilt and that it appeared no new evidence had been collected against Mr. Masters since Detective Wheeler-Holloway had refused to arrest him in 1992.

191.    With Gilmore and Blair's approval, Broderick included these false statements in his affidavit for the purpose of fabricating probable cause to arrest Mr. Masters and ensure his prosecution and conviction for Ms. Hettrick's murder at all costs, regardless of the great weight of evidence supporting his innocence.

192.    After reviewing the affidavit, Detective Wheeler-Holloway told Defendants Gilmore and Blair that she believed Tim Masters was innocent.  Further, she stated that the affidavit did nothing to convince her otherwise, considering that it contained no new evidence against Mr. Masters since she had closed the investigation several years prior.  Detective Wheeler-Holloway expressed that if she was called as a witness at Mr. Masters' trial and was asked whether she had doubts about his guilt, she would tell the truth.  As a result, Defendants Blair and Gilmore dramatically shortened Detective Wheeler-Holloways testimony.

### viii.    *False Statements at Mr. Masters' Proof Evident Presumption Great Hearing*

193.    On September 16, 1998, Broderick testified under oath at Mr. Masters' Proof Evident Presumption Great Hearing (the equivalent of a preliminary hearing on a murder case).

194.     Broderick was a witness in the proceeding and he actively instigated and encouraged the prosecution of Mr. Masters.

195.     In response to questions posed by Gilmore, Broderick made several material statements supporting Mr. Masters' arrest that both Broderick and Gilmore knew to be false.

196.     For instance, Broderick stated that the FBI shoe print analysis revealed that several shoe "prints" at the crime scene were those of Mr. Masters.  In reality, the FBI shoe print analysis revealed that only one shoe *print* matched that of Tim Masters.  Further, Broderick was aware that over a dozen shoe prints at the crime scene, two of which straddled the drag trail, were Thom McAn prints that were not made by Mr. Masters.  Broderick's failure to state so was a material omission meant to mislead the court and ensure the wrongful prosecution of Tim Masters.

197.     Additionally, at the hearing, Broderick relied in large part upon the theories of Dr. Meloy to show Tim Masters' guilt.  To support this reliance, he stated that Dr. Meloy had been given a copy of the FCPD's <u>entire</u> <u>case</u> <u>file</u> regarding the Hettrick murder.  According to Broderick, Dr. Meloy "reviewed the entire crime scene and had the opportunity to review *all case documents.*"  In fact, Broderick, Reed, Gilmore and Blair withheld a significant amount of highly exculpatory documents from Dr. Meloy, knowing that those documents were patently relevant to Dr. Meloy's analysis.  These documents, at minimum, included: all evidence related to Dr. Hammond, including his diagnosis as a voyeur; the FBI's analysis that the Hettrick culprit was a sexual voyeur who would likely commit another crime on the anniversary date of the homicide; numerous photographs of the crime scene; numerous photographs from the autopsy of Ms. Hettrick, revealing the precise nature of the vaginal excision; all evidence related to Donald Long; Dr. Tsoi's analysis; Dr. Gardner's analysis; all evidence related to the FBI psychological

profile and the 1988 surveillance; and a transcript of a conversation secretly taped between Tim Masters and his father in which Mr. Masters' repeatedly professed his innocence.

198.    Broderick and Gilmore conspired to make these false statements to the court for the sole purpose of prosecuting and convicting Mr. Masters for Ms. Hettrick's murder at all costs, in spite of their knowledge of significant weight of evidence supporting Mr. Masters' innocence.

### ix.    Failure to Turn Over Evidence Exculpatory of Mr. Masters

199.    Broderick and Reed conspired to withhold significant amounts of evidence exculpatory of Mr. Masters from the Eighth Judicial District Attorney's Office with the intent of ensuring the evidence would not be discovered by Tim Masters, thereby ensuring his wrongful arrest, prosecution, conviction and incarceration.  This evidence included, for example, the vast majority of evidence related to the FBI psychological profile and 1988 Surveillance.

200.    Shortly before Mr. Masters' trial, Detective Wheeler-Holloway gave Gilmore her personal copy of the entire Hettrick case file through the end of her investigation in 1993. Wheeler-Holloway took this action because she rightfully believed that Broderick and Reed had not given Gilmore all of the FCPD's evidence in the Hettrick case, including significant amounts of evidence exculpatory of Mr. Masters.  Her files included, for example, the vast majority of evidence related to the FBI psychological profile and 1988 Surveillance.

201.    As evidence of Broderick, Reed, Gilmore and Blair's intent to ensure the wrongful prosecution and conviction of Tim Masters for Peggy Hettrick's murder at all costs and in spite of their knowledge of the great weight of evidence supporting his innocence, they conspired to intentionally withhold the following highly exculpatory evidence from Mr. Masters and his defense attorneys throughout the course of trial:

      a.   all evidence related to Dr. Tsoi;

b.   all evidence related to Knife Expert Gardner;

c.   all evidence related to Dr. Hammond;

d.   all evidence related to Donald Long;

e.   the vast majority of evidence related to the FBI psychological profile and 1988 Surveillance;

f.   all evidence that Dr. Hazelwood disagreed on several material aspects of Dr. Meloy's opinion;

g.   274 pages of Dr. Meloy's underlying data forming the basis for the opinions to which he testified at trial and which could have been used to impeach him;

h.   an FBI Agent's assessment that the Hettrick perpetrator was a voyeur;

i.   Broderick's February, 1987, notes of his description of the likely characteristics of the perpetrator in terms of a sexual homicide, including that it was likely a voyeur who committed the crime;

j.   a transcript of a conversation secretly taped between Tim Masters and his father in which Mr. Masters repeatedly professed his innocence; and

k.   Broderick's April 30, 1987, letter to FBI Agents asking them to review the entire file, and disclosing the secretly taped conversation between Tim and Clyde Masters.

### x.   *Post-Conviction Misconduct*

202.   In 2000, Detective Wheeler-Holloway contacted Defendant VanMeveren to share that she and others in the FCPD had serious doubts about Mr. Masters' innocence.  VanMeveren took no action to address these doubts at the time.

203.     On May 5, 2003, Tim Masters filed a *pro se* motion for Post-Conviction relief.  Maria Liu and David Wymore were subsequently appointed to represent Mr. Masters in his post-conviction proceedings.

204.     Greg Lammons and Cliff Riedel, Eighth Judicial District Attorneys, were appointed to represent the State in the post-conviction proceedings.

205.     In spite of the mounting evidence discovered and presented by the post-conviction defense team, much of which is detailed above, that Gilmore, Broderick, Blair and Reed had systematically destroyed, manufactured, and withheld significant exculpatory evidence in order to fabricate probable cause to charge Mr. Masters with Peggy Hettrick's murder, as well as to bring about his wrongful prosecution and eventual conviction, Lammons and Riedel *continued* to doggedly fight to prevent from coming to light evidence of Mr. Masters' innocence and the extreme misconduct by the District Attorney's Office of the Eighth Judicial District and the FCPD.

206.     As detailed below, these acts, many undertaken in late 2006 through 2007, were overt acts in furtherance of the conspiracy to wrongfully arrest, prosecute, and convict Tim Masters, in violation of his constitutional rights.

207.     As a result of these acts, Tim Masters, exercising due diligence, did not and could not have discovered the basis for the constitutional claims stated herein until 2007.

208.     Lammons and Riedel's gross misconduct intentionally and predictably caused significant delay in Mr. Masters' ability to gain post-conviction relief.

209.     Due in part to their misconduct, Lammons and Riedel, as part of the Eighth Judicial District were disqualified from Mr. Masters' case.

