IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 08-cv-02278 - LTB - KLM

TIMOTHY MASTERS,

      Plaintiff,

v.

TERENCE A. GILMORE, Former Deputy District Attorney of the Eighth Judicial District, in
his individual capacity;
JOLENE C. BLAIR, Former Deputy District Attorney of the Eighth Judicial District, in her
individual capacity;
JAMES BRODERICK, Lieutenant of the Fort Collins Police Department, in his individual and
official capacities;
MARSHA REED, Former Detective in the Fort Collins Police Department, in her individual
capacity;
DENNIS V. HARRISON, Chief of the Fort Collins Police Department, in his individual and
official capacities;
CITY OF FORT COLLINS, a municipality;
STUART VANMEVEREN, Former District Attorney of the Eighth Judicial District, in his
individual capacity;
LARRY ABRAHAMSON, District Attorney of the Eighth Judicial District, in his official
capacity; and
EIGHTH JUDICIAL DISTRICT OF COLORADO, a political subdivision of the State of
Colorado,

      Defendants.

---

MEMORANDUM OPINION AND ORDER

---

Babcock, J.

# I. Introduction

Canon 5 of the American Bar Association ("ABA") Canons of Professional Ethics

adopted in 1908 provides:

> The primary duty of a lawyer engaged in public prosecution is not to convict, but
> to see that justice is done.  The suppression of facts or the secreting of witnesses

capable of establishing the innocence of the accused is highly reprehensible.

In turn, Ethical Consideration ("EC") 7-13 of the ABA Code of Professional Responsibility

adopted in 1969 provides:

> The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice not merely to convict. ... With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.  Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

These principles have been acknowledged by the Colorado Supreme Court in *People v.*

*District Court,* 632 P.2d 1022 (Colo. 1981).  The Court stated

> Our analysis begins with recognition that the duty of the prosecutor is to seek justice, not merely convict.  As stated in *Singer v. United States,* 380 U.S. 24, 85 S. Ct. 783, 13 L.Ed.2d 630 (1965) "... the (prosecutor) in a criminal prosecution is not an ordinary party to a controversy, but is a 'servant of the law' with a 'twofold aim ... that guilt shall not escape or innocence suffer.'" *Id.* at 37, 85 S.Ct. at 791.

*Id.* at 1023.  But there is more.  These principles are enshrined in the jurisprudence of the United

States Supreme Court.  *See Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787

(1987); *Singer v. United States,* 380 U.S. 24 (1965).  In *Young,* the Supreme Court said

> This distinctive role of the prosecutor is expressed in [EC] 7-13 of Canon 7 of the [ABA] Model Code of Professional Responsibility (1982): "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."

*Id.* at 803.  These principles even find expression chiseled into the stone of the Robert F.

Kennedy Center (Department of Justice Headquarters, Washington, D.C., constructed in 1935)

where it is admonished that "[t]he United States wins its case whenever justice is done one of its

citizens in the Courts."

Implicit in these principles is the notion that justice be done to victims, to their families, and to the United States Constitution.  This happens when fundamental fairness applies to convict the truly guilty.  Bedrock principles, yes.  Fundamental and objectively reasonable within the meaning of the Due Process Clause of the Fourteenth Amendment of the Constitution, of course.  And, these principles long pre-date the events of the case now before this Court.

This case is now before me on Defendants Eighth Judicial District, Stuart VanMeveren, and Larry Abrahamson's Rule 12(b)(6) Motion to Dismiss [Doc # 29]; Defendant Jolene Blair's Motion to Dismiss [Doc # 32]; and Defendant Terence Gilmore's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) [Doc # 35].  Although the motions were separately briefed, it is appropriate to address them in a single consolidated order based on the common and interrelated issues presented.  After consideration of the motion and all related pleadings, as well as the arguments presented at the hearing held on August 25, 2009, I grant the motions in part and deny them in part as set forth below.

## II.  Background

On February 11, 1987, the body of Peggy Hettrick was found in a field in Fort Collins, Colorado.  Plaintiff Timothy Masters was 15 years old at the time and lived in a trailer nearby. In August of 1998, more than 11 years after the murder of Ms. Hettrick, Mr. Masters was arrested and charged with the murder.  Following a trial in March of 1999, Mr. Masters was convicted of first degree murder and sentenced to life in prison.  Mr. Masters' conviction was upheld on appeal.  Then in January of 2008, Mr. Masters' conviction nearly a decade earlier was vacated pursuant to post-conviction motions, and the charge against him for the murder of Ms. Hettrick was dismissed.

Mr. VanMeveren was the district attorney for the Eighth Judicial District from 1972 through 2004.  Mr. Abrahamson succeeded Mr. VanMeveren as the district attorney for the Eighth Judicial District in 2005 and continues to serve in that position.  As a deputy district attorney for the Eighth Judicial District, Mr. Gilmore assisted the investigation of the Hettrick murder case then was lead counsel in the prosecution and trial of Mr. Masters.  As a deputy district attorney for the Eighth Judicial District, Ms. Blair also worked on the Hettrick murder case and was second chair in the prosecution and trial of Mr. Masters.

Mr. Masters' Amended Complaint asserts the following allegations against the moving Defendants (collectively the "DA Defendants") which are accepted as true as appropriate under the applicable standard of review solely for purposes of analyzing the motions to dismiss.

**A.  Allegations Relating to Defendant Gilmore**

Mr. Gilmore began working on the Hettrick murder case on February 11, 1987, the same day Ms. Hettrick's body was found.  Amended Complaint, ¶ 4.  Mr. Gilmore was present at the crime scene and at the autopsy on February 11, 1987 when the coroner remarked on the medical precision of excisions on Ms. Hettrick's body.  *Id* at ¶¶ 4 & 30.  Throughout the entire investigation of the Hettrick murder, Mr. Gilmore worked closely with the police defendants; was briefed on all aspects of the investigation; and consistently provided legal advice to the Fort Collins Police Department (the "FCPD") during its pre-trial investigation of the facts surrounding the Hettrick murder.  *Id* at ¶ 41.

After early 1987, Mr. Gilmore, along with police, targeted only Mr. Masters as a suspect for the murder of Ms. Hettrick.  *Id* at ¶ 31.  Before a decision was made to charge Mr. Masters in connection with the Hettrick murder, Mr. Gilmore worked closely with other Defendants,

sharing information and strategizing, to produce probable cause that Mr. Masters committed the murder.  *Id.* at ¶¶ 58 &  59.

Mr. Gilmore reviewed and approved the plans for a 1988 surveillance of Mr. Masters that was predicated on the assumption that Mr. Masters would exhibit certain behaviors on the anniversary of the Hettrick murder if he was indeed the murderer.  *Id.* at ¶¶ 133 & 134.  Mr. Gilmore later withheld and ignored the results of this surveillance which contradicted the theory that Mr. Masters was responsible for the murder of Ms. Hettrick.  *Id.* at ¶¶ 141 & 142.

In March of 1995, Mr. Gilmore was at the scene of the arrest of Dr. Richard Hammond, an experienced eye surgeon, for videotaping female genitalia without the subjects' knowledge at his home.  *Id.* at ¶¶ 81, 83 - 84.  Dr. Hammond was discussed at that time in Mr. Gilmore's presence as a suspect in the Hettrick murder case based on the close proximity of his home to the crime scene, his crimes involving the taping of female genitalia, and his surgical abilities.  *Id.* at ¶¶ 81 & 84.  A FCPD detective told Mr. Gilmore that the several hundreds of videotapes seized from Dr. Hammond might include a recording of Ms. Hettrick.  *Id.* at ¶ 94.  Several FCPD detectives urged  Mr. Gilmore that Dr. Hammond, not Mr. Masters, was likely the culprit in the Hettrick murder case.  *Id.* at ¶ 108.  Other FCPD detectives expressed to Mr. Gilmore that there was ample reason to at least doubt Mr. Masters' guilt and further investigate Dr. Hammond.  *Id.* at ¶ 108.

Mr. Gilmore was associated with Dr. Hammond through church and social activities but did not reveal this conflict or disqualify himself from the Hettrick murder case.  *Id.* at ¶¶ 85 & 87.  Mr. Gilmore did not investigate Dr. Hammond as a suspect in the Hettrick murder.  *Id.* at ¶ 120.  Mr. Gilmore authorized the burning of all evidence from the Hammond case a few months

after Dr. Hammond's suicide in March of 1995 before it could be reviewed in connection with the Hettrick murder case. *Id.* at ¶ 114. This destruction of evidence was a deviation from FCPD custom, policy and/or practice. *Id.* at ¶¶ 117 & 118. Typically, the FCPD stored evidence for several years and destroyed it only when a storage crisis arose and after it was determined that it no longer had any conceivable evidentiary value. *Id.* at ¶ 117. The FCPD typically destroyed evidence by burying it with evidence from several other cases. *Id.*

Mr. Gilmore did not investigate Donald Long, who admitted to the killing of two other women murdered in the Fort Collins-Greeley area within a year of Ms. Hettrick's murder, in connection with the Hettrick murder. *Id.* at ¶ 128. In 1993, Mr. Gilmore authorized the release and destruction of all evidence in Mr. Long's case. *Id.* at ¶ 129.

Mr. Gilmore manufactured an opinion by Tom Bevel, a crime scene/blood spatter expert, that Ms. Hettrick was attacked near where her body was found by providing Mr. Bevel with carefully selected pieces of evidence. *Id.* at ¶¶ 147 & 149.

Mr. Gilmore carefully selected a discrete set of evidence to share with Dr. Reid Meloy, a sexual homocide expert consulted on the Hettrick murder case, in order to manipulate him into concluding that Mr. Masters was guilty of the Hettrick murder. *Id.* at ¶162. Mr. Gilmore withheld highly exculpatory and relevant information from Dr. Meloy including the opinions proffered by surgical expert Dr. Chris Tsoi and knife expert Herb Gardner and the results of the 1988 surveillance. *Id.* at ¶¶ 71, 78, 141 & 164. Mr. Gilmore did not inform Dr. Meloy of the crimes of Dr. Hammond or Mr. Long. *Id.* at ¶¶ 120 & 130. Mr. Gilmore provided Dr. Meloy with evidence in Mr. Masters' possession as a result of it being planted by the FCPD as part of the 1988 surveillance without explanation and misrepresented that the physical evidence from

the crime scene directly implicated Mr. Masters.  *Id.* at ¶¶ 165 & 167.