### a.     The DNA Grab

210.     In November 2006, Mr. Masters' post-conviction defense team sought and won the right to conduct DNA testing of items of evidence remaining in the Hettrick case based on the team's strong belief that such evidence would fully exculpate Mr. Masters.  The defense team explained at length in open court and presented testimony to the effect that they planned to use experts to test the DNA with cutting edge techniques that had been shown to have an increased ability to render results from very small quantities of DNA – such as that remaining in the Hettrick case.  Further, the defense team explained that some of the DNA samples were so small that testing was likely to result in the DNA's destruction.  Consequently, the defense team expressly assured the court and prosecution that they would follow the principles of Colorado law requiring preservation of adequate samples for independent testing by the opposing party, or, if the testing was to be destructive of the entire sample, to provide notice and an opportunity for the opposing party to be present during the testing.

211.     The court ordered that the parties confer regarding procedures to be used to protect the evidence for the defense's shipment of the DNA evidence to its out-of-country forensic DNA experts.  Much of the pertinent evidence was clothing introduced into evidence at trial and, thus, was in the court's custody.

212.     Prior to the defense team seeking to test the evidence for DNA, the Eighth Judicial District had expressed absolutely no interest in such testing.  Nevertheless, a few weeks later, in direct contravention of the court's order, Defendants Lammons and Riedel, without obtaining permission of the court or the defense team, and without establishing a protocol for preservation of the evidence, misrepresented to the court reporter, Ms. Gina Meyers, the

custodian of the evidence, that they had permission to take the Hettrick clothing items which were to be tested for DNA.

213.     Lammons and Riedel took the evidence and released it to CBI agents.   Those agents, at the direction of Lammons and Riedel, proceeded to manipulate and alter the evidence purportedly in order to collect half of the DNA evidence, through procedures that Lammons and Riedel knew – based on extensive prior arguments and evidence presentation in open court – would have the effect of dramatically decreasing the defense's odds of getting results from the remaining small and non-porous DNA samples, thereby potentially robbing Mr. Masters of any opportunity to effectively test the DNA and exculpate himself.

214.     Through CBI's procedures, Lammons and Riedel directed the destruction of substantial amounts of the limited DNA samples still available in Mr. Masters' case.  These Defendants knew of the patently exculpatory value of this evidence at the time that it was destroyed.

215.     The purpose and effect of Lammons and Riedel's conduct was to interfere with and defeat Tim Masters' efforts to locate exculpatory evidence and to continue to conceal the gross investigatory and prosecutorial misconduct that served as the basis for Tim Masters' arrest, prosecution and conviction.

216.     Lammons and Riedel's DNA "grab" was an overt act in furtherance of a conspiracy spanning more than two decades to bring about the unconstitutional arrest, prosecution, conviction, and incarceration of Tim Masters by any means necessary, and despite the great weight of evidence supporting his innocence.

### b.      Hazelwood Evidence

217.      In November 2006, Mr. Masters' post-conviction defense counsel issued a *subpoena duces tecum* to Broderick to bring to court *all information* related to his communications with Roy Hazelwood.

218.      Broderick produced ten pieces of paper, far short of the dozens of documents that actually existed in the FCPD file regarding Hazelwood, most of which document Broderick's interactions with Hazelwood.  In particular, Broderick chose not to produce any of the documents later discovered by the post-conviction defense team, in which Hazelwood directly refuted the bases for Meloy's opinions linking Tim Masters to Peggy Hettrick's murder.

219.      Production of Hazelwood's exculpatory opinions would have revealed that the sole link connecting Mr. Masters to the Hettrick murder – Reid Meloy's opinions – was even weaker than could have been suspected.

220.      Broderick's refusal to produce Dr. Hazelwood's exculpatory opinions was an overt act in furtherance of a conspiracy spanning more than two decades to bring about the unconstitutional arrest, prosecution, conviction, and incarceration of Tim Masters by any means necessary, and despite the great weight of evidence supporting his innocence.

### c.      Hammond Evidence

221.      Lammons and Riedel were long-time friends of Gilmore and Blair.  Through this friendship, Lammons and Riedel were, like Gilmore and Blair, conflicted in their consideration of Dr. Hammond's potential involvement in Peggy Hettrick's murder.  Yet, rather than recusing themselves at the outset, and in spite of the obvious import of Dr. Hammond's crime and psychological history to the determination of Mr. Masters' guilt or innocence, Lammons and

Riedel doggedly fought to bar, obstruct, and/or delay any access by Mr. Masters' defense team to the Hammond evidence.  Doing so constituted an overt act in furtherance of a conspiracy spanning more than two decades to bring about the unconstitutional arrest, prosecution, conviction, and incarceration of Tim Masters by any means necessary, and despite the great weight of evidence supporting his innocence.

222.    Dr. Hammond's suicide note explicitly waived his medical privilege by releasing all of his medical documents to Gilmore.  Yet, Lammons and Riedel persistently refused to produce Dr. Hammond's medical records, arguing they were irrelevant and privileged.

223.    Upon motion by Mr. Masters' post-conviction defense counsel, on November 27, 2006, the District Court of Larimer County ordered the State to produce all material related to "other unknown suspect(s) concerning the homicide of Ms. Hettrick."

224.    Rather than producing to Mr. Masters' defense team the documents relating to the FCPD's Hammond investigation, Lammons and Riedel persistently argued that the State had no discovery rights related to such evidence because Richard Hammond was not and should not have been an alternative suspect in the Hettrick murder.

225.    In an attempt to intimidate a Former FCPD Detective from testifying regarding the relevance of the Hammond case to the Hettrick case, Riedel said to the Detective: "I don't know why you're so interested in an old man who likes to watch little girls pee."

226.    Producing the Hammond evidence and/or admission that Dr. Hammond was a viable alternative suspect for the Hettrick murder would have laid bare the gross misconduct by Gilmore, Blair, Broderick, and Reed in choosing not to investigate Dr. Hammond in relation to the Hettrick case and in destroying the evidence related to Dr. Hammond's crimes.

227.     Admission that Dr. Hammond was a viable alternative suspect for the Hettrick murder would have laid bare the blatant falsity that was at the heart of Gilmore, Broderick, Reed, and Blair's intentional fabrication of probable cause to arrest Tim Masters and their eventual malicious prosecution of him – that the FCPD had left no stone unturned in its investigation of the Hettrick murder.  Specifically, Gilmore, Blair, and Broderick stated to the jury that FCPD had followed *any lead of suspicious similar-type behavior in the Fort Collins area*, and that this thorough investigation had revealed *no one* but Tim Masters with the psychosexual fantasy and weapon to commit the crime.

228.     In an attempt to protect the reputation of their colleagues, Gilmore and Blair, as well as their employer – the District Attorney's Office of the Eighth Judicial District – Lammons and Riedel persistently fought to deny Mr. Masters any opportunity to discover the evidence related to the Dr. Hammond, thereby intentionally postponing the eventual dismissal of the unfounded charge against Mr. Masters.  By doing so, Lammons and Riedel engaged in an overt act in furtherance of a conspiracy spanning more than two decades to bring about the unconstitutional arrest, prosecution, conviction, and incarceration of Tim Masters by any means necessary, and despite the great weight of evidence supporting his innocence.

### d.     FBI Profile

229.     Upon motion by Mr. Masters' post-conviction defense counsel, on November 27, 2006, the District Court of Larimer County ordered the State to produce all material related to the FBI Psychological Profile of the Hettrick murderer.

230.     By September 19, 2007, the State still refused to produce such documents.

231.     Lammons and Riedel never produced to post-conviction defense counsel an August 3, 2006, memo from Broderick to Riedel concerning the FBI psychological profile and several

other topics that would have been valuable in post-conviction proceedings.  In this memo,

Broderick refers to his "trial working files," *i.e.*, a collection of materials which he held separate

and apart from normal police files, and which were never disclosed to the defense.  As noted

herein, Broderick, Riedel and Lammons successfully blocked Tim Masters' efforts to discovery

just this sort of material for many years.