Dr. Meloy's opinion that Mr. Masters was guilty of the Hettrick murder was the centerpiece of Mr. Masters' prosecution.  *Id.* at ¶¶ 46, 163 & 170.  After reviewing the evidence withheld from him during the investigation and prosecution of Mr. Masters, Dr. Meloy concluded that he would not have supported the charging, prosecution, and conviction of Mr. Masters had he been provided this information earlier; that the probability that Mr. Masters committed the Hettrick murder was "incredibly small;" and that the evidence relating to Dr. Hammond would have "strongly overridden" any suspicion of Mr. Masters and put Dr. Hammond "at the top of the list" of suspects for the Hettrick murder.  *Id.* at ¶ 166.

Mr. Gilmore otherwise ignored, hid, withheld and/or destroyed the opinions proffered by Dr. Tsoi and Mr. Gardner and the evidence of shoeprints not belonging to Mr. Masters at the crime scene, *Id.* at ¶¶ 70, 71, 77, 152 & 158.  Mr. Gilmore may have also destroyed fingerprints and hairs not belonging to Mr. Masters that were found on the contents of Ms. Hettrick's purse and clothing.  *Id.* at ¶¶ 172 - 176.  These fingerprints and hairs were purportedly lost by the FCPD, making it impossible to compare them to other suspects for the Hettrick murder or to obtain DNA from them.  *Id.* at ¶ 174.

Mr. Gilmore supervised and provided legal advice regarding the affidavit used to support the request for a warrant to arrest Mr. Masters for the Hettrick murder and supported the filing of this affidavit knowing that it contained false statements and omissions.  *Id.* at ¶¶ 178 - 180.  Mr. Gilmore conspired with Defendant Broderick to make false statements at Mr. Masters' Proof Evidence Presumption Great Hearing.  *Id.* at ¶¶ 195 - 198.  Mr. Gilmore engaged in further acts of alleged misconduct during the trial of Mr. Masters.  *Id.* at ¶¶ 119, 160, 192 & 201.

During interviews in 2008 with the Weld County District Attorney's Office after Mr. Masters' release, Mr. Gilmore falsely denied knowledge that Dr. Hammond was a viable suspect for the Hettrick murder.  *Id.* at ¶ 112.  During a 2008 investigation by the Colorado Supreme Court Office of Attorney Regulation after Mr. Masters' release, Mr. Gilmore also falsely denied knowledge and possession of exculpatory evidence that was withheld from Mr. Masters, including evidence relating to the 1988 surveillance.  *Id.* at ¶¶ 233 - 235.   In a sworn affidavit provided in the settlement of the investigation, however, Mr. Gilmore  acknowledged misconduct during the prosecution of Mr. Masters, including the failure to provide Mr. Masters with highly exculpatory evidence that he knew or should have known existed.  *Id.* at ¶ 57.

## B.  Allegations Relating to Defendant Blair

Ms. Blair began working on the Hettrick murder case in April of 1998, 4-5 months before the arrest of Mr. Masters.  *Id.* at ¶ 5.  Ms. Blair provided legal advice to the FCPD during its pre-trial investigation of the facts surrounding the Hettrick murder.  *Id.* at ¶ 41.  Before a decision was made to charge Mr. Masters in connection with the Hettrick murder, Ms. Blair worked closely with other Defendants, sharing information and strategizing, to produce probable cause that Mr. Masters committed the murder.  *Id.* at ¶¶ 58 &  59.

Ms. Blair carefully selected a discrete set of evidence to share with Dr. Meloy in order to manipulate him into concluding that Mr. Masters was guilty of the Hettrick murder.  *Id.* at ¶162.  Ms. Blair withheld highly exculpatory and relevant information from Dr. Meloy including the opinions proffered by surgical expert Dr. Chris Tsoi and knife expert Herb Gardner and the results of the 1988 surveillance.  *Id.* at ¶¶ 71, 78, 141 & 164.  Ms. Blair did not inform Dr. Meloy of the crimes of Dr. Hammond or Mr. Long.  *Id.* at ¶¶ 120 & 130.  Ms. Blair provided Dr.

Meloy with evidence in Mr. Masters' possession as a result of it being planted by the FCPD as part of the 1988 surveillance without explanation and misrepresented that the physical evidence from the crime scene directly implicated Mr. Masters.  *Id.* at ¶¶ 165 & 167.

Ms. Blair otherwise ignored, hid, withheld, and/or destroyed the opinions proffered by Dr. Tsoi and Mr. Gardner; the results of the 1988 surveillance; and the shoeprint evidence at the crime scene.  *Id.* at ¶¶ 70, 71, 77, 142, 152 & 158.  Ms. Blair may have also destroyed fingerprints and hairs not belonging to Mr. Masters that were found on the contents of Ms. Hettrick's purse and clothing.  *Id.* at ¶¶ 172 -176.

Ms. Blair did not investigate Dr. Hammond or Mr. Long as suspects in the Hettrick murder.  *Id.* at ¶¶ 120 & 128.  Ms. Blair did not immediately reveal that she was a patient at the eye clinic of Dr. Hammond or disqualify herself from the Hettrick case.  *Id.* at ¶¶ 86 & 87.

Ms. Blair supervised and provided legal advice regarding the affidavit used to support the request for a warrant to arrest Mr. Masters for the Hettrick murder and supported the filing of this affidavit knowing that it contained false statements and omissions.  *Id.* at ¶¶ 178 - 180.  Ms. Blair engaged in further acts of alleged misconduct during the trial of Mr. Masters.  *Id.* at ¶¶ 119, 160, 192 & 201.

During interviews in 2008 with the Weld County District Attorney's Office after Mr. Masters' release, Ms. Blair falsely denied knowledge that Dr. Hammond was a viable suspect for the Hettrick murder.  *Id.* at ¶ 112.  During a 2008 investigation by the Colorado Supreme Court Office of Attorney Regulation after Mr. Masters' release, Ms. Blair also falsely denied knowledge and possession of exculpatory evidence that was withheld from Mr. Masters.  *Id.* at ¶¶ 233 - 235.   In a sworn affidavit provided in the settlement of the investigation, however, Ms.

Blair acknowledged misconduct during the prosecution of Mr. Masters, including the failure to provide Mr. Masters with highly exculpatory evidence that she knew or should have known existed. *Id.* at ¶ 57.

**C. Allegations Relating to Defendant VanMeveren**

As district attorney, Mr. VanMeveren was responsible for the training and supervision of Eighth Judicial District personnel; provided overall management and accountability for the Eighth Judicial District; and was its final policymaker. *Id.* at ¶ 10.

Mr. VanMeveren assigned Defendants Gilmore and Blair to the Hettrick murder case and was their direct supervisor for all of the work that they did on the case. *Id.* As Defendants Gilmore and Blair's direct supervisor, Mr. VanMeveren was regularly and thoroughly briefed on the investigation and prosecution of Mr. Masters and consulted closely with these Defendants throughout the investigation and prosecution. *Id.* at ¶¶ 10 & 59.

Mr. VanMeveren was informed of the results of the 1988 surveillance and the conflict of interest Defendants Gilmore and Blair had with any investigation of Dr. Hammond. *Id.* at ¶¶ 121 & 140. Mr. VanMeveren allowed Defendant Gilmore to participate in the Hammond investigation and to offer Mrs. Hammond immunity. *Id.* at ¶121. Upon information and belief, Mr. VanMeveren agreed not to investigate Dr. Hammond as a suspect, allowed for the destruction of evidence in the case, and failed to recuse the Eighth Judicial District from the Hettrick murder case. *Id.*

In 1992, former FCPD detective Linda Wheeler-Holloway, who was lead detective on the Hettrick murder case from 1991 to 1993, expressed her strong doubts that Mr. Masters was guilty of the murder to Mr. VanMeveren. *Id.* at ¶¶ 33 & 34. Ms. Wheeler-Holloway also

contacted Mr. VanMeveren in 2000 to express doubts that she and others in the FCPD had about Mr. Masters' guilt. *Id.* at ¶ 202.  Mr. VanMeveren took no action to address these doubts at the time. *Id.* at ¶ 202.

Mr. VanMeveren failed to adequately train and/or supervise his subordinates to (1) prevent the destruction of exculpatory evidence; (2) prevent the manufacture of inculpatory evidence; (3) prevent conspiring to perjure; (4) prevent an obvious conspiracy to fabricate probable cause to arrest Tim Masters; (5) prevent an obvious conspiracy to maliciously prosecute Tim Masters; (6) ensure that district attorneys ("DAs") do not influence the investigation or prosecution of a case on which they are conflicted; (7) ensure that all viable suspects for a crime are fully investigated; (8) ensure the flow of investigatory information, including exculpatory evidence, from the relevant police department to the DA's office; (9) ensure the DA engages in an adequate amount of investigation independent of the police department's investigation; (10) ensure that all exculpatory evidence is disclosed to the defendant and his counsel; and (11) ensure that defendants have access to potentially exculpatory DNA evidence. *Id.* at ¶ 250.

Mr. VanMeveren had customs, policies, and/or actual practices that allowed: (1) destruction of exculpatory evidence; (2) manufacturing of inculpatory evidence; (3) conspiracy to commit perjury; (4) conspiracy to fabricate probable cause to arrest Tim Masters; (5) a failure to investigate all viable suspects for a crime; (6) DAs to influence the investigation and/or prosecution of case on which they are conflicted; (7) patently inadequate information sharing between the police department and the DA's office; and (8) DAs to rely exclusively on the investigation performed by the police department. *Id.* at ¶ 252.  These customs, policies, and/or

actual practices were consciously approved by Mr. VanMeveren and represent a deliberate choice to follow a course of action made from among various alternatives.  *Id.* at ¶ 256.