232.    These efforts by the State were overt acts in furtherance of a conspiracy spanning

more than two decades to bring about the unconstitutional arrest, prosecution, conviction, and

incarceration of Tim Masters by any means necessary despite the great weight of evidence

supporting his innocence.

### e.    False Statements by Gilmore and Blair to the Office of Attorney Regulation

233.    During the 2008 investigation by the Colorado Supreme Court Office of Attorney

Regulation, Gilmore and Blair consistently claimed that they were in the dark regarding the

plethora of exculpatory evidence that was withheld from Tim Masters throughout his trial,

including, for instance, the 1988 Surveillance, Dr. Tsoi's exculpatory opinion, and Hazelwood's

exculpatory opinion.  Gilmore and Blair explained their failure to turn over this evidence due to

ignorance of its highly exculpatory nature and non-possession of the evidence.

234.    This explanation, sworn to by both Gilmore and Blair, is patently false.  Numerous

documents spanning over a decade show countless communications between Broderick, Blair,

Reed, and Gilmore regarding virtually every aspect of the effort to fabricate probable cause,

prosecute, and convict Tim Masters of the Hettrick murder at all costs, and despite the great

weight of evidence supporting his innocence.

235.    The 1988 Surveillance, for instance, was a major FCPD operation, utilizing dozens of

FCPD police officers.  Gilmore, at the time, was the DA assigned to investigate the Hettrick case

and was well-informed of the surveillance and fully briefed regarding its failure.  During Gilmore's May 29, 2008, interview with the Weld County District Attorney's Office, he admitted to having learned of the surveillance while it was still underway in 1988.  During Blair's April 25, 2008 interview with the Weld County District Attorney's Office, she admitted that "[w]e were all aware of the 1988 surveillance."  Moreover, FCPD Detective Wheeler-Holloway confirmed that, in 1998, she gave Gilmore her entire Hettrick case file, including *all* of the 1988 surveillance documents.  Gilmore, thus, misrepresented to the Office of Attorney Regulation his knowledge of the 1988 Surveillance and his possession of the documents relating to it.

236.    Similarly, throughout Broderick's two years of communications with Hazelwood, Broderick regularly briefed Gilmore about such communications, including Hazelwood's opinions that were critical of Dr. Meloy's approach and conclusions.

237.    Gilmore was also present for the 1987 discussion in which Reed agreed, upon urging by Meloy, to seek out Dr. Tsoi's expert advice on the knife cut.

238.    Gilmore and Blair's behavior is so consistent in their efforts to withhold, hide, and/or destroy evidence exculpatory of Mr. Masters, that their motive in doing so can *only* have been the wrongful prosecution and conviction of Tim Masters at all costs, despite the great weight of evidence supporting his innocence.

### xi.    *Mr. Masters Remains at Grave Risk of Wrongful  Prosecution*

239.    According to Defendant Broderick, as a representative of the FCPD, Mr. Masters remains a suspect in the continuing Hettrick investigation.

240.    Mr. Masters is currently under investigation by the FCPD for the murder of Peggy Hettrick.

241.    Mr. Masters, therefore, remains at risk of wrongful arrest by the FCPD and wrongful prosecution by the Eighth Judicial District.

242.    Given these facts, unless Defendants are enjoined from engaging in present and/or future investigative and/or prosecutorial acts in violation of Mr. Masters' constitutional rights, he will suffer further irreparable injury.

### xii.    Supervision, Training, Customs, Policies, and/or Practices of the FCPD

243.    The Fort Collins Police Department engaged in numerous practices that, either by design or by a complete and utter failure to train and supervise, resulted in the deprivation of Mr. Masters constitutional rights.  One such intentional practice was purposefully removing detectives from the Hettrick investigation if they failed to only target Mr. Masters for the crime. Even the mere suggestion of another perpetrator could result in an officer's removal from the investigation and a demotion to the "street beat."  This was the custom, policy and/or actual practice of the FCPD throughout throughout Mr. Masters' investigation.

244.    In addition, Broderick and Harrison failed to adequately train and/or supervise their subordinates to: (1) prevent the destruction of exculpatory evidence; (2) prevent the manufacturing of inculpatory evidence; (3) prevent perjury; (4) prevent an obvious conspiracy to fabricate probable cause to arrest Tim Masters; (5) prevent an obvious conspiracy to maliciously prosecute Tim Masters despite the great weight of evidence pointing to his innocence; (6) ensure that all viable suspects for a crime are fully investigated; (7) ensure the proper sharing of investigatory information, including exculpatory evidence, between all FCPD personnel engaged in an investigation; and (8) ensure the flow of investigatory information, including exculpatory evidence, from the FCPD to the DA's office.

245.     In light of the duties and responsibility of Broderick and Harrison, who exercise control over FCPD personnel charged with investigating crimes, the need for scrutiny and specialized training and supervision regarding the above detailed problems was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of constitutional rights, such as those described herein, that Supervisory Police Defendants' failure to train and supervise amounts to deliberate indifference to the constitutional rights of persons, including Tim Masters, which whom the FCPD comes into contact.

246.     Harrison and the City of Fort Collins ("Policymaking Police Defendants") had either no policies governing or long-standing, department-wide customs, policies, and/or actual practices that allowed: (1) Broderick to doggedly pursue Tim Masters' wrongful arrest and conviction virtually unchecked; (2) the destruction of exculpatory evidence; (3) the manufacturing of inculpatory evidence; (4) perjury; (5) a conspiracy to fabricate probable cause to arrest Tim Masters; (6) a failure to investigate all viable suspects for a crime; (7) a failure to share significant amounts of investigatory information between FCPD personnel engaged in an investigation; and (8) a failure to pass all investigatory information, particularly exculpatory evidence, from the FCPD to the DA's office.

247.     Policymaking Police Defendants had no known, official policies in place to ensure: (1) that police reports were timely filed with the Records Department; (2) that experts retained by the State to assist in a criminal case, including exculpatory evidence, received all documents relevant to their analysis; (3) that all documents relevant to a criminal case were shared with all FCPD investigators working on that case; and (4) that all documents relevant to a criminal case, including exculpatory evidence, were shared with the DA assigned to prosecute that case.

248.    As detailed above, Policymaking Police Defendants had and continue to have customs, policies, and/or actual practices that have allowed a long-standing, department-wide conspiracy to maliciously investigate, arrest, prosecute, and convict Tim Masters for the Hettrick murder at all costs, and in spite of the great weight of evidence supporting his innocence.

249.    These customs, policies, and/or actual practices (including any lack thereof) were consciously approved by Policymaking Police Defendants, represent a deliberate choice to follow a course of action made from among various alternatives, and were a moving force behind the constitutional violations at issue, as detailed below.

><b><i>xiii.    Supervision, Training, Customs, Policies, and/or Practices of the Eighth Judicial District Attorney's Office</i></b>

250.    Gilmore and VanMeveren ("Supervisory DA Defendants"), failed to adequately train and/or supervise their subordinates to: (1) prevent the destruction of exculpatory evidence; (2) prevent the manufacturing of inculpatory evidence; (3) prevent conspiring to perjure; (4) prevent an obvious conspiracy to fabricate probable cause to arrest Tim Masters; (5) prevent an obvious conspiracy to maliciously prosecute Tim Masters; (6) ensure that DA's do not influence the investigation or prosecution of a case on which they are conflicted; (7) ensure that all viable suspects for a crime are fully investigated; (8) ensure the flow of investigatory information, including exculpatory evidence, from the relevant police department to the DA's office; (9) ensure the DA engages in an adequate amount of investigation independent of the police department's investigation; (10) ensure that all exculpatory evidence is disclosed to the defendant and his counsel; and (11) ensure that defendants have access to potentially exculpatory DNA evidence.