**D.  Allegations Relating to Defendant Abrahamson**

As district attorney, Mr. Abrahamson is responsible for the training and supervision of Eighth Judicial District personnel; provides overall management and accountability for the Eighth Judicial District; and is its final policymaker.  *Id.* at ¶ 11.

Mr. Abrahamson assigned deputy district attorneys Cliff Riedel and Gregory Lammons to Mr. Masters' post-conviction case, which began in 2003.  *Id.*  Mr. Abrahamson was Mr. Riedel and Mr. Lammons' supervisor during the post-conviction investigation of the Hettrick murder case until the Eighth Judicial District was disqualified from the case in 2007.  *Id.*

Mr. Abrahamson had and/or has customs, policies, and/or actual practices that allowed: (1) destruction of exculpatory evidence; (2) manufacturing of inculpatory evidence; (3) conspiracy to commit perjury; (4) conspiracy to fabricate probable cause to arrest Tim Masters; (5) a failure to investigate all viable suspects for a crime; (6) DAs to influence the investigation and/or prosecution of case on which they are conflicted; (7) patently inadequate information sharing between the police department and the DA's office; and (8) DAs to rely exclusively on the investigation performed by the police department.  *Id.* at ¶ 252.  These customs, policies, and/or actual practices were consciously approved by Mr. Abrahamson and represent a deliberate choice to follow a course of action made from among various alternatives.  *Id.* at ¶ 256.

**E.  Allegations Relating to Defendant Eighth Judicial District**

The Eighth Judicial District worked with the Fort Collins Police Department ("FCPD") to

investigate and prosecute Mr. Masters. *Id* at ¶ 12. The Eighth Judicial District is responsible for the supervision, training, official policies, customs, and practices of the other DA Defendants. *Id.*

The Eighth Judicial District had and/or has customs, policies, and/or actual practices that allowed: (1) destruction of exculpatory evidence; (2) manufacturing of inculpatory evidence; (3) conspiracy to commit perjury; (4) conspiracy to fabricate probable cause to arrest Tim Masters; (5) a failure to investigate all viable suspects for a crime; (6) DAs to influence the investigation and/or prosecution of case on which they are conflicted; (7) patently inadequate information sharing between the police department and the DA's office; and (8) DAs to rely exclusively on the investigation performed by the police department. *Id.* at ¶ 252. These customs, policies, and/or actual practices were consciously approved by the Eighth Judicial District and represent a deliberate choice to follow a course of action made from among various alternatives. *Id.* at ¶ 256.

**F. Mr. Masters' Claims and the DA Defendants' Motions to Dismiss**

Based on the allegations in the Amended Complaint, Mr. Masters has asserted claims against the DA Defendants under 42 U.S.C. § 1983 for malicious prosecution; destruction and/or hiding of exculpatory evidence; manufacture of inculpatory evidence; unreasonable seizure/arrest without probable cause; false imprisonment; and fundamental unfairness of his criminal trial in violation of his rights under the Fourth and Fourteenth Amendments, as well as conspiracy to violate his civil rights. By their motions to dismiss, the DA Defendants argue that Mr. Masters' claims against them must be dismissed under a variety of legal theories but central to the motions is absolute prosecutorial immunity, qualified immunity, and Eleventh Amendment

immunity.

### III.  Standard for Review

Under Rule 12(b)(6), "[d]ismissal is appropriate only if the complaint, viewed in the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Conner v. Salina Regional Health Center, Inc*., 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotations and citations omitted).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937, 1949 (2009) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (*citing Twombly, supra*).

Although plaintiffs need not provide "detailed factual allegations" to survive a motion to dismiss, they must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly,* 550 U.S. at 555.  *See also Ashcroft,* 129 S.Ct. at 1949 (a complaint will not suffice if it tenders naked assertions devoid of further factual enhancement).  Furthermore, conclusory allegations are "not entitled to the assumption of truth." *Ashcroft,* 129 S.Ct. at 1950.

### IV.  Analysis

**A.  Defendant Gilmore's Arguments for Dismissal**

**1.  Absolute Prosecutorial Immunity**

**a.  The Law of Absolute Prosecutorial Immunity**

"Absolute prosecutorial immunity is a complete bar to a suit for damages under 42

U.S.C. § 1983." *Mink v. Suthers,* 482 F.3d 1244, 1258 (10th Cir. 2007), *cert. denied,* — U.S. —, 128 S.Ct. 1122 (2008) (*citing Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13 (1976)).  Prosecutors are absolutely immune from those activities "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430.  To determine whether absolute immunity applies, courts use a "functional approach" to determine which actions the prosecutor took "in initiating a prosecution and in presenting the State's case." *Id.* at 431.  The functional approach "looks to 'the nature of the function performed, not the identity of the actor who performed it.'"  *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993) (*quoting Forrester v. White,* 484 U.S. 219, 229 (1988)).  "[T]he more distant a function is from the judicial process, the less likely absolute immunity will attach."  *Mink*, 482 F.3d at 1261 (citations omitted).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed,* 500 U.S. 478, 486 (1991) (citations omitted).  Because it is presumed that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties, the Supreme Court has been "quite sparing" in its recognition of absolute immunity.  *Id.* at 487 (*quoting Forrester,* 484 U.S. at 224).  Thus, "[a]bsolute immunity does not extend to 'those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.'" *Mink,* 482 F.3d at 1259 (*quoting Imbler,* 424 US. at 430-31)).

"[T]he duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler,* 424 U.S. at 431 n. 33.  In the role of an advocate, prosecutors are required to decide such questions as "whether to file an information, whether and when to prosecute, ... which witnesses to call, and

-15-

what other evidence to present." *Id.* "Preparation, both for the initiation of the criminal process

and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Id.* But

> [t]here is a difference between the advocate's role in evaluating evidence and
> interviewing witnesses as he prepares for trial, on the one hand, and the
> detective's role in searching for the clues and corroboration that might give him
> probable cause to recommend that a suspect be arrested, on the other hand. When
> a prosecutor performs the investigative functions normally performed by a
> detective or police officer, it is neither appropriate nor justifiable that, for the
> same act, immunity should protect the one and not the other.

*Buckley* 509 U.S. at 273 (internal quotations omitted). In evaluating whether absolute immunity

applies to pe-indictment acts, it is important to consider such factors as "(1) whether the action is

closely associated with the judicial process, (2) whether it is a uniquely prosecutorial function,

and (3) whether it requires the exercise of professional judgment." *Mink*, 482 F.3d at 1261

(internal citations omitted).

Applying and expanding on the principles set forth in *Imbler*, the Supreme Court has held

that absolute immunity applies when a prosecutor appears in court in support of an application

for a search warrant as a lawyer for the State, *Burns,* 500 U.S. at 487; when a prosecutor

prepares and files an information and motion for an arrest warrant, *Kalina v. Fletcher,* 522 U.S.

118, 129 (1997); and when a prosecutor fulfills administrative obligations of supervision or

training that are directly connected with the conduct of a trial, *Van de Kamp v. Goldstein,* – U.S.

–. 129 S.Ct. 855, 861-62 (2009). Conversely, the Supreme Court has held that absolute

immunity does not apply when a prosecutor gives the police legal advice on suspect

interrogation and the existence of probable cause to arrest that suspect, *Burns,* 500 U.S. at 487;

when a prosecutor manufactures false evidence during the preliminary investigation of a crime

and makes statements to the press, *Buckley,* 509 U.S. at 275-78; or when a prosecutor acts as a

complaining witness in support of an application for an arrest warrant, *Kalina*, 522 U.S. at 131.

The Tenth Circuit has held that absolute immunity does not apply when a prosecutor approves a

search warrant affidavit that she played no role in preparing or presenting in court.  *Mink*, 482

F.3d at 1262.

### b.  Application of Absolute Prosecutorial Immunity to Mr. Gilmore's Alleged Conduct

Mr. Gilmore argues that he has absolute immunity for all of Mr. Masters' claims relating

to "all acts immediately surrounding and following Mr. Masters' arrest."  Indeed, the law is clear

that Mr. Masters' allegations relating to Mr. Gilmore's pretrial conduct following the arrest of

Mr. Masters and at trial, with one exception, fall within the scope of absolute prosecutorial

immunity.  This includes all allegations that Mr. Gilmore withheld numerous categories of

evidence from Ms. Masters and his counsel and presented false evidence at the preliminary

hearing and at trial.  *See* Amended Complaint, ¶¶ 50, 119, 120, 130, 141, 158, 160, 192, 195 -

198 & 201.  Relying on persuasive authority from the Third Circuit, however, I conclude that

Mr. Masters' allegations that Mr. Gilmore destroyed exculpatory evidence do not fall within the

scope of absolute prosecutorial immunity regardless of when this destruction occurred.

In holding that the destruction of evidence was not subject to absolute immunity in *Yarris*

*v. County of Delaware,* 465 F.3d 129, 136 (3rd Cir. 2006), the Third Circuit aptly noted that

"[u]nlike decisions on whether to withhold evidence from the defense, decisions to destroy

evidence are not related to a prosecutor's prosecutorial function."  *See also Odd v. Malone,* 538

F.3d 202, 211 (3rd Cir. 2008) ("...presumably by virtue of their egregiousness, some acts fall

wholly outside the prosecutorial role no matter when or where they are committed."); *Wilkinson*

*v. Ellis,* 484 F. Supp. 1072, 1083 (E.D. Pa. 1980) ("... once the decision is made not to furnish

evidence to the defense, no additional protectible prosecutorial discretion is involved in deciding to dispose of it ....").

In concluding that Mr. Gilmore is not entitled to absolute immunity for the destruction of exculpatory evidence at any stage of the investigation and prosecution of Mr. Masters, I am mindful that *Gradle v. Oklahoma,* 203 Fed. Appx. 179, 182-83 (10th Cir. 2006), arguably supports a different conclusion.  In this unpublished opinion, the Tenth Circuit concluded that a prosecutor would have been immune from a § 1983 claim even assuming the defendant had sufficiently alleged that the prosecutor had destroyed or withheld exculpatory evidence.  In contrast to *Yarris* and *Wilkinson*, *supra*, however, *Gradle* contains scant analysis of how a prosecutor's alleged destruction of exculpatory evidence falls within the framework for absolute prosecutorial immunity set forth in *Imbler* and subsequent cases.  Notwithstanding *Gradle* then, I conclude that Ms. Gilmore is not absolutely immune for his alleged destruction of exculpatory evidence regardless of when this destruction took place.