251.    In light of the duties and responsibilities of Supervisory DA Defendants, who exercise control over Eighth Judicial District personnel charged with investigating and

prosecuting crimes, the need for scrutiny and specialized training and supervision regarding the above detailed problems was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of constitutional rights, such as those described herein, that Supervisory DA Defendants' failure to train and supervise amounts to deliberate indifference to the constitutional rights of persons, including Tim Masters, which whom the Eighth Judicial District comes into contact.

252.    VanMeveren, Abrahamson, Larimer County, Board of County Commissioners of Larimer County and the Eighth Judicial District of Colorado ("Policymaking DA Defendants") had and/or have customs, policies, and/or actual practices that allowed: (1) destruction of exculpatory evidence; (2) manufacturing of inculpatory evidence; (3) conspiracy to commit perjury; (4) conspiracy to fabricate probable cause to arrest Tim Masters; (5) a failure to investigate all viable suspects for a crime; (6) DAs to influence the investigation and/or prosecution of case on which they are conflicted; (7) patently inadequate information sharing between the police department and the DA's office; and (8) DAs to rely exclusively on the investigation performed by the police department.

253.    Gilmore, following the custom, policy, and/or actual practice of Policymaking DA Defendants, discouraged the FCPD from sharing with the DA's Office exculpatory evidence in certain criminal files, in order to assist in gaining a wrongful conviction.  This was the custom, policy and/or actual practice of the Eighth Judicial District throughout VanMeveren's tenure and throughout the investigation, prosecution and incarceration of Mr. Masters.

254.    As the Office of Attorney Regulation found, at least until Tim Masters' prosecution, the Eighth Judicial District had "no policies (written or unwritten) in existence…concerning the prosecution's duty to gather information from others who have

participated in the investigation or the methods for doing so.  Disclosure to the defense was

based entirely on what was provided to them by the police department."

255.     As detailed above, Policymaking DA Defendants had customs, policies, and/or

actual practices that allowed for a long-standing, department-wide of conspiracy to maliciously

investigate, arrest, prosecute, and convict of Tim Masters for the Hettrick murder at all costs, and

in spite of the great weight of evidence supporting his innocence.

256.     These customs, policies, and/or actual practices were consciously approved by

Policymaking DA Defendants, represent a deliberate choice to follow a course of action made

from among various alternatives, and were the moving force behind the constitutional violations

at issue.

257.     The acts or omissions of each Defendant, including the polices, customs, and/or

actual practices described above, were the legal and proximate cause of Mr. Masters' damages,

which include but are not limited to: robbing him of his liberty by incarcerating him for ten years

without cause, thereby damaging him emotionally, mentally, and financially; and dramatically

curtailing his ability to be a productive, well-adjusted member of society.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Malicious Prosecution
### (4th Amendment and 14th Amendment Procedural Due Process Violations)
### (Against All Defendants)[1]

258.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if

fully set forth herein.

259.     Defendants were acting under color of state law in their actions and omissions

which occurred at all times relevant to this action.

---

[1] Each of Mr. Masters' claims for relief is brought against all Defendants in their capacities as identified in the caption.

260.    Defendants, acting without probable cause, procured groundless charges against Tim Masters based upon Gilmore, Broderick, Reed and Blair's fabrication of inculpatory evidence, destruction of exculpatory evidence, and false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about Tim Masters' arrest, prosecution, and continued confinement.

261.    Defendants, acting knowingly, maliciously, willfully and wantonly, and evincing a complete and utter disregard for the truth, instituted legal proceedings against Mr. Masters, including seeking an arrest warrant, prosecuting, convicting and continuing to confine Mr. Masters with knowledge that there was no reasonable grounds to believe, and no realistic probability, that Mr. Masters had committed the homicide against Ms. Hettrick, thereby intentionally and maliciously subjecting Mr. Masters to wrongful incarceration for almost ten years.

262.    Defendants Broderick, Reed, Gilmore and Blair acted knowingly, maliciously, willfully and wantonly, as more fully described herein, by (1) systematically destroying and hiding exculpatory evidence from judicial officers, expert witnesses, Mr. Masters and his defense counsel; (2) systematically manufacturing inculpatory evidence that was designed to promulgate the arrest, prosecution and continued confinement of Mr. Masters and using this evidence against him by presenting such evidence to judicial officers, expert witnesses, Mr. Masters and his defense counsel; (3) committing perjury; (4) influencing an investigation upon which a DA is fundamentally conflicted; (5) refusing to investigate alternative and more viable suspects; (6) failing to share information between the FCPD and the office of the DA; (7) relying exclusively on the investigation of the FCPD and instituting no independent investigation by the Eighth Judicial District in approving the arrest and prosecution of Tim Masters; (8) attempting and

taking affirmative steps to deny Tim Masters access to potentially exculpatory DNA evidence;

(9) actively discouraging and/or denying the sharing of massive amounts of exculpatory evidence

with a criminal defendant; and (10) conspiring to fabricate probable cause to arrest Tim Masters,

to prosecute Tim Masters and to continue to confine Tim Masters, despite the great weight of

evidence pointing to his innocence.

263.    Defendants Blair and Gilmore knowingly, intentionally, and maliciously failed to

obtain all of the exculpatory evidence from FCPD detectives, and discouraged the FCPD

detectives from turning over such evidence, in order to keep this information from defense

counsel and Mr. Masters in order to wrongfully prosecute Mr. Masters for the murder of Ms.

Hettrick without probable cause.

264.    Defendant Broderick acted knowingly, maliciously and in reckless disregard for

the truth by testifying falsely at the Proof Evident Presumption Great Hearing as a complaining

witness, by actively encouraging the prosecution of Mr. Masters and intentionally misleading a

judicial officer into ordering that Mr. Masters be held in custody after his arrest.

265.    Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and

Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly,

participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick,

Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr.

Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

266.    As described above, Defendants Harrison, VanMeveren, and Abrahamson failed

to adequately train and/or supervise their subordinates to prevent the acts described herein, and

particularly in paragraph numbers 262-265, and failed to establish policies, customs, and/or

practices to prevent the above constitutional violations.  This failure inevitably led to the arrest of

Tim Masters without probable cause and his subsequent wrongful prosecution and confinement. In light of the duties and responsibility of these Defendants to train, supervise and exercise control over one or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and specialized training and supervision regarding preventing the acts described in paragraph numbers 262-65, so as to ensure that Mr. Masters was not subject to arrest and prosecution without probable cause, was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of Fourth and Fourteenth Amendment rights that Defendants Harrison, VanMeveren, and Abrahamson's failure to train and supervise amounts to deliberate indifference to the constitutional rights of persons, including Tim Masters, with whom the FCPD and Eighth Judicial District come into contact.

267.    Defendants Harrison and VanMeveren, not only failed to adequately train and supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest.

268.    Given the long-term and widespread nature of the acts described herein, and particularly in paragraph numbers 262-65, Defendants Harrison, VanMeveren, and Abrahamson knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and incarceration.

269.    As described above, Defendants Harrison, VanMeveren, and Abrahamson had long-standing, department-wide customs, policies, and/or actual practices that allowed the acts described in paragraph numbers 262-65.

270.    The customs, policies, and/or actual practices that allowed the unconstitutional arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in paragraphs 217-230, were necessarily consciously approved by Defendants Harrison,

VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made from among various alternatives, and were the moving force behind the constitutional violation at issue.

271.     Defendants Harrison, Van Meveren and Abrahamson are the chief policy makers for the FCPD and the DA's office, respectively.

272.     It was the custom, practice and policy of the City of Fort Collins, through the police chief, Defendant Harrison, to engage in the misconduct described herein.

273.     It was the custom, practice or policy of the Eighth Judicial District Attorneys office, through the elected district attorney, to engage in the misconduct described herein.