Some of Mr. Gilmore's pre-arrest and pretrial conduct also fall within the scope of absolute prosecutorial immunity.  First, Mr. Gilmore is absolutely immune for his involvement in the preparation and filing of the affidavit supporting the 1998 arrest warrant under *Kalina, supra*.  There the Supreme Court held that a prosecutor's preparation and filing of an information and motion for an arrest warrant were protected by absolute immunity.  *Kalina,* 522 U.S. at 129.  Although Mr. Masters alleges that Defendant Broderick drafted and submitted the warrant request and supporting affidavit with Mr. Gilmore's "input, advice, and approval," the fact remains that Mr. Gilmore's involvement with the preparation and submission of these documents constituted acts undertaken in preparation for the initiation of judicial proceedings.  *See Buckley,*

-18-

509 U.S. at 273.  *Compare Mink,* 482 F.3d at 1262 (prosecutor who reviewed search warrant application - not arrest warrant application - as part of a continuing effort to obtain evidence when the district attorney was far from filing charges was not entitled to absolute prosecutorial immunity).  Indeed, Mr. Masters alleges that Mr. Gilmore and other Defendants "made the decision" to have Defendant Broderick seek the arrest warrant thereby further demonstrating that Mr. Gilmore was acting as an advocate and initiating a prosecution at that time.  *See Lerwill v. Joslin,* 712 F.2d 435, 437 (10th Cir. 1983) ("... a prosecutor's seeking a warrant for the arrest of a defendant against whom he has filed charges is part of his 'initiation of a prosecution' under *Imbler*.").

Although Mr. Gilmore's conduct as alleged violates EC 7-13 and the ABA Code of Professional Responsibility, *supra*, binding precedent dictates that he is also absolutely immune for his alleged failure to conduct an investigation of the Hettrick murder independent of that of the FCPD.  *See Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1490 (10th Cir. 1991) ("There is no question in this circuit that prosecutors are absolutely immune from liability for allegedly failing to conduct an adequate, independent investigation of matters referred to them for prosecution.").  But, it is critical to distinguish between failure to conduct an adequate and independent investigation and the destruction and/or hiding of material exculpatory evidence and manufacture of false evidence during the investigative phase of a case.  Absolute immunity affords no protection as to the latter.  *Buckley*, 509 U.S. at 275-78; *Yarris*, 465 F.3d at 136-37.

Apart from the allegations for which Mr. Gilmore is entitled to absolute immunity as discussed above, Mr. Masters' Amended Complaint alleges:

(1) that throughout the entire investigation of the Hettrick murder, Mr. Gilmore worked closely with the police defendants; was briefed on all aspects of the

investigation; and consistently provided legal advice to the FCPD;

(2) that Mr. Gilmore worked closely with other Defendants to produce probable cause that Mr. Masters committed the Hettrick murder before a decision to charge him for the crime was made;

(3) that Mr. Gilmore reviewed and approved the plans for the 1998 surveillance and ignored its results;

(4) that Mr. Gilmore did not reveal his conflict relating to Dr. Hammond or disqualify himself from the Hettrick murder case on this basis;

(5) that Mr. Gilmore failed to consider or investigate Dr. Hammond, Donald Long, or anyone other than Mr. Masters as a suspect for the Hettrick murder;

(6) that Mr. Gilmore authorized the destruction of all evidence relating to Dr. Hammond and Mr. Long;

(7) that Mr. Gilmore manufactured opinions from Mr. Bevel by providing him with only carefully selected pieces of evidence;

(8) that Mr. Gilmore manufactured opinions from Dr. Meloy by providing him with only carefully selected pieces of evidence and by misrepresenting the physical evidence;

(9) that Mr. Gilmore otherwise ignored, hid, withheld and/or destroyed the opinions proffered by Dr. Tsoi and Mr. Gardner and the evidence of shoeprints not belonging to Mr. Masters at the crime scene;

(10) that Mr. Gilmore may have destroyed fingerprints and hairs not belonging to Mr. Masters that were found on the contents of Ms. Hettrick's purse and clothing;

(11) that Mr. Gilmore falsely denied knowledge that Dr. Hammond was a viable suspect for the Hettrick murder during interviews in 2008 with the Weld County District Attorney's Office after Mr. Masters' release; and

(12) that Mr. Gilmore falsely denied knowledge and possession of exculpatory evidence that was withheld from Mr. Masters during a 2008 investigation by the Colorado Supreme Court Office of Attorney Regulation after Mr. Masters' release.

The sufficiency of these allegations to support Mr. Masters' claims will be addressed in the context of other arguments advanced by Mr. Gilmore and the DA Defendants.  I note,

however, that although Mr. Masters' allegations regarding false statements that Mr. Gilmore

made during post-release investigations by the Weld County District Attorney's Office and the

Colorado Supreme Court Office of Attorney Regulation do not fall within the scope of absolute

prosecutorial immunity, *see Martinez v. Winner,* 771 F.2d 424, 438 (10th Cir. 1985) (prosecutors

are not entitled to immunity for actions taken outside the judicial process to cover up wrongs to

avoid any possible personal liability), these allegations cannot support Mr. Masters' claims in

any event.  Since Mr. Masters was no longer incarcerated at the time of the alleged false

statements, they could not have caused or contributed to his alleged wrongful arrest, prosecution,

conviction, and incarceration.  Accordingly, no further consideration will be given to these

allegations regarding Mr. Gilmore or to the identical allegations regarding Ms. Blair.

### 2.  Qualified Immunity

#### a.  The Law of Qualified Immunity

Qualified immunity shields governmental officials performing discretionary functions

from liability for civil damages provided that their conduct does not violate clearly established

constitutional rights.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Once a defendant asserts

the defense of qualified immunity, the plaintiff must establish that (1) the defendant's actions

violated a constitutional or statutory right; and (2) the law was clearly established such that a

reasonable person in the defendant's position would have known that their conduct violated the

law.  *Garrett v. Stratman,* 254 F.3d 946, 951 (10th Cir. 2001).  Although it is often beneficial to

analyze these two factors sequentially, I have discretion to analyze these factors in the order I

find most appropriate.  *Pearson v. Callahan,* – U.S. – , 129 S.Ct. 808, 818 (2009).

#### b.  Violation of Mr. Masters' Constitutional Rights

Mr. Gilmore concedes that Mr. Masters has rights under the Fourth and Fourteenth Amendments not to be arrested and prosecuted without probable cause. Mr. Gilmore argues, however, that Mr. Masters cannot establish that he violated these rights because there is no constitutional violation until an injury results from the alleged wrongful conduct. Mr. Gilmore further argues that Mr. Masters was not injured by any of his alleged conduct until his arrest or trial at which time Mr. Gilmore is entitled to absolute immunity. Mr. Gilmore would therefore have me re-visit, and so, conflate the concept of absolute prosecutorial immunity under the first prong of qualified immunity analysis even though I have already determined that he is not absolutely immune for most of his alleged conduct during the investigatory stage of the Hettrick murder case or for his alleged destruction of evidence.

In support of the application of this circular analysis, Mr. Gilmore relies principally on *Buckley v. Fitzsimmons,* 20 F.3d 789 (7th Cir. 1994) (*Buckley IV*), on remand from the Supreme Court in *Buckley, supra* (*Buckley III*). In *Buckley IV,* the Seventh Circuit considered whether a prosecutor's seeking out and hiring of a witness allegedly known for her willingness to fabricate testimony violated a constitutional right. In concluding that it did not, the Seventh Circuit focused its analysis on the time of the injury, which it concluded was not when the prosecutor had discussions with the witness but rather when the prosecutor decided to file charges and proffer the witness's testimony at which point he was entitled to absolute immunity. *Id.* at 795-96. Although the Seventh Circuit gave lip service to the proposition that "[i]mmunity for prosecutorial deeds does not whitewash wrongs completed during the investigation," it also noted that "events not themselves supporting recovery under § 1983 do not become actionable because they lead to injurious acts for which the defendants possess absolute immunity." *Id.* at

796.  *See also Michaels v. New Jersey,* 222 F.3d 118, 121-23 (3rd Cir. 2000) (following the

reasoning of *Buckley IV* to affirm trial court's conclusion that plaintiff's constitutional rights

were not violated by prosecutor's use of improper interview techniques until testimony was

presented at trial).

I first note that the Supreme Court recently granted certiorari in *Pottawattamie County,*

*Iowa v. McGhee,* 129 S.Ct. 2002 (Apr. 20, 2009) to review *McGhee v. Pottawattamie County,*

*Iowa*, 547 F.3d 922 (8th Cir. 2008).  There the Eighth Circuit, like the Second Circuit in *Zahrey*

*v. Coffey,* 221 F.3d 342 (2nd Cir. 2000), essentially rejected the Seventh Circuit's analysis in

*Buckley IV*.   Resolution of *McGhee* could clarify whether there is any merit to Mr. Gilmore's

argument regarding the first prong to qualified immunity analysis.  I must, however, proceed to

decide this issue without the benefit of a decision in *McGhee*, and I am unpersuaded by the

Seventh Circuit's analysis in *Buckley IV*.