274.     The acts or omissions of each Defendant, including the polices, customs, and/or actual practices described above, were the legal and proximate cause of Mr. Masters' wrongful arrest and conviction, causing his injuries alleged herein.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Destruction and/or Hiding of Exculpatory Evidence**
**(14th Amendment Violations)**
**(Against All Defendants)**

275.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

276.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

277.     Defendants Reed, Broderick, Gilmore, and Blair recklessly, knowingly, intentionally, willfully and wantonly hid and/or destroyed a substantial amount of exculpatory evidence that they knew would have vitiated probable cause to arrest, prosecute, and imprison Tim Masters for the Hettrick homicide.

278.     Defendants Reed and Broderick, during the investigation of the Hettrick homicide, consulted with and interviewed Chris Tsoi, M.D., a plastic surgeon in Fort Collins regarding the excisions from Ms. Hettrick's body and obtained an exculpatory expert opinion from Dr. Tsoi that would have vitiated any reasonable grounds that Tim Masters committed the crime.  Among other things, Dr. Tsoi opined that a right-handed person would have committed the crime and that the excisions were surgical in nature. Moreover, Dr. Tsoi's opinion that two people would have been involved in the excising Ms. Hettrick's body parts completely dispelled of the prosecution's theory of the case.  Defendants Gilmore, Broderick, Reed and Blair knew about this interview, and the exculpatory nature of Dr. Tsoi's expert analysis of the excisions, yet, no notes, reports, memorandums or the like were ever turned over to defense counsel or Mr. Masters.

279.     Defendants Gilmore, Broderick, Reed, and Blair  recklessly, knowingly, intentionally, willfully, and wantonly destroyed in order to bring about the unconstitutional arrest, prosecution, conviction, and imprisonment of Mr. Masters for the murder of Ms. Hettrick.

280.     Defendants Broderick, Reed, Gilmore and Blair knew of Dr. Richard Hammond's sexual obsessions and activities, his medical knowledge and surgical ability, a plethora of evidence about his personal predilections and psychology, and his proximity to the crime scene, *and* were aware that FCPD detectives suspected his involvement in the Hettrick homicide and had urged them to investigate Dr. Hammond in connection with the Hettrick homicide.  Despite this knowledge that the evidence uncovered in the Hammond investigation was exculpatory with respect to Mr. Masters' involvement in the Hettrick homicide, Defendants Broderick, Reed, and Gilmore knowingly and intentionally destroyed all of this evidence.  The destruction of the Hammond evidence was conducted in a manner inconsistent with FCPD custom, policy and/or

practice and was done so recklessly, intentionally, knowingly, intentionally, willfully and wantonly in order to arrest, prosecute and imprison Mr. Master*rs f*or the murder of Ms. Hettrick, as evidenced by the speed with which Defendants destroyed the evidence and the manner in which the destruction was carried out.

281.     Defendants Gilmore, Blair, Broderick, and Reed chose not to investigate Donald Long in relation to the Hettrick murder, even though Long had already admitted to the sexual killing of two other women in their thirties in the Fort Collins area.  Defendants did not provide any judicial officer, expert witness, or defense counsel of Mr. Masters with this exculpatory evidence.  Instead, Gilmore recklessly, knowingly, intentionally, willfully, and wantonly destroyed all evidence related to Donald Long's crimes

282.     Defendants Broderick, Reed, Gilmore and Blair discovered multiple shoeprints at the crime scene that did not belong to Tim Masters.  However, Defendants knowingly, intentionally, willfully, and wantonly hid this exculpatory evidence from judicial officers, experts, defense counsel and Mr. Masters in order to arrest, prosecute and imprison Mr. Masters for the murder of Ms. Hettrick without reasonable grounds to believe that Mr. Masters committed any crime.

283.     The FCPD claims they have lost exculpatory hair and fingerprints found at the Hettrick crime scene.  Given the concerted effort by Gilmore, Broderick, and Reed to fabricate probable cause to arrest Tim Masters for the Hettrick murder, regardless of great weight of evidence supporting his innocence, it is a reasonable inference that one or all of these defendants intentionally destroyed this evidence.

284.     Defendants Blair and Gilmore recklessly, knowingly, intentionally, willfully and wantonly failed to obtain all of the exculpatory evidence from FCPD detectives, and discouraged

the FCPD detectives from turning over such evidence, in order to keep this information from defense counsel and Mr. Masters.

285.     Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly, participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr. Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

286.     As described above, Defendants Harrison, VanMeveren, and Abrahamson failed to adequately train and/or supervise their subordinates to prevent the acts described herein, and particularly in paragraph numbers 277-85.  This failure inevitably led the arrest of Tim Masters without probable cause and his subsequent wrongful prosecution and confinement.  In light of the duties and responsibility of these Defendants to train, supervise and exercise control over one or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and specialized training and supervision regarding preventing the acts described in paragraph numbers 277-85, so as to ensure that Mr. Masters was not subject to arrest and prosecution without probable cause, was so obvious, and the inadequacy of the training and supervision provided so likely to result in a constitutional violation, that Defendants Harrison, VanMeveren, and Abrahamson's failure to train and supervise amounts to deliberate indifference to the constitutional rights of persons, including Tim Masters, with whom the FCPD and Eighth Judicial District come into contact.

287.     Defendants Harrison and VanMeveren not only failed to adequately train and supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest.

288.     Given the long-term and widespread nature of the acts described herein, and particularly in paragraph numbers 277-85, Defendants Harrison, VanMeveren, and Abrahamson knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and incarceration.

289.     As described above, Defendants Harrison, VanMeveren, and Abrahamson had long-standing, department-wide customs, policies, and/or actual practices that allowed the acts described in paragraph numbers 277-85.

290.     The customs, policies, and/or actual practices that allowed the unconstitutional arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in paragraph numbers 243-57, were necessarily consciously approved by Defendants Harrison, VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made from among various alternatives, and were the moving force behind the constitutional violation at issue.

291.     The acts or omissions, of each Defendant, including the polices, customs, and/or actual practices described above, were the legal and proximate cause of Mr. Masters' wrongful arrest and conviction, causing his injuries alleged herein.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Manufacture of Inculpatory Evidence
### (14th Amendment Violations)
### (Against All Defendants)

292.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

293.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

294.    Defendants Broderick, Reed, Gilmore and Blair fabricated inculpatory evidence by recklessly, knowingly, intentionally, willfully and wantonly extracting a severely flawed expert opinion from Dr. Reid Meloy, prior to the existence of probable cause to arrest Tim Masters, in order to use his opinion to wrongfully arrest and convict Mr. Masters.

295.    Despite Dr. Meloy's recommendation that the FCPD seek an expert opinion from plastic surgeon regarding the surgical wounds on Peggy Hettrick's body, Defendants Reed, Broderick, Gilmore and Blair never informed Dr. Meloy of Dr. Tsoi's opinion that it would have been extremely unlikely that a fifteen-year-old-boy could have made the cuts with a survival knife.  Dr. Tsoi's expert opinions, including his opinion regarding the "hard cut" of the excision, that two people would be needed to perform the "surgery," frog-leg positioning, and the fact that the assailant was right-handed, unlike Mr. Masters, were necessary for Dr. Meloy to adequately evaluate the perpetrator's *modus operandi* in committing the murder.

296.    Defendants Broderick, Reed, Gilmore and Blair knew that Dr. Richard Hammond was a self-proclaimed and diagnosed voyeur, living in close proximity to the Hettrick crime scene, obsessed with female genitalia, and had surgical abilities.  These Defendants also knew that several detectives in the FCPD were calling for an investigation of Dr. Hammond as a suspect in the Hetterick case.  Dr. Meloy's opinions as to the psychology of the person who committed the Hettrick murder and the abnormal sexual interests that person would have exhibited directly applied to Dr. Hammond, yet Broderick, Reed, Gilmore, and Blair never informed Dr. Meloy of Dr. Hammond, his crimes, and his paraphilia.