The primary problem that I see with the Seventh Circuit's analysis in *Buckley IV* is that it

is inconsistent with the Supreme Court's rationale for extending only qualified immunity to

actions taken by prosecutors in an investigative capacity.  That is, "[w]hen a prosecutor performs

the investigative functions normally performed by a detective or police officer, it is neither

appropriate nor justifiable that, for the same act, immunity should protect the one and not the

other." *Buckley III,* 509 U.S. at 273 (internal quotations omitted).  If prosecutors are permitted to

invoke the principles of absolute immunity in the context of qualified immunity, then they are

not being treated in the same manner as other investigating officers.  As the Second Circuit aptly

noted, allowing this type of analysis "would have the effect of 'relating back' a prosecutor's

absolute immunity for acts committed as an advocate to a stage of the proceeding when,

according to the Supreme Court in *Buckley III*, a prosecutor enjoys only qualified immunity."
*Zahrey,* 221 F.3d at 353 n. 10.  *See also Buckley IV,* 20 F.3d at 801 (Fairchild, J. dissenting)
("The majority's theory ... brings about absolute immunity for wrongful investigative acts.").  It
would also eviscerate the clear and express limitations on absolute immunity developed over
many years through numerous Supreme Court cases.  I therefore decline to apply the majority's
alchemic analysis in *Buckley IV*  in this case and proceed to the second prong of qualified
immunity analysis.

### b. Whether Mr. Masters' Constitutional Rights Were Clearly Established

Even if Mr. Masters' constitutional rights were violated, Mr. Gilmore argues that Mr.
Masters cannot satisfy the second prong of qualified immunity analysis and show that the rights
were clearly established at the time the violations occurred.  Remarkably, Mr. Gilmore argues
that during the relevant time period a reasonable prosecutor would not have known that
fabricating, destroying and/or concealing evidence violated Mr. Masters' constitutional rights.
Given the egregious conduct alleged, taken as true, I disagree.  *See* Introduction, *supra.*

"The relevant, dispositive inquiry in determining whether a right is clearly established is
whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation
he confronted."  *Saucier v. Katz,* 533 U.S. 194, 202 (2001), *overruled on other grounds by
Pearson,* 129 S.Ct. at 818-22.  Whether a particular constitutional right is clearly established at
the time of the defendant's actions presents a "purely legal question," *Garrett v. Stratman,* 254
F.3d 946, 951 (10th Cir. 2001) (*quoting Siegert v. Gilley,* 500 U.S. 226, 232 (1991)), that must
be analyzed in light of the specific context of the case, *Saucier,* 533 U.S. at 201.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court

or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Weigel v. Broad,* 544 F.3d 1143, 1154 (10th Cir. 2008), *cert. denied,* — U.S. —, 129 S.Ct. 2387 (2009) (*quoting Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). *See also Pierce v. Gilchrist,* 359 F.3d 1279,1298 (10th Cir. 2004) (In *Hope, supra,* the Supreme Court "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts towards the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."). "[Q]ualified immunity will not be granted if government defendants fail to make 'reasonable applications of the prevailing law to their own circumstances.'" *Pierce, supra* (internal quotations and citations omitted). When, as here, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.*

In *Pierce,* the Tenth Circuit recognized that it was clearly established in 1986 that the knowing or reckless falsification or omission of evidence in the pre-arrest and post-arrest stages of a prosecution violated an accused's constitutional rights. *Id.* at 1298-1299. *See also Limone v. Condon,* 372 F.3d 39, 45-48 (1st Cir. 2004) (right to not be framed by law enforcement agents through the subornation of false testimony from a key witness and the suppression of exculpatory evidence was clearly established in 1967 based on Supreme Court precedent dating back to 1935).

To avoid the inescapable conclusion that he had clear warning that the fabrication, destruction and/or concealment of evidence during the Hettrick murder investigation beginning in 1987 was a violation of Mr. Masters' constitutional rights, Mr. Gilmore focuses on his status as a prosecutor and relies on *Buckley IV* and *Michaels* to demonstrate that, at a minimum, it was unclear at the relevant time whether a prosecutor violated a defendant's constitutional rights by engaging in these acts. But, until Mr. Gilmore's intimate involvement with the preparation of the arrest warrant affidavit, taken as true, the allegations are that his role and function was that of an investigator. In addition, qualified immunity is determined by a test that "focuses on the objective legal reasonableness of an official's acts," *Harlow*, 457 U.S. at 819, not his title. Whatever title Mr. Gilmore chooses his alleged actions are devoid of objective reasonableness. In any event, the limited authority cited by Mr. Gilmore cannot render decades of jurisprudence recognizing the unconstitutionality of the fabrication and suppression of evidence by law enforcement officers unclear.

Accordingly, I conclude that Mr. Masters has met his burden of demonstrating that the law was clearly established such that a reasonable person in Mr. Gilmore's position would have known that his conduct in fabricating, destroying and/or concealing evidence violated Mr. Masters' constitutional rights. Because I have also concluded that Mr. Masters has established that Mr. Gilmore's alleged conduct violated his constitutional rights, Mr. Gilmore is not entitled to qualified immunity for his conduct that is not protected by absolute immunity.

### 3. Mr. Gilmore's Alternative Arguments for Dismissal of Mr. Masters' Claims

#### a. Fourth and Fifth Claims for Relief - False Arrest and False Imprisonment

Mr. Gilmore argues that Mr. Masters' claims for false arrest and false imprisonment are

barred because he was arrested pursuant to a warrant issued in August of 1998. I agree.

In *Wilkins v. DeReyes,* 528 F.3d 790, 798 (10th Cir. 2008), *cert. denied,* 129 S.Ct. 1526 (2009), the Tenth Circuit distinguished claims for false arrest and false imprisonment from claims for malicious prosecution by noting that the latter addresses detention after the wrongful institution of legal process. *See also Wallace v. Kato,* 549 U.S. 384, 389 (2007) ("The sort of unlawful detention remediable by the tort of false imprisonment is detention *without legal process* ...."). The Tenth Circuit further noted that "the issuance of an arrest warrant represents a classic example of the institution of legal process." *Wilkins*, 528 F.3d at 799. *Accord Wallace, supra* (detention was without legal process since respondents did not have warrant for petitioner's arrest). Accordingly, claims for false arrest and false imprisonment end once the victim becomes held pursuant to legal process. *Wallace*, 549 U.S. at 390.

Although he was undisputedly first detained when he was arrested pursuant to a warrant, Mr. Masters argues that he may nonetheless assert claims for false arrest and false imprisonment because the arrest warrant was so flawed that it did not constitute "the institution of legal process." In support of this argument, Mr. Masters cites the Tenth Circuit's dicta in *Mondragon v. Thompson,* 519 F.3d 1078, 1083 (10th Cir. 2008) that "[it did] not decide (although [it doubted]) that a forged arrest warrant functions as legal process." Not only is this language dicta, but it is also inapplicable to the alleged facts of this case. The warrant for Mr. Masters' arrest was facially valid although it allegedly contained false statements and material omissions. As such, the warrant for Mr. Masters' arrest is analogous to that in *Wilkins* which was treated as the institution of legal process despite similar allegations that it contained false statements and omitted exculpatory evidence. *Id.* at 799. Mr. Masters therefore cannot assert claims for false

arrest and false imprisonment on the basis that he was detained without legal process.

Mr. Masters also argues that even if the warrant for his arrest constituted legal process he may still assert claims for false arrest and false imprisonment for the time period between his arrest on August 10, 1998 and the filing of the information charging him with murder on August 27, 1998. Since the issuance of the warrant for Mr. Masters' arrest constitutes the institution of legal process that forecloses these claims, this argument is without merit.

I therefore conclude that Mr. Gilmore is entitled to the dismissal of Mr. Masters' Fourth and Fifth Claims for Relief, and I need not address his alternative argument regarding the applicable statute of limitations on these claims.

### b. Sixth Claim for Relief - Fundamental Unfairness of Criminal Trial

Mr. Gilmore argues that Mr. Masters' claim based on the fundamental unfairness of his criminal trial in violation of his substantive due process rights fails to state a claim because the conduct he alleges in support of this claim is adequately redressed by his claim for malicious prosecution under the Fourth and Fourteenth Amendments. I disagree.

Yes, "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998). Relying on this principle, Mr. Gilmore asserts with little analysis that Mr. Masters' allegations of substantive due process violations are adequately addressed by his malicious prosecution claims. As Mr. Masters notes, however, substantive due process violations have been recognized where a criminal trial lacks fundamental fairness to a degree that shocks the conscience. *Reali v. Abbot,* 90 Fed. Appx. 319,

-28-

324, 2004 WL 352837 *4 (10th Cir. 2004).  Mr. Masters' allegations regarding Mr. Gilmore,

taken as true, "shocks the conscience" of this Court and, therefore, support a claim for violation

of his substantive due process rights.

### c.  Duplicative Claims

Mr. Gilmore argues that Mr. Masters' Second, Third , Fourth, Fifth and Sixth Claims for

Relief are duplicative of his malicious prosecution claim and should be dismissed as redundant

in order to streamline this litigation.  Having already dismissed Mr. Masters' Fourth and Fifth

Claims for Relief for false imprisonment and false arrest on other grounds, I limit my analysis of

this argument to  Mr. Masters' Second, Third, and Sixth Claims for Relief, which allege

destruction and/or hiding of exculpatory evidence, manufacture of inculpatory evidence, and

fundamental unfairness of his criminal trial, respectively.

Although Mr. Masters has provided little explanation as to why his Second, Third, and

Sixth Claims for Relief are not subsumed by his malicious prosecution claim, I decline to

dismiss them solely to streamline the litigation at this early stage in the proceedings.  It may well

be appropriate to revisit this argument at a later stage of this case.

### 4.  Summary

In conclusion then, Mr. Gilmore is absolutely immune for his involvement in the

preparation and filing of the affidavit supporting the 1998 arrest warrant; his alleged failure to

conduct an investigation of the Hettrick murder independent of that of the FCPD; and for his

conduct following the arrest of Mr. Masters and at trial with the sole exception of his alleged

destruction of exculpatory evidence.

Mr. Gilmore is entitled to the dismissal of Mr. Masters' claims for false arrest (Fourth

Claim for Relief) and false imprisonment (Fifth Claim for Relief), for failure to state a claim upon which relief may be granted.  Mr. Masters' remaining claims against Mr. Gilmore will be limited consistent with my conclusions regarding the scope of Mr. Gilmore's absolute immunity.