297.    Defendant Broderick informed Dr. Meloy that Ms. Hettrick was suddenly attacked at the curb, assaulted and then dragged into the field.  This theory of the case belied the evidence that the initial attack occurred elsewhere.

298.     On numerous occasions, Dr. Meloy told Defendant Broderick that he wanted all information the FCPD had in their possession with the respect to the Hettrick homicide. Defendant Broderick misrepresented to Dr. Meloy on numerous occasions that he had supplied Dr. Meloy with the entire case file.  However, Dr. Meloy saw only a select few of the photographs of the crime seen, and was never provided with numerous photographs of the autopsy, including photographs revealing that Ms. Hettrick's body had been washed and photographs that showed the close-ups of the vaginal excision.

299.     Had Dr. Meloy received information regarding Dr. Tsoi's opinion, Dr. Hammond, and the complete crime scene photographs, he would have been able to provide a much more accurate expert opinion regarding the likely perpetrator of the Hettick murder.  However, Defendants Broderick and Reed recklessly, knowingly, intentionally, willfully, and wantonly provided Dr. Meloy with a skewed version of the evidence in order to generate an expert opinion that comported with their theory of the case, in order to arrest and prosecute Mr. Masters.

300.     Defendants Gilmore and Blair, as prosecutors on the case, were aware of  Dr. Meloy's fabricated opinion and shaped their presentation of the case at trial in order to provide the court and the jury with this manufactured opinion.  Likewise, correspondence shows that Defendant VanMeveren knew about and approved of Dr. Meloy's assistance in the case.

301.     Defendants Broderick and Reed recklessly, knowingly, intentionally, willfully and wantonly provided forensic expert, Tom Bevel only carefully selected pieces of crime scene evidence in order to manipulate Mr. Bevel's opinion to support their construction of probable cause that Tim Masters committed the Hettrick murder.  By informing Mr. Bevel that they had turned over to him *all* of the relevant, available information in the State's possession regarding the crime scene Broderick and Reed intentionally *manufactured* Bevel's crime scene analysis

and used this faulty analysis in seeking Mr. Masters' unconstitutional arrest.  Defendants

Gilmore and Blair knowingly and intentionally utilized this fabricated analysis at trial in order to

prosecute and wrongfully convict Mr. Masters.

302.     Only one shoeprint crossing the drag trail coincided with Mr. Masters' shoe.  The

numerous Thom McAn shoeprints at the crime scene did not match Mr. Masters' shoe prints.

Yet, in 1997, when Broderick and Reed sent the casts of the Hettrick crime scene shoeprints to

the FBI for analysis, they chose to send only Mr. Masters' shoeprint for comparison, and chose

not to send any of the twelve Thom McAn shoeprints found at the crime scene, thereby

recklessly, knowingly, intentionally, willfully, and wantonly manufacturing evidence in order to

fabricate probable cause against Mr. Masters.

303.     Defendants Gilmore and Blair, as prosecutors on the case, were aware that they

had manufactured Mr. Bevel's opinion by selectively withholding evidence from him and shaped

their presentation of the case at trial in order to provide the court and the jury with this

manufactured opinion.

304.     Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and

Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly,

participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick,

Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr.

Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

305.     As described above, Defendants Harrison, VanMeveren, and Abrahamson failed

to adequately train and/or supervise their subordinates to prevent the acts described herein, and

particularly in paragraph numbers 294-300.  This failure inevitably led the arrest of Tim Masters

without probable cause and his subsequent wrongful prosecution and confinement.  In light of

the duties and responsibility of these Defendants to train, supervise and exercise control over one

or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and specialized

training and supervision regarding preventing the acts described in paragraph numbers 294-300,

so as to ensure that Mr. Masters was not subject to arrest and prosecution without probable

cause, was so obvious, and the inadequacy of the training and supervision provided so likely to

result in the violation of Fourteenth Amendment rights that Defendants Harrison, VanMeveren,

and Abrahamson's failure to train and supervise amounts to deliberate indifference to the

constitutional rights of persons, including Tim Masters, with whom the FCPD and Eighth

Judicial District come into contact.

306.    Defendants Harrison and VanMeveren not only failed to adequately train and

supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick,

Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest.

307.    Given the long-term and widespread nature of the acts described herein, and

particularly in paragraph numbers 294-300, Defendants Harrison, VanMeveren, and Abrahamson

knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and

incarceration.

308.    As described above, Defendants Harrison, VanMeveren, and Abrahamson had

long-standing, department-wide customs, policies, and/or actual practices that allowed the acts

described in paragraph numbers 294-300.

309.    The customs, policies, and/or actual practices that allowed the unconstitutional

arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in

paragraph numbers 243-57, were necessarily consciously approved by Defendants Harrison,

VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made

from among various alternatives, and were the moving force behind the constitutional violation at issue.

310.     The acts or omissions, of each Defendant, including the polices, customs, and/or actual practices described above, were the legal and proximate cause of Mr. Masters' unconstitutional arrest, prosecution, conviction, and confinement, causing his injuries alleged herein.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Unreasonable Seizure/Arrest Without Probable Cause**
**(4th Amendment Violation)**
**(Against All Defendants)**

311.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

312.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

313.     Defendants recklessly, knowingly, intentionally, willfully, and wantonly sought Mr. Masters' arrest and instituted legal process against him by acting with knowledge that there was not a substantial probability that the Hettrick murder had been committed by Mr. Masters.

314.     Defendants Broderick, Reed, Gilmore and Blair recklessly, knowingly, intentionally, willfully and wantonly by preparing an affidavit containing false statements in support of the arrest of Tim Masters, and by misleading expert witnesses to support the allegations in the affidavits, thereby misleading a judicial officer into issuing the arrest warrant for Mr. Masters without probable cause.

315.     Defendants Broderick, Gilmore, Reed and Blair also acted recklessly, knowingly, intentionally, willfully and wantonly by omitting information that would have vitiated probable cause from the affidavits for the warrant for the arrest of Tim Masters.

316.     Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly, participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr. Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

317.     As described above, Defendants Harrison, VanMeveren, and Abrahamson failed to adequately train and/or supervise their subordinates to prevent the acts described herein, and particularly in paragraph numbers 313-15.  This failure inevitably led the arrest of Tim Masters without probable cause and his subsequent wrongful prosecution and confinement.  In light of the duties and responsibility of these Defendants to train, supervise and exercise control over one or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and specialized training and supervision regarding preventing the acts described in paragraph numbers 313-15, so as to ensure that Mr. Masters was not subject to arrest and prosecution without probable cause, was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of Fourth Amendment rights that Defendants Harrison, VanMeveren, and Abrahamson's failure to train and supervise amounts to deliberate indifference to the constitutional rights of persons, including Tim Masters, with whom the FCPD and Eighth Judicial District come into contact.

318.     Defendants Harrison and VanMeveren, not only failed to adequately train and supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest.

319.     Given the long-term and widespread nature of the acts described herein, and particularly in paragraph numbers 313-15, Defendants Harrison, VanMeveren, and Abrahamson

knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and incarceration.

320.     As described above, Defendants Harrison, VanMeveren, and Abrahamson had long-standing, department-wide customs, policies, and/or actual practices that allowed the acts described in paragraph numbers 313-15.

321.     The customs, policies, and/or actual practices that allowed the unconstitutional arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in paragraph numbers 243-57, were necessarily consciously approved by Defendants Harrison, VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made from among various alternatives, and were the moving force behind the constitutional violation at issue.

322.     The acts or omissions, of each Defendant, including the polices, customs, and actual practices described above, were the legal and proximate cause of Mr. Masters' unconstitutional  arrest, prosecution, conviction and incarceration, causing his injuries alleged herein.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – False Imprisonment
### (4th and 14th Amendment Violations)
### (Against All Defendants)

323.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

324.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

325.     Defendants recklessly, knowingly, intentionally, willfully and wantonly arrested and imprisoned Mr. Masters with no probable cause or reasonable grounds for believing that Mr.