**B.  Defendant Blair's Arguments for Dismissal**

**1.  Absolute Prosecutorial Immunity**

Like Mr. Gilmore, Ms. Blair is absolutely immune for her involvement in the preparation and filing of the affidavit supporting the 1998 arrest warrant; her alleged failure to conduct an investigation of the Hettrick murder independent of that of the FCPD; and for her conduct following the arrest of Mr. Masters and at trial with the sole exception of her alleged destruction of exculpatory evidence.  Mr. Masters' other  allegations relating to Ms. Blair are

> (1) that Ms. Blair provided unspecified legal advice to the FCPD during its pretrial investigation of the facts surrounding the Hettrick murder case;

> (2) that Ms. Blair worked closely with other Defendants to produce probable cause that Mr. Masters committed the Hettrick murder before a decision to charge him for the crime was made;

> (3) that Ms. Blair ignored, hid and/or destroyed opinions proffered by expert witnesses, the results of the 1988 surveillance, and the footprint evidence from the crime scene;

> (4) that Ms. Blair did not investigate alternative suspects for the Hettrick murder;

> (5) that Ms. Blair did not immediately reveal her conflict relating Dr. Hammond or disqualify herself from the Hettrick murder case on this basis;

> (6) that Ms. Blair provided false and incomplete evidence to Dr. Meloy in order to manipulate him into concluding that Mr. Masters was guilty of the Hettrick murder; and

> (7) that Ms. Blair may have destroyed fingerprints and hairs not belonging to Mr. Masters that were found on the contents of Ms. Hettrick's purse and clothing.

Even to the extent that this alleged conduct pre-dates the preparation of the affidavit supporting the warrant for Mr. Masters' arrest in August of 1998 or involves the destruction of evidence, Ms. Blair argues that all of Mr. Masters' claims must fail because her conduct is not described with the requisite specificity.  I disagree.

Mr. Masters has alleged that Ms. Blair worked with other Defendants to manufacture probable cause that Mr. Masters committed the Hettrick murder before a decision to charge him for the crime was made.  Mr. Masters has further alleged specific acts and omissions by Ms. Blair that would serve this objective including her alleged hiding, ignoring and/or destruction of exculpatory evidence.  Although Mr. Masters' Amended Complaint does not set forth specific dates on which Ms. Blair performed specific acts, the pleading standards under Fed R. Civ. P. 8 as recently refined by *Twombley, supra,* and *Ashcroft*, *supra*, do not require this level of specificity.  *See Twombley*, 550 U.S. at 555 (plaintiff need not provide "detailed factual allegations" to survive motion to dismiss).

The critical alleged fact now presumed to be true is that Ms. Blair began working on the Hettrick murder case 4-5 months prior to the arrest of Mr. Masters, at which time there was no probable cause for his arrest.  This allegation in combination with Mr. Masters' other factual allegations regarding Ms. Blair is sufficient to enable me to draw the plausible and reasonable inference that Ms. Blair may be liable for acts that she performed as an investigative officer, as opposed to an advocate.

Ms. Blair also argues that all of Mr. Masters' claims predicated on her conduct prior to his arrest must fail because the timing of this conduct, *ie.* 11 years after the investigation into the Hettrick murder began and only 4-5 months before the arrest of Mr. Masters, demonstrates that

she was necessarily acting in her role as an advocate throughout her involvement in the Hettrick

murder case.  Again, I disagree.

First, I have already concluded that the destruction of evidence is never an act of

advocacy.  Second, Mr. Masters has alleged, and I assume to be true for purposes of Ms. Blair's

motion, that there was not yet probable cause, either real or manufactured, to arrest him at the

time Ms. Blair began working on the Hettrick murder case.  "A prosecutor neither is, nor should

consider himself to be, an advocate before he has probable cause to have anyone arrested."

*Buckley III*, 509 U.S. at 274.   Furthermore, the Supreme Court made it clear that a suspect's

ultimate arrest and trial does not transform all prior prosecutorial work done on the case into

advocacy:

> A prosecutor may not shield his investigative work with the aegis of absolute
> immunity merely because, after a suspect is eventually arrested, indicted, and
> tried, that work may be retrospectively described as 'preparation' for a possible
> trial; every prosecutor might then shield himself from liability for any
> constitutional wrong against innocent citizens by ensuring that they go to trial.

*Id.* at 275.

Based on the allegations in the Amended Complaint and the controlling legal authority

then, I conclude that Ms. Blair is unable to meet her burden of demonstrating at this stage in the

proceedings that she is entitled to absolute immunity on all of Mr. Masters' claims.  I will

therefore analyze her arguments that are directed to particular claims of Mr. Masters.  I note that

not all of the allegations listed above are referenced in Mr. Masters' response to Ms. Blair's

motion to dismiss and are therefore presumably included in the Amended Complaint to establish

other relevant considerations such as motive and plan.  Accordingly, I will limit my analysis of

each claim to the supporting allegations identified in Mr. Masters' response.

## 2. First Claim for Relief - Malicious Prosecution

Ms. Blair argues that Mr. Masters' malicious prosecution claim must fail because this claim arose, at the earliest, when Mr. Masters was arrested, at which time she was absolutely immune for her alleged unconstitutional acts. This argument, which contains little citation to supporting legal authority, must fail because it ignores the proper approach to determining absolute immunity. *See Buckley III*, 509 U.S. at 272 (" ... the *Imbler* approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful.").

Mr. Masters' response to Ms. Blair's motion to dismiss clarifies that his malicious prosecution claim against her is predicated on her knowing fabrication of probable cause and the incriminating expert opinions of Dr. Meloy, as well as her involvement in the preparation and filing of the affidavit supporting the 1998 arrest warrant. I have already concluded that Ms. Blair is absolutely immune for her involvement with the affidavit supporting the 1998 arrest warrant. Mr. Masters' § 1983 malicious prosecution claim against Ms. Blair therefore survives her motion to dismiss only to the extent that it is predicated on her alleged fabrication of probable cause and Dr. Meloy's expert opinions.

## 3. Second Claim for Relief - Destruction and/or Hiding of Exculpatory Evidence

Mr. Masters' response to Ms. Blair's motion to dismiss clarifies that this claim against her is predicated on her alleged participation in the destruction of evidence of Dr. Tsoi's opinions that it was extremely unlikely that Mr. Masters committed the Hettrick murder as a result of the surgical precision and complexity involved.

Ms. Blair first argues that this claim must fail because Dr. Tsoi's opinions were obtained

before Ms. Blair got involved with the Hettrick murder case.  However, the time when Dr. Tsoi

provided his opinions regarding the case and when the evidence of these opinions was allegedly

destroyed are not specified in the Amended Complaint, and it is plausible that the alleged

destruction occurred sometime after April of 1998.  *See* Amended Complaint, ¶¶ 62 & 63 (Dr.

Tsoi was first consulted and interviewed regarding the Hettrick murder case immediately after

recommendation from Dr. Meloy in December of 1997).

Ms. Blair also argues that Mr. Masters is actually complaining that she ignored or hid Dr.

Tsoi's opinions as opposed to destroying evidence relating to them.  This may be a distinction

without a difference.  In any case, this argument is contradicted by the allegations in the

Amended Complaint.  *See* Amended Complaint, ¶¶ 71 & 279.  As previously discussed, the

destruction of exculpatory evidence does not fall within the scope of absolute prosecutorial

immunity regardless of when it takes place.  Ms. Blair is therefore not entitled to the dismissal of

Mr. Masters' § 1983 claim for the destruction of exculpatory evidence under any of the

arguments presented.

### 4.  Third Claim for Relief - Manufacture of Inculpatory Evidence

Mr. Masters' Section 1983 claim against Ms. Blair for the manufacture of inculpatory

evidence is predicated on her involvement in procuring the incriminating opinions of Dr. Meloy

by limiting and misrepresenting the evidence considered by him.

Ms. Blair argues that she is entitled to absolute immunity for her conduct relating to Dr.

Meloy because he was a "trial witness."  Again though, Mr. Masters has alleged that there was

no probable cause to arrest him at the time Dr. Meloy began working on the Hettrick murder

case sometime before December of 1997 and for some period of time thereafter.  During this

period of time, it cannot be said that Dr. Meloy's work on the case was done in preparation for trial such that the immunity typically afforded prosecutors in dealing with trial witnesses is applicable.

In *Buckley III*, *supra*, the Supreme Court held that prosecutors who allegedly fabricated evidence by shopping for expert witnesses to provide a false opinion during the preliminary investigation of an unsolved crime were not entitled to absolute immunity. *Buckley III*, 509 U.S. at 275-76. Although the prosecutors' conduct relating to expert witnesses in *Buckley III* seemingly occurred earlier in the investigation than is the case here, the two cases are similar in that the alleged wrongful conduct occurred before the prosecutors had probable cause for arrest or to initiate judicial proceedings. *Id.* at 274. Following *Buckley III* then, I conclude that Ms. Blair is not absolutely immune from Mr. Masters' § 1983 claim based on her alleged manufacture of inculpatory evidence through the manipulation of Dr. Meloy's opinions.

**5. Fourth and Fifth Claims for Relief - False Arrest and False Imprisonment**

In support of his claims for false arrest and false imprisonment, Mr. Masters' response to Ms. Blair's motion to dismiss references only her participation in drafting, reviewing, and giving legal advice related to the affidavit supporting the 1998 arrest warrant, which he alleges she knew contained material false statements and omissions. I have already concluded that this conduct falls within the scope of absolute prosecutorial immunity pursuant to *Kalina*. Because Ms. Blair is absolutely immune for her conduct with respect to the affidavit supporting the 1998 arrest warrant, Mr. Masters' cannot recover damages from her on his claims for false arrest and false imprisonment. Although absolute immunity does not extend to declaratory and injunctive relief, *Martinez*, 771 F.2d at 438, the fact that Ms. Blair is no longer associated with the DA's

office renders the complete dismissal of these claims against her appropriate.

Like Mr. Gilmore, Ms. Blair also argues that Mr. Masters' claims for false arrest and false imprisonment must be dismissed for failure to state a claim because Mr. Masters was arrested pursuant to a warrant. For the reasons set forth in the discussion of Mr. Gilmore's motion, this argument provides an alternative basis for the dismissal of these claims against Ms. Blair. By the same token, Ms. Blair's argument that she is entitled to the dismissal of these particular claims on absolute immunity grounds is equally applicable to Mr. Gilmore who is likewise absolutely immune for his conduct with respect to the arrest warrant affidavit.