Masters committed the murder of Ms. Hettrick, thereby unreasonably restricting Mr. Masters'

freedom for almost ten years without any legal basis.

326.     No reasonable officer in Broderick's or Reed's position, and no reasonable

attorney in Gilmore's or Blair's position, with the information each had in his or her possession

when seeking the arrest warrant for Mr. Masters, would have found that the application for the

arrest warrant was supported by probable cause.

327.     Defendants acted recklessly, knowingly, intentionally, willfully and wantonly by:

(1) systematically destroying and hiding exculpatory evidence from judicial officers, expert

witnesses, Mr. Masters and his defense counsel; (2) systematically manufacturing inculpatory

evidence that was designed to promulgate the arrest, prosecution and continued confinement and

using this evidence against him by presenting such evidence to judicial officers, expert

witnesses, Mr. Masters and his defense counsel; (3) committing perjury; (4) influencing an

investigation upon which a DA is fundamentally conflicted; (5) refusing to investigate alternative

and more viable suspects; (6) patently and inadequately sharing information between the

employees and supervisors of the FCPD and the office of the DA; (7) relying exclusively on the

investigation of the FCPD and instituting no independent investigation by the Eighth Judicial

District in approving the arrest and prosecution of a criminal defendant; (8) attempting, and

taking affirmative steps, to deny Tim Masters access to potentially exculpatory DNA evidence;

(9) actively discouraging and/or denying sharing of massive amounts of exculpatory evidence

with a criminal defendant; (10) conspiring to fabricate probable cause to arrest Tim Masters, to

prosecute Tim Masters and to continue to confine Tim Masters, despite the great weight of

evidence pointing to his innocence; (11) failing to train and supervise to prevent the above

constitutional violations; and (12) failing to establish policies, customs, and/or practices to prevent the above constitutional violations.

328.     Based on the acts described herein, and particularly in paragraph numbers 325-27, the process by which Mr. Masters was wrongfully arrested, prosecuted and confined, was so wholly lacking in the concept of justice in a civilized society, that Mr. Masters was never actually provided legal process and, therefore, was falsely imprisoned by Defendants Broderick, Reed, Gilmore and Blair.

329.     Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly, participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr. Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

330.     As described above, Defendants Harrison, VanMeveren, and Abrahamson failed to adequately train and/or supervise their subordinates to prevent the acts described herein, and particularly in paragraph numbers 225-27.  This failure inevitably led the arrest of Tim Masters without probable cause and his subsequent wrongful prosecution and confinement.  In light of the duties and responsibility of these Defendants to train, supervise and exercise control over one or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and specialized training and supervision regarding preventing the acts described in paragraph numbers 325-27, so as to ensure that Mr. Masters was not subject to arrest and prosecution without probable cause, was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of Fourteenth Amendment rights that Defendants Harrison, VanMeveren, and Abrahamson's failure to train and supervise amounts to deliberate indifference to the

constitutional rights of persons, including Tim Masters, with whom the FCPD and Eighth Judicial District come into contact.

331.     Defendants Harrison and VanMeveren, not only failed to adequately train and supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest.

332.     Given the long-term and widespread nature of the acts described herein, and particularly in paragraph numbers 325-27, Defendants Harrison, VanMeveren, and Abrahamson knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and incarceration.

333.     As described above, Defendants Harrison, VanMeveren, and Abrahamson had long-standing, department-wide customs, policies, and/or actual practices that allowed the acts described in paragraph numbers 325-27.

334.     The customs, policies, and/or actual practices that allowed the unconstitutional arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in paragraph numbers 243-57, were necessarily consciously approved by Defendants Harrison, VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made from among various alternatives, and were the moving force behind the constitutional violation at issue.

335.     The acts or omissions, of each Defendant, including the polices, customs, and/or actual practices described above, were the legal and proximate cause of Mr. Masters' unconstitutional arrest and conviction, causing his injuries alleged herein.

**SIXTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fundamental Unfairness of Tim Masters' Criminal Trial**
**(14th Amendment Procedural and Substantive Due Process Violations)**
**(Against All Defendants)**

336.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

337.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

338.     Mr. Masters has a protected liberty interest in freedom from incarceration by the State except upon conviction after a trial that complies with all constitutional requirements.

339.     By engaging in one or more of the following acts, each Defendant, as detailed above and acting recklessly, knowingly, intentionally, willfully and wantonly, played a personal and essential role in ensuring that Mr. Masters' criminal trial lacked fundamental fairness to a degree that shocks the universal sense of justice: (1) systematically destroying, hiding, and withholding exculpatory evidence from the Eighth Judicial District Attorney's Office, judicial officers, expert witnesses, Mr. Masters and his defense counsel; (2) systematically manufacturing inculpatory evidence that was designed to promulgate the arrest, prosecution and continued confinement and using this evidence against him by presenting such evidence to judicial officers, expert witnesses, Mr. Masters and his defense counsel; (3) committing perjury; (4) influencing an investigation upon which a DA is fundamentally conflicted; (5) refusing to investigate alternative and more viable suspects; (6) patently and inadequately sharing information between the employees and supervisors of the FCPD and the office of the DA; (7) relying exclusively on the investigation of the FCPD and instituting no independent investigation by the Eighth Judicial District in approving the arrest and prosecution of a criminal defendant; (8) attempting, and

taking affirmative steps, to deny Tim Masters access to potentially exculpatory DNA evidence; (9) actively discouraging and/or denying sharing of massive amounts of exculpatory evidence with a criminal defendant; (10) conspiring to fabricate probable cause to arrest Tim Masters, to prosecute Tim Masters and to continue to confine Tim Masters, despite the great weight of evidence pointing to his innocence; (11) failing to train and supervise to prevent the above constitutional violations; and (12) failing to establish policies, customs, and/or practices to prevent the above constitutional violations.

340.    Although Mr. Masters' conviction has since been vacated, the actions by Defendants described herein recklessly, knowingly, intentionally, willfully and wantonly caused Mr. Masters to be unconstitutionally arrested, prosecuted, convicted and confined for nearly ten years were so egregious and were carried out in manner that shocks the judicial conscience, that they constituted deprivation of Constitutional dimension.

341.    Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly, participated in, knew of, condoned and/or approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair, described herein, with the intent and understanding to bring about Mr. Masters' unconstitutional arrest, prosecution, conviction and continued confinement.

342.    As described above, Defendants Harrison, VanMeveren and Abrahamson failed to adequately train and/or supervise their subordinates to prevent the acts described herein, and particularly in paragraph numbers 339-40.  This failure inevitably led to a criminal trial against Tim Masters that lacked the fundamental fairness essential to the very concept of justice.  In light of the duties and responsibility of these Defendants to train, supervise, and exercise control over one or more of Defendants Broderick, Reed, Gilmore, and Blair, the need for scrutiny and

specialized training and supervision regarding preventing the acts described in paragraph numbers 339-40, so as to allow for a fundamentally fair criminal trial, was so obvious, and the inadequacy of the training and supervision provided so likely to result in the violation of Due Process rights that Defendants Harrison, VanMeveren and Abrahamson's failure to train and supervise amounts to deliberate indifference to the due process rights of persons, including Tim Masters, with whom the FCPD and Eighth Judicial District come into contact.

343.     Defendants Harrison and VanMeveren, not only failed to adequately train and supervise, but also knew of, condoned and approved the wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair that resulted in Mr. Masters' unreasonable and wrongful arrest, fundamentally unfair trial, and unconstitutional conviction.

344.     Given the long-term and widespread nature of the acts described herein, and particularly in paragraph numbers 339-40, Defendants Harrison, VanMeveren, and Abrahamson knew of a substantial risk of Tim Masters' unconstitutional arrest, prosecution, conviction and incarceration.