Because I have already concluded that Ms. Blair is entitled to the dismissal of Mr. Masters' claims for false arrest and false imprisonment both because she is absolutely immune for the conduct on which these claims are based and because Mr. Masters was arrested pursuant to a warrant, I need not address her argument regarding the applicable statute of limitations on these claims

### 6. Sixth and Seventh Claims for Relief - Fundamental Unfairness of Criminal Trial and Conspiracy

Ms. Blair's supplemental arguments that she is absolutely immune for Mr. Masters' claims for fundamental unfairness of his criminal trial and conspiracy assume that these claims are predicated on actions she undertook in connection with judicial proceedings against him. In his response to the motion to dismiss, however, Mr. Masters clarifies that these claims are predicated on actions that he alleges Ms. Blair undertook in an investigatory capacity including the destruction of exculpatory evidence and manufacture of inculpatory evidence previously discussed in the context of Mr. Masters' other claims. Ms. Blair is therefore not entitled to absolute immunity on Mr. Masters' claim for fundamental unfairness of his criminal trial and

conspiracy for the reasons previously set forth.

For the reasons set forth in the discussion of Mr. Gilmore's motion to dismiss, Ms. Blair's arguments that Mr. Masters' substantive due process claim for fundamental unfairness of his criminal trial claim should be dismissed as duplicative and for failure to state a claim are equally unavailing.

### 7. Summary

In conclusion then, Ms. Blair is absolutely immune for her involvement in the preparation and filing of the affidavit supporting the 1998 arrest warrant; her alleged failure to conduct an investigation of the Hettrick murder independent of that of the FCPD; and for her conduct following the arrest of Mr. Masters and at trial with the sole exception of her alleged destruction of exculpatory evidence. Ms. Blair's motion to dismiss does not assert qualified immunity so I have no occasion to consider whether she is entitled to qualified immunity on some or all of Mr. Masters' claims.

Ms. Blair is entitled to the dismissal of Mr. Masters' claims for false arrest (Fourth Claim for Relief) and false imprisonment (Fifth Claim for Relief), which are based solely on conduct for which Ms. Blair is absolutely immune and which fail to state a claim upon which relief may be granted. Mr. Masters' remaining claims against Ms. Blair will be limited consistent with my conclusions regarding the scope of Ms. Blair's absolute immunity.

### C. Defendant VanMeveren's Arguments for Dismissal

### 1. Sufficiency of Mr. Masters' Allegations

Mr. VanMeveren argues that the allegations against him are insufficient as a matter of law under *Twombley, supra,* and *Ashcroft, supra*, In making this argument, Mr. VanMeveren

highlights paragraphs 250 to 257 of the "Factual Background" section of the Amended

Complaint, which are under the subheading of  "Supervision, Training, Customs, Policies, and/or

Practices of the Eighth Judicial District Attorney's Office," and other paragraphs in the

"Statement of Claims" section of the Amended Complaint that likewise address training and

other general policies of the DA's Office.

At oral argument, counsel for Mr. Masters conceded that the Supreme Court's decision in

*Van de Kamp*, *supra*, likely precludes all claims against Mr. VanMeveren in his individual

capacity  based on general policies he implemented or followed as the DA for the Eighth Judicial

District.  As a result, counsel for Mr. Masters indicated that the only claims that Mr. Masters is

currently pursuing against Mr. VanMeveren are based on his alleged direct participation in the

wrongful investigation and  prosecution of Mr. Masters for the Hettrick murder.  Under the

current posture of the case then, I need not address the sufficiency of Mr. Masters' allegations

regarding Mr. VanMeveren's involvement with the training and other general policies of the

DA's Office and will limit my analysis to Mr. Masters' allegations of direct involvement by Mr.

VanMeveren in the alleged wrongful conduct.

 Mr. Masters alleges that Mr. VanMeveren (1) was regularly and thoroughly briefed by

and consulted closely with Defendants Gilmore and Blair throughout the investigation and

prosecution of Mr. Masters (Amended Complaint, ¶¶ 10 & 59); (2) was specifically aware of the

results of the 1988 surveillance and the conflict of interest that Defendants Gilmore and Blair

had with any investigation of Dr. Hammond (*Id*. at  ¶¶ 121 & 140); (3) allowed Mr. Gilmore to

participate in the Hammond investigation and to offer Mrs. Hammond immunity (*Id*. at  ¶¶ 121);

and (4) upon information and belief, agreed not to investigate Dr. Hammond as a suspect,

allowed for the destruction of evidence in the case, and failed to recuse the Eighth Judicial

District from the Hettrick murder case (*Id.*).

Mr. VanMeveren argues that *Ashcroft* dictates that a plaintiff seeking to impose

supervisory liability on a § 1983 defendant must allege more than that the particular defendant

"knew of, condoned, and willfully and maliciously agreed to" violate a plaintiff's constitutional

rights.  Although such allegations were held to be insufficient in *Ashcroft*, the plaintiffs' claims

there are distinguishable from those of Mr. Masters.  Specifically, the plaintiff in *Ashcroft*

brought a *Bivens* action for discrimination in violation of the First and Fifteenth Amendments.

Such claims require a plaintiff to plead and prove that the defendant acted with discriminatory

purpose.  *Ashcroft*, 129 S.Ct. 1948.  As a result of this particular requirement, the Supreme Court

concluded that mere knowledge on the part of the supervisor was an insufficient basis for *Bivens*

liability, which it treated as equivalent to § 1983 liability.  *Id.* at 1948-49.  The Supreme Court

prefaced its analysis of this issue by recognizing that "[t]he factors necessary to establish a

*Bivens* [or § 1983] violation will vary with the constitutional provision at issue."  *Id.* at 1948.

*Ashcroft* thus does not support the general proposition that allegations of knowledge,

acquiescence, and agreement on the part of a supervisory defendant are never sufficient to

support a § 1983 claim.  In any event, Mr. Masters' Amended Complaint goes further and alleges

that Mr. VanMeveren "consulted closely" and plausibly participated with Defendants Gilmore

and Blair throughout the investigation and prosecution of Mr. Masters.

Generally, "to establish supervisory liability, a plaintiff must show that an affirmative

link exists between the [constitutional] deprivation and either the supervisor's personal

participation, his exercise of control or direction, or his failure to supervise."  *Worrell v. Henry,*

219 F.3d 1197, 1214 (10th Cir. 2000) (internal quotations and citations omitted).  This

affirmative link must be alleged in the complaint as well as proven at trial.  *Stidham v. Peace*

*Officer Standards and Training,* 265 F.3d 1144, 1157 (10th Cir. 2001).  Liability under § 1983

also requires more than mere negligence on the part of a supervisory defendant.  *Woodward v.*

*City of Worland,* 977 F.2d 1392, 1399 (10th Cir. 1992).  Instead, a plaintiff must show that a

supervisory defendant had actual knowledge of a substantial  risk of harm to the plaintiff.  *Id.*

In view of Mr. VanMeveren's substantial personal participation with the investigation

and prosecution of Mr. Masters as alleged in the Amended Complaint, I conclude that Mr.

Masters has adequately pled the required elements of supervisory liability under § 1983.  Careful

review of Mr. Masters' Amended Complaint further satisfies me that Mr. VanMeveren has fair

notice of the nature of Mr. Masters' claims against him and that a reasonable and plausible

inference can be drawn that Mr. VanMeveren is liable for his personal participation, exercise of

control or direction, and/or failure to supervise the misconduct alleged.  Mr. VanMeveren is,

therefore, not entitled to the dismissal of Mr. Masters' claims against him in his individual

capacity on the basis that there are insufficient allegations in the Amended Complaint to support

these claims.

### 2.  Absolute Prosecutorial Immunity

Mr. VanMeveren first argues that he is entitled to absolute immunity for any claims for

which his subordinates have absolute immunity.  I agree that Mr. VanMeveren is entitled to

absolute immunity to the same extent as Defendants Gilmore and Blair.  So Mr. VanMeveren is

absolutely immune for any role that he may have played in the preparation and filing of the

affidavit supporting the 1998 arrest warrant; the alleged failure to conduct an investigation of the

Hettrick murder independent of that of the FCPD; and conduct engaged in following the arrest of Mr. Masters and at trial with the sole exception of the alleged destruction of exculpatory evidence.  Like Defendants Gilmore and Blair, Mr.VanMeveren is also entitled to the dismissal of Mr. Masters' claims for false arrest and false imprisonment, which are predicated on conduct for which Mr. VanMeveren is absolutely immune and which fail to state a claim upon which relief may be granted.

Mr. VanMeveren next argues that he is entitled to absolute immunity for all claims predicated on his role as a supervisor responsible for training and creating and/or approving the general policies, practices, and customs that led to the alleged deprivations of Mr. Masters' rights under *Van de Kamp, supra.*  As previously noted, counsel for Mr. Masters has conceded that *Van de Kamp* likely precludes all such claims, and Mr. Masters is no longer pursuing these claims against Mr. VanMeveren.  Dismissal of all claims predicated on Mr. VanMeveren's role as a supervisor responsible for training and creating and/or approving the general policies, practices, and customs of the Eighth Judicial District is therefore appropriate.

### 3.  Statute of Limitations

Mr. VanMeveren "incorporate[s] and join[s] in the statute of limitations motion raised by other parties."  Defendants Gilmore and Blair argued only that Mr. Masters' Fourth and Fifth Claims for Relief for false arrest and false imprisonment were time-barred.  Because I dismissed these claims against these Defendants on alternative grounds of absolute immunity and failure to state a claim based on the warrant for Mr. Masters' arrest, it was unnecessary for me to address their arguments based on the applicable statute of limitations.  The same is true with respect to Mr. VanMeveren who is entitled to the dismissal of Mr. Masters' false arrest and false

imprisonment claims on the same grounds as Defendants Gilmore and Blair.