345.     As described above, Defendants Harrison, VanMeveren, and Abrahamson had long-standing, department-wide customs, policies, and/or actual practices that allowed the acts described in paragraph numbers 339-40.

346.     The customs, policies, and/or actual practices that allowed the unconstitutional arrest, prosecution, conviction and incarceration of Tim Masters, described herein, particularly in paragraph numbers 243-57, were necessarily consciously approved by Defendants Harrison, VanMeveren and Abrahamson, represent a deliberate choice to follow a course of action made from among various alternatives, and were the moving force behind the constitutional violation at issue.

347.     The acts or omissions, of each Defendant, including the polices, customs, and/or actual practices described above, were the legal and proximate cause of Mr. Masters' unconstitutional arrest, prosecution, conviction and confinement, causing his injuries alleged herein.

348.     Due to the actions of each Defendant, Mr. Masters' criminal trial lacked fundamental fairness to a degree that shocks the universal sense of justice.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Conspiracy To Violate Tim Masters' Civil Rights**
**(4th and 14th Amendment Violations)**
**(Against All Defendantscities)**

349.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

350.     Defendants were acting under color of state law in their actions and omissions which occurred at all times relevant to this action.

351.     Defendants Broderick, Reed, Gilmore, and Blair recklessly, knowingly, intentionally, willfully and wantonly conspired with one another, and others, to deprive Tim Masters of his Fourth and Fourteenth Amendment rights under the United States Constitution by bringing about his wrongful arrest, prosecution, conviction, and confinement, in spite of knowledge that the great weight of evidence supported Mr. Masters' innocence.

352.     These Defendants recklessly, knowingly, intentionally, willfully and wantonly acted in concert throughout the investigation and prosecution of Tim Masters is documented thousands of pages of police reports, letters, and testimony.

353.     Each Defendant recklessly, knowingly, intentionally, willfully and wantonly engaged in overt acts in furtherance of the conspiracy, as described herein, including but not limited to: (1) fabricating inculpatory evidence, by deceiving experts and concocting perjurious

statements; (2) destroying and/or hiding exculpatory evidence in an effort to ensure Tim

Masters' wrongful arrest, prosecution, and conviction; (3) making material misrepresentations to

a judicial officer in the affidavit for the arrest warrant for Mr. Masters; (4) making material

misrepresentations to a judicial officer in Mr. Masters' Proof Evident Presumption Great

Hearing; (5) and initiating and aggressively advocating for the prosecution of Mr. Masters with

no reasonable grounds to believe the Mr. Masters committed the murder of Ms. Hettrick.

354.    In particular, Defendants Broderick and Reed recklessly, knowingly,

intentionally, willfully and wantonly engaged in the overt acts of destroying and/or withholding

significant amounts of evidence exculpatory of Mr. Masters from the Eighth Judicial District

Attorney's Office with the intent and understanding of ensuring the evidence would not be

discovered by Tim Masters, his defense counsel and judicial officers, and in furtherance of their

conspiracy to unconstitutionally arrest, prosecute, convict, and incarcerate Tim Masters.

355.    Defendants Blair and Gilmore recklessly, knowingly, intentionally, willfully and

wantonly engaged in the overt acts of failing to obtain all of the exculpatory evidence from

FCPD detectives, and actively discouraged the FCPD detectives from turning over such

evidence, in furtherance of their conspiracy to unconstitutionally arrest, prosecute, convict, and

incarcerate Tim Masters.  Blair and Gilmore engaged in the overt acts of withholding

exculpatory evidence from Mr. Masters, as detailed above, in furtherance of their conspiracy to

unconstitutionally arrest, prosecute, convict, and incarcerate Tim Masters.

356.    Defendants Gilmore and Blair have admitted that they worked closely with

Broderick and Reed, and, in doing so, must have been aware of the fabricated opinions of Mr.

Bevel and Dr. Meloy.  Gilmore and Blair recklessly, knowingly, intentionally, willfully and

wantonly engaged in the overt act of shaping their presentation of the case at trial in order to

provide the court and the jury with these manufactured opinions in furtherance of their

conspiracy to wrongfully arrest, prosecute, convict, and incarcerate Tim Masters.

357.    Defendants Harrison and VanMeveren, as supervisors of Broderick and Reed and

Gilmore and Blair, respectively, recklessly, knowingly, intentionally, willfully and wantonly,

took overt acts in furtherance of the conspiracy by supervising, condoning, and/or approving the

wrongful acts of Defendants Broderick, Reed, Gilmore, and Blair, described herein, with the

intent and understanding to bring about Mr. Masters' unconstitutional arrest, prosecution,

conviction and continued confinement.

358.    Riedel, Lammons, and Abrahamson, knowing no probable cause existed for the

arrest, prosecution and/or confinement of Tim Masters, nonetheless took an active part in the

post-conviction proceedings and attempted to cover-up the malfeasance of the earlier

investigation of the FCPD and District Attorneys, attempted to withhold exculpatory evidence

from Mr. Masters, and attempted to destroy potentially exculpatory DNA, thereby continuing

Mr. Masters' wrongful confinement.  These actions were overt acts in furtherance of the

continuing conspiracy to unconstitutionally arrest, prosecute, convict, and confine Mr. Masters in

violation of his constitutional rights.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor

and against Defendants, and award him all relief as allowed by law and equity, including, but not

limited to, the following:

a.  Appropriate equitable relief including but not limited to prospective

injunctive relief, declaratory and other injunctive remedies;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to, those for past and

future pecuniary and non-pecuniary losses, emotional distress, suffering,

loss of reputation, humiliation, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses;

d.   Punitive damages for all claims allowed by law in an amount to be

determined at trial;

e.   Pre-judgment and post-judgment interest at the highest lawful rate;

f.   Attorney's fees and costs; and

g.   Any other relief this Court deems just and proper..

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 27th day of March, 2009.

KILLMER, LANE & NEWMAN, LLP

*s/David A. Lane*

_____

David A. Lane
Sara J. Rich
Althea S. Licht
Rebecca T. Wallace
David Wymore
1543 Champa Street, Suite 400
Denver, Colorado  80202
(303) 571-1000
dlane@kln-law.com
srich@kln-law.com
alicht@kln-law.com
rtwallace@kln-law.com

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| Jon N. Banashek: | jnb@bhgrlaw.com |
| | cds@bhgrlaw.com |
| Thomas Mark Dunn: | tdunn@dillanddill.com |
| | vevans@dillanddill.com |
| Jeannine S. Haag: | jeannine@hshh.com |
| | george@hshh.com |
| George H. Hass: | george@hshh.com |
| | jennifer@hshh.com |
| | tami@hshh.com |
| | karen@hshh.com |
| | becki@hshh.com |
| LaMar F. Jost: | jost@wtklaw.com |
| | purdy@wtklaw.com |
| Kevin Kuhn: | kuhn@wtklaw.com |
| | wheatley@wtklaw.com |
| Thomas J. Lyons: | lyonst@hallevans.com |
| | mandisc@hallevans.com |
| | cmecef@hallevans.com |
| | wilsonm@hallevans.com |
| Josh Marks: | jam@bhgrlaw.com |
| | cds@bhgrlaw.com |
| Sean T. Olson: | olson@wtklaw.com |
| | testa@wtlklaw.com |
| Marsha M. Piccone: | piccone@wtklaw.com |
| | joos@wtklaw.com |
| | berryman@wtklaw.com |
| Andrew D. Ringle: | ringlea@hallevans.com |
| | trout@hallevans.com |
| Patrick Tooley: | pdtooley@dillanddill.com |
| | moverton@dillanddill.com |
| Craig Lewis Truman: | craig@cltrumanlaw.com |

ATTORNEYS FOR DEFENDANTS

*s/ Stacie Murray*
_____