### 4. Summary

In conclusion then, Mr. VanMeveren is absolutely immune for any involvement he may have had in the preparation and filing of the affidavit supporting the 1998 arrest warrant; his alleged failure to conduct an investigation of the Hettrick murder independent of that of the FCPD; and for his conduct following the arrest of Mr. Masters and at trial with the sole exception of any involvement he may have had with the alleged destruction of exculpatory evidence.  Mr. VanMeveren's motion to dismiss does not assert qualified immunity so I have no occasion to consider whether he is entitled to qualified immunity on some or all of Mr. Masters' claims.

Mr. VanMeveren is entitled to the dismissal of all of Mr. Masters' claims that are predicated on Mr. VanMeveren's role as a supervisor responsible for training and creating and/or approving the general policies, practices, and customs of the Eighth Judicial District. *See* Amended Complaint, ¶¶ 266, 269, 270, 273, 286, 289, 290, 305, 308, 309, 342, 345 & 346.  Mr. VanMeveren is also entitled to the dismissal of Mr. Masters' claims for false arrest (Fourth Claim for Relief) and false imprisonment (Fifth Claim for Relief), which are predicated on conduct for which Mr. VanMeveren is absolutely immune and which fail to state a claim upon which relief may be granted.  Mr. Masters' remaining claims against Mr. VanMeveren will be limited consistent with my conclusions regarding the scope of Mr. VanMeveren's absolute immunity.

### D.  Defendant Abrahamson and Eighth Judicial District's Arguments for Dismissal

Mr. Masters' claims against Mr. Abrahamson in his official capacity are tantamount to

claims against the entity of which he is an agent.  *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985).  Mr. Abrahamson is therefore not entitled to absolute immunity for any of Mr. Masters' claims, *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166 (1993) (unlike government officials sued in their individual capacities, public entities do not enjoy absolute immunity under Section 1983), and I need only address Mr. Abrahamson's arguments that he, like the Eighth Judicial District, is entitled to Eleventh Amendment immunity for Mr. Masters' claims and that some of Mr. Masters' claims are barred by the applicable statute of limitations.

**1. Eleventh Amendment Immunity**

**a.  the Law of Eleventh Amendment Immunity**

The Eleventh Amendment bars actions for damages against a state in federal court. *Kentucky,* 473 U.S. 159, 169 (1985).  Eleventh Amendment immunity extends "to states and state entities but not to counties, municipalities, or other local government entities." *Steadfast Ins. Co. v. Agric. Ins. Co.,* 507 F.3d 1250, 1253 (10th Cir. 2007).  Whether a particular entity is entitled to Eleventh Amendment immunity depends on whether it is "an arm of the state." *Id.* An "arm of the state" is an entity that was created by state government and that operates as an alter ego or instrumentality of the state.  *Sturdevant v. Paulsen,* 218 F.3d 1160, 1164 (10th Cir. 2000).  "If a state entity is more like a political subdivision - such as a county or city - than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity." *Steadfast, supra.*

There are four primary factors to consider in determining whether an entity constitutes "an arm of the state:" (1) the character ascribed to the entity under state law; (2) the autonomy

accorded the entity under state law; (3) the entity's finances; and (4) whether the entity is concerned primarily with local or state affairs.  *Id.*

### b.  Mr. Abrahamson and Eighth Judicial District's Entitlement to Eleventh Amendment Immunity

Mr. Abrahamson argues that *Rozek v. Topolnicki,* 865 F.2d 1154, 1158 (10th Cir.1989), conclusively establishes that he is entitled to Eleventh Amendment immunity on Mr. Masters' claims against him in his official capacity.  In *Rozek*, the Tenth Circuit held that the "Office of the District Attorney" was entitled to Eleventh Amendment immunity.

In response, Mr. Masters notes that *Rozek* was decided before *Davidson v. Sandstrom,* 83 P.3d 648 (Colo. 2004) and no longer represents good law.  In *Davidson*, the Colorado Supreme Court considered whether state district attorneys are subject to term limits imposed by the state constitution on any "nonjudicial elected official of ... any [] political subdivision of the State of Colorado."  Resolution of this issue required the Colorado Supreme Court to determine whether judicial districts, in which state district attorneys serve, are political subdivisions of the state.

In concluding that judicial districts are political subdivisions of the state, the Colorado Supreme Court noted that a judicial district represents a finite geographical area and exists to provide judicial services to residents of that district and those who have transacted business there and that a district attorney is elected solely by the voters of their judicial district and answers only to them.  *Id.* at 656.  Although *Davidson* did not involve a question of Eleventh Amendment immunity, the Colorado Supreme Court cited *Sturdevant,* which did, in support of its determination that a judicial district is a political subdivision of the state.  *Id.  See also Strudevant,* 218 F.3d at 1170 ("... a fundamental characteristic of a political subdivision [is] political control by some community other than the state as a whole.").

The Tenth Circuit has recognized that deference should be given to the rationale of state court decisions regarding the status of a particular entity. *Sturdevant*, 218 F.3d at 1164. Thus, the Colorado Supreme Court's conclusion in *Davidson* that a judicial district is a political subdivision of the state is persuasive authority that it should be accorded the same status in my analysis of Eleventh Amendment immunity for Mr. Abrahamson and the Eighth Judicial District for which he serves. Furthermore, the Colorado Supreme Court's analysis in *Davidson* reflects other factors identified as relevant by the Tenth Circuit in determining an entity's status including its focus on matters of local concern. *See Steadfast, supra.*

I therefore conclude that *Davidson* dictates that neither the Eighth Judicial District nor Mr. Abrahamson are entitled to Eleventh Amendment immunity for the claims asserted against them. I further note that the Eighth Judicial District has cited no legal authority to support its contention that it is not a sueable entity.

### 2. Statute of Limitations

Because Mr. Abrahamson and the Eighth Judicial District, like the other DA Defendants, are entitled to the dismissal of Mr. Masters' false arrest and false imprisonment claims for failure to state a claim upon which relief may be granted, I need not address the statute of limitations arguments made by other DA Defendants and joined in by these Defendants with respect to these claims.

### 3. Summary

Mr. Abrahamson and the Eighth Judicial District are entitled to the dismissal of Mr. Masters' claims for false arrest (Fourth Claim for Relief) and false imprisonment (Fifth Claim for Relief) for failure to state a claim upon which relief may be granted. Because Mr. Masters'

claims against Mr. Abrahamson and the Eighth Judicial District do not entail individual liability under § 1983, none of the limitations recognized on the remaining claims against the other DA Defendants are applicable to these Defendants.

For the reasons set forth above, IT IS HEREBY ORDERED that

1.   Defendant Terence Gilmore's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) [Doc # 35] is GRANTED IN PART and DENIED IN PART;

a.   Plaintiff's Fourth Claim for Relief (unreasonable seizure/arrest without probable cause under § 1983) and Fifth Claim for Relief (false imprisonment under §1983) against Mr. Gilmore are DISMISSED WITH PREJUDICE;

b.   Plaintiff's remaining claims against Mr. Gilmore shall be limited to his conduct prior to the preparation of the warrant and supporting affidavit for Mr. Masters' arrest except that Plaintiff can maintain claims against Mr. Gilmore for the destruction of evidence including material exculpatory evidence of viable alternative suspects regardless of when the alleged destruction occurred; and

c.   Plaintiff's allegation that Mr. Gilmore failed to conduct an investigation of the Hettrick murder independent of that of the FCPD cannot be used to support any of his remaining claims;

2.   Defendant Jolene Blair's Motion to Dismiss [Doc # 32] is GRANTED IN PART and DENIED IN PART;

a.   Plaintiff's Fourth Claim for Relief (unreasonable seizure/arrest without probable cause under § 1983 and Fifth Claim for Relief (false imprisonment under § 1983) against Ms. Blair are DISMISSED WITH PREJUDICE;

b.  Plaintiff's remaining claims against Ms. Blair shall be limited to her conduct prior to the preparation of the warrant and supporting affidavit for Mr. Masters' arrest except that Plaintiff can maintain claims against Ms. Blair for the destruction of evidence regardless of when the alleged destruction occurred; and

c.  Plaintiff's allegation that Ms. Blair failed to conduct an investigation of the Hettrick murder independent of that of the FCPD cannot be used to support any of his remaining claims; and

3.  Defendants Eighth Judicial District, Stuart VanMeveren, and Larry Abrahamson's Rule 12(b)(6) Motion to Dismiss [Doc # 29] is GRANTED IN PART and DENIED IN PART;

a.  Plaintiff's Fourth Claim for Relief (unreasonable seizure/arrest without probable cause under § 1983) and Fifth Claim for Relief (false imprisonment under § 1983) against Mr. VanMeveren are DISMISSED WITH PREJUDICE;

b.  Plaintiff's claims against Mr. VanMeveren based on his role as a supervisor generally responsible for training and creating and/or approving the general policies, practices and customs of the Eighth Judicial District are DISMISSED WITH PREJUDICE; and

c.  Plaintiff's remaining claims against Mr. VanMeveren shall be limited to his conduct prior to the preparation of the warrant and supporting affidavit for Mr. Masters' arrest with the exception that Plaintiff can maintain claims against Mr. VanMeveren relating to the destruction of evidence regardless of when the alleged destruction occurred;

d.  Plaintiff's allegations that the DA's Office failed to conduct an investigation of the Hettrick murder independent of that of the FCPD cannot be used to support any of his remaining claims against Mr. VanMeveren;

e.  Plaintiff's Fourth Claim for Relief (unreasonable seizure/arrest without probable cause under § 1983) and Fifth Claim for Relief (false imprisonment under § 1983) against the Eighth Judicial District and Mr. Abrahamson are DISMISSED WITH PREJUDICE; and

f.  Because Mr. Masters' claims against Mr. Abrahamson and the Eighth Judicial District do not entail individual liability under § 1983, none of the limitations recognized on the remaining claims against the other DA Defendants based on absolute immunity are applicable to the remaining claims against these Defendants.

Dated: October  5 , 2009 in Denver, Colorado.

BY THE COURT:

    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